UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| THOMAS MCNIFF,<br>        Plaintiff<br><br>v.<br><br>TOWN OF DRACUT,<br>        Defendant | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 05CV10238 RBC<br>)<br>)<br>)<br>) |

## DEFENDANT'S LOCAL RULE 56.1 CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to L.R. 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, the Defendant Town of Dracut submits the following concise statement of the material facts of record as to which Defendant contends there is no genuine issue to be tried:

### Waiver of Count IV Equal Protection Claim

1.    Plaintiff has expressly waived his claims under Count IV for Equal Protection. See Pl.'s Int. Ans. No.s 15 & 21 (stating Plaintiff no longer contends the adverse action was based on age; and no longer contends the Defendant violated the Equal Protection clause) (attached hereto as **Exhibit A**); see also Pl.'s Depo. pp. 207-208 (attached hereto as **Exhibit B**).

### Background

2.    Louis Panas is former Police Chief for Town of Dracut, having served nineteen years in that position from 1986 until his retirement on February 19, 2005. See L. Panas Aff. ¶¶ 2, 4 (attached hereto as **Exhibit C**).

3.    Thomas McNiff is a Captain in the Dracut Police Department, and is a member of the local union. See Pl.'s Depo. pp. 21-22.

4.    Dennis Piendak, the Town Manager, is the appointing authority for the Position of Police

Chief (and Provisional Police Chief) for the Town of Dracut, such appointments subject to the approval of the Board of Selectmen.  See D. Piendak Aff. ¶ 4 (attached hereto as **Exhibit D**).

**Plaintiff's Cancer Treatments**

5.      The Plaintiff contends that his "disability" was having suffered from prostate cancer.  See Pl.'s Ans. Interrog. No. 8.

6.      At his deposition, Plaintiff also identified having suffered from skin cancer on his nose as a basis of his disability claim.  See Pl.'s Depo. p. 180.

7.      Plaintiff stated his prostate cancer surgery and recuperation caused him to miss approximately 36 days from work.  See Pl.'s Depo. pp. 112-113.

8.      This recuperation time was due to having a catheter for two weeks and recovering from "major surgery."  See Pl.'s Depo. pp. 113-114.

9.      His cancer treatments did not require radiation or chemotherapy.  See Pl.'s Depo. p. 113.

10.     Plaintiff's skin cancer on his nose required four hours of outpatient surgery, followed by two weeks of wearing bandages on his nose, the removal of stitches and follow-up laser surgery to reduce the scarring.  See Pl.'s Depo. pp. 100-102.

11.     Plaintiff estimates he missed a total of 10 to 20 days from work due to the nose surgery for skin cancer.  See Pl.'s Depo. p. 103.

12.     Upon his return to work after the nose surgery he never advised his employers that he needed any accommodations to do his job, nor that he was limited in his abilities in any way.  See Pl.'s Depo. pp. 117; 184.

13.     Other than the two cancer surgeries, Plaintiff did not suffer from any other medical requiring

him to take extended sick leave. <u>See</u> Pl.'s Depo. pp. 117-118.

14.    The Town was not aware of the Plaintiff suffering from prostate cancer until after the filing

of a lawsuit in this case. <u>See</u> Aff. of L. Panas ¶ 8; Aff. of D. Piendak at ¶ 14.

15.    Plaintiff acknowledged during his deposition that he did not tell his employers that he

suffered from prostate cancer. <u>See</u> Pl.'s Depo. pp. 109-110.

16.    Plaintiff did not provide any further information other than that he would be out for

"surgery," because he "felt that it was a private matter and didn't want to discuss it with

them." <u>See</u> Pl.'s Depo. pp. 108-109.

17.    Plaintiff instructed his Doctors <u>not</u> to advise his employers of the reason for his surgery. <u>See</u>

<u>Id.</u> at p. 109.

18.    Furthermore, his doctors notes concerning the surgery and stating he could return to work

as of October 12, do not indicate that he could not perform the essential functions of his job.

<u>See</u> F. McGovern, M.D. Ltrs. dtd. 8/18/04 & 9/8/04 (attached hereto as **Exhibit E**).

19.    The Plaintiff's surgery for skin cancer on his nose was sudden, and Plaintiff asked his wife

to inform the Chief immediately after the surgery. <u>See</u> Pl.'s Depo. pp. 103-104 (stating

Plaintiff's wife told Chief Panas right after the surgery).

20.    Plaintiff testified he missed 36 days from work due to prostate cancer, and 10-20 days due

to his skin cancer. <u>See</u> Pl.'s Depo. pp. 103, 112-113.

21.    Plaintiff's current position with the Town of Dracut Police Department is as the police

prosecutor assigned to Lowell District Court. <u>See</u> Pl.'s Depo. p. 30.

22.    Plaintiff works weekdays from 7 a.m. to 3 p.m., and has filled that role since 1999. <u>See</u> Pl.'s

Depo. pp. 30; 32.

23.    Although Plaintiff would only concede that he was "close" to being able to function the same as he could before the prostate cancer surgery, he explained that he did not "want to wrestle with anybody." See Pl.'s Depo. pp. 114-115.

24.    Plaintiff admitted that as the Department's prosecuting Court Officer he was not required to physically handle prisoners. See Pl.'s Depo. pp. 114-115.

25.    Upon his return to duty, Plaintiff acknowledged that he did not advise his employers that he had any limitations on his return to work. See Pl.'s Depo. p. 117.

26.    Nor did Plaintiff request any accommodations from his employer. See Pl.'s Depo. p. 117.

27.    Plaintiff acknowledged that today he has a good working relationship with incumbent Chief Richardson and Plaintiff is able to complete his job duties. See Pl.'s Depo. p. 169.

**Legitimate Non-Discriminatory Grounds for Bypassing Plaintiff as Provisional Chief**

### *Plaintiff Previously Announced His Own Retirement*

28.    On December 3, 2002, Plaintiff submitted his letter of retirement indicating his intent to retire on December 31, 2004. See T. McNiff Ltr. dtd. 12/03/02 (attached hereto as **Exhibit F**).

29.    By way of this letter providing advanced notice of his retirement, Plaintiff requested a 7.5% increase to his pay as provided under the existing Union contract. See Id.

30.    The Plaintiff, in his letter of retirement requested the pay increase, noted his entitlement to a sick leave buy back of his remaining sick days, and noted his entitlement to payment for his accumulated comp time. See Id.

31.    Plaintiff, in fact, received the additional pay. See Pl.'s Depo. pp. 34-35.

32.    By letter dated June 9, 2004, Police Chief Panas announced his intent to retire from that

position. See L. Panas Ltr. dtd. 06/09/04 (attached to D. Piendak Aff. as **Exhibit 1**).

33.   Although Chief Panas letter specified a date certain for his retirement (September 18, 2004), in subsequent discussions with the Town Manager, Chief Panas agreed to an open-ended retirement date dependent upon the Town appointing his successor. See L. Panas Depo. p. 59 (attached hereto as **Exhibit G**); see also D. Piendak Aff. ¶ 6.

34.   Plaintiff only reconsidered his earlier decision to retire after hearing that Chief Panas announced his retirement. See Pl.'s Depo. p. 38.

35.   Plaintiff acknowledged that he never informed Chief Panas of his intent to withdraw Plaintiff's own resignation at any time prior to Plaintiff's letter of December 22, 2004. See Pl.'s Depo. pp. 95-96.

36.   Plaintiff told the Town Manager that he would agree to pay back the retirement benefits he received and later met with the Town Accountant and agreed to pay back approximately $5000. See Pl.'s Depo. pp. 47-49; see also T. McNiff Check No. 2161 dtd. 01/19/05 (attached hereto as **Exhibit H**).

37.   It was not until Plaintiff submitted a written notice of his intent to withdraw his resignation in December 2004 that the Town calculated the amount Plaintiff would be required to reimburse the Town for his 7.5 % retirement raise. See A. Vandall Ltr. dtd. 01/11/05 (attached to D. Piendak Aff. as **Exhibit 7**).

38.   Upon Chief Panas' eventual retirement in February 2005, Lieutenant Kevin Richardson was appointed to the position of Provisional Police Chief. See L. Panas Depo. p. 65.

### *Excessive Use of Sick Leave*

39.   At the time Plaintiff gave notice of his own retirement, Plaintiff had accumulated

approximately 250 days of sick leave.  See Pl.'s Verified Compl. ¶ 11; see also Pl.'s Depo. pp. 41-42.

40.  Plaintiff acknowledged at his deposition that his sick leave usage decreased his balance of sick days from about 250 to 128 days at the time of the appointment of the Provisional Chief. See Pl.'s Depo. pp. 139-140.

41.  Under his collective bargaining agreement, Plaintiff could be reimbursed for up to 120 sick days at the time of his retirement.  See Pl.'s Depo. p. 140.

42.  Plaintiff's use of sick time reflects that from January 29, 2002 to November 2004 he took 152 sick days, 37 of which could be justified by a doctor's note for surgery, leaving 113 sick days unexplained.  See Printout of T. McNiff Sick Day Usage (attached to D. Piendak Aff. as **Exhibit 5**).

43.  A comparison of the sick days used with subsequent overtime shifts during the years 2002 through 2004 shows a clear pattern of usage of multiple sick days in the middle of the week permitting work on overtime shifts on the weekends without violating the Department's rule prohibiting assignment to Overtime or Paid Detail Shifts within two days of a sick day.  See List of T. McNiff  Sick Days and Overtime Shifts (attached to D. Piendak Aff. as **Exhibit 6**); see also L. Panas Depo. p. 85.

44.  The two written notes by Plaintiff's doctor McGovern were the only written documentation received by the Town for Plaintiff's use of sick days from January 2002 through November 2004.  See Aff. of L. Panas ¶ 14.

45.  Neither letter indicates the exact reason for Plaintiff's usage of sick time and do not explain Plaintiff's usage of sick time before and after the time period of August 25 to October 12,

2004. See F. McGovern, M.D. Ltrs. dtd. 8/18/04 & 9/8/04.

46.    Plaintiff testified that for other days he took off as a sick day he would call in sick to the

Department, but that he did not always state the reason he was out sick, explaining

"sometimes I did, sometimes I didn't." See Pl.'s Depo. pp. 176-178.

### *Violation of the Conflict of Interest Law*

47.    Chief Panas issued a letter of reprimand to Plaintiff in 1997 for his conduct regarding the

personnel records of his wife, who was an employee of the Dracut Police Department, which

conduct the Chief deemed a violation of the conflict of interest laws. See L. Panas Ltr. dtd.

06/09/97 (attached to L. Panas Aff. as **Exhibit 2**).

48.    The Chief's investigation concluded that Plaintiff, acting as a Provisional Deputy Chief,

instructed a Sergeant to make changes to Plaintiff's wife's sick time accrual records. Id.; see

also L. Panas Depo. pp. 27-34.

49.    By letter dated October 16, 1997, the Massachusetts State Ethics Commission advised

Plaintiff it concluded he had "violated the conflict of interest laws" but in lieu of a formal

inquiry the Commission deemed its confidential letter sufficient to ensure Plaintiff's future

compliance with the law. See Mass. Ethics Comm'n Ltr. dtd. 10/16/97 (Please see **Exhibit**

**I**, which is being filed with the Court under separate cover due to its being marked

"Confidential" by the Commission).

50.    Plaintiff did not take a grievance with his union concerning the issuance of the letter of

reprimand from Chief Panas. See Pl.'s Depo. p. 143.

### *Violations of Dracut Police Department Rules and Regulations*

51.    On September 10, 1999, Chief Panas issued a three day suspension to Plaintiff because the

Chief determined Plaintiff failed to take suitable and appropriate police action on June 2, 1999 and June 17, 1999. See L. Panas. Ltr. dtd. 09/10/99 (attached to L. Panas Aff. as **Exhibit 2**).

52. For the June 2, 1999 incident, the Chief disciplined Plaintiff because the Chief found Plaintiff did not report and did not allow another officer and the duty dispatcher to report "an incident that could of had some relevance to an important police investigation." Id.

53. For the June 17, 1999 incident, the Chief disciplined Plaintiff because the Chief found Plaintiff told an officer to not arrest an individual with an outstanding warrant for (1) assault, and (2) threatening to commit a crime. Instead he told the officer to have the individual turn himself in at a later date. Id.

54. Plaintiff appealed the suspension to through to the Civil Service Commission. See Pl.'s Depo. pp. 155-156.

55. The three day suspension was upheld by after hearing by the Civil Service Commission in a six page decision. See McNiff v. Dracut Police Dept., Mass. Civil Svc. Commn. No. D-99-800, Decision dtd. 12/06/00 (attached hereto as **Exhibit J**); see also Pl.'s Depo. p. 156.

### *Plaintiff's Disinterest in Leadership Position*

56. On August, 29, 2003, Chief Panas posted a notice, on the Union Bulletin Board, advertising that a position of Provisional Deputy Police Chief was open to application by any Captain or Lieutenant. See Dracut Police Dept. Notice of Position dtd. 08/29/03 (attached hereto as **Exhibit K**).

57. The only person who showed interest by signing the posting was Lieutenant Kevin Richardson. See Id.

58.    Chief Panas perceived Plaintiff's failure to sign up for the Provisional Deputy Chief's position as an expression of lack of interest in a leadership position in the Department.  <u>See</u> L. Panas. Aff. ¶ 25.

59.    The Plaintiff acknowledged he did not sign up for the position and explained he "wasn't interested in it" and "had filled the position as acting deputy for four years ... and just wasn't interested in taking it again." <u>See</u> Pl.'s Depo. pp. 23-24.

### *Availability of a More Qualified Employee*

60.    Lieutenant Richardson does not have a record of discipline and has no pattern of sick time abuse. <u>See</u> L. Panas Ltr. dtd. 11/16/04 (attached to L. Panas Aff. as **Exhibit 1**).

61.    Additionally, he has an extensive resume that included working for Dracut since January of 1985 and on September 21, 2003 Lieutenant Richardson was promoted to the rank of provisional Deputy Chief. <u>Id.</u>

62.    While serving in this capacity, Lieutenant Richardson has impressed Chief Panas and has demonstrated to both the Chief and Town Manager Piendak that he has the "diverse skills and management ability required to serve as Chief of the Police Department." <u>See</u> L. Panas Ltr. dtd. 11/16/04 (attached to L. Panas Aff. as **Exhibit 1**); <u>see also</u> D. Piendak & L. Panas Memo dtd. 11/30/04 (attached to D. Piendak Aff. as **Exhibit 3**).

63.    Plaintiff sat for the four hour long civil service exam for the Dracut Police Chief's position in May 2005. <u>See</u> Pl.'s Depo. pp. 73-74.

64.    Plaintiff did not pass the exam, receiving less than the 70 points needed to pass. <u>See</u> Pl.'s Depo. pp. 74-75.

65.    Plaintiff acknowledged that he was not eligible for the permanent Police Chief's position

given that he did not pass the civil service exam for that position. <u>See</u> Pl.'s Depo. pp. 165-166.

**Plaintiff Failed to Exhaust his Administrative Remedies**

66.    Prior to bringing this action, Plaintiff never filed a claim before the Massachusetts Commission Against Discrimination alleging discrimination by the Town of Dracut.

67.    Plaintiff's Appealed of the Civil Service Unit's Approval of the bypass decision to the full Civil Service commission. <u>See</u> Bypass Appeal Form dtd. 02/07/05 (attached hereto as **Exhibit L**); Pl.'s Depo. pp. 87-88.

68.    This Civil Service Appeal was still pending at the time Plaintiff filed the present lawsuit, and as of the date of Plaintiff's deposition in this case in September 2005. <u>See</u> Pl.'s Depo. pp. 79; 185-186.

Respectfully Submitted,

The Defendant,
TOWN OF DRACUT
By its Attorneys,

PIERCE, DAVIS & PERRITANO, LLP

John J. Cloherty III, BBO # 566522
Ten Winthrop Square
Boston, MA  02110
(617) 350-0950

<u>CERTIFICATE OF SERVICE</u>
I hereby certify that on this day a true copy of the
above document was served upon each attorney of
record, or pro se litigant, by electronic mail.

/Date

-10-

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

THOMAS MCNIFF,
         Plaintiff

                         C.A. No.:  05CV10238 RBC

v.

TOWN OF DRACUT,
         Defendant

### PLAINTIFF, THOMAS MCNIFF'S RESPONSE TO DEFENDANT, TOWN OF DRACUT'S, FIRST SET OF INTERROGATORIES

1.     Please state your name, address, date of birth, social security number,

occupation, marital status, name of spouse and spouse's occupation, name and

ages of any children.

Answer:
Thomas McNiff  D/O/B 4-26-49
6 Independence Drive
Tyngsboro, MA
ss# 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

Carol McNiff – wife
Retired

Children: Andrew 22 and Nicole 24

2.     Identify (a) each person (other than Plaintiff's attorneys) with whom

Plaintiff has discussed any of the Incidents alleged in his Complaint; (b) the date,

place and means (e.g., telephone, face-to-face conversation, e-mail) or each such

1


EXHIBIT 20
T. McNiff
9/2/05

discussion; (c) the substance of each such discussion; and (d) any other persons who were present during each such discussion.

2.  Answer:  Objection as being over burdensome.  By further answer the plaintiff states that he has had numerous conversations with numerous individuals on numerous dates. The conversations on generally face to face and specifically involved my appointment as interim chief.  Persons involved in those discussions were Dennis Piendak, Tony Archinski, James O'Loughlin, Joseph Dirocco, Doug Willette, Warren Shaw, Jack Ditullio and Louis Panas.  Numerous other people would ask about the interim position in general terms.

3.      Set forth in full detail all Plaintiff's injuries, ailments, pains or damages (physical or otherwise) he claims to have suffered as a result of the Incidents alleged in the Complaint, including the nature and extent for how long it has lasted an a computation of the damages he is seeking through this Complaint, including all data, assumptions and hypotheses on which such computation is based; if you claim to suffer lost wages, please specify the dates of such lost wages and amounts; if you claim lost earning capacity please specify the facts and circumstances and the manner in which you have suffered a lost earning capacity.

Answer:  The damages incurred by the plaintiff are lost wages in the difference between the position of chief and captain of the Dracut Police force for the interim period commencing September 1, 2004 to the future date of the appointment of a

permanent chief. Further damages included the amount of retirement income, which would have been received by averaging the last three years of service.

4.     Identify each person whom Plaintiff expects to call as a fact witness at the trial in this case, and with respect to each such witness, state (a) the witness' name and home and business addresses and telephone numbers, (b) the witness' business or occupation and job title, and (c) the substance of the testimony that the witness is expected to provide.

Answer:  The plaintiff may call the following witnesses:

Thomas McNiff - will testify as to this suitability for the position of interim chief.

Dennis Piendak – will attempt to support his position of unsuitability.

Louis Panas  - will attempt to support his position that Thomas McNiff is a suitable candidate to be interim chief.

Selectman Joseph DiRocco, Douglas Willette and James O'Laughlin – will testify as to the suitability of the plaintiff as interim chief.

Police Officers – Tony Archinski, Steve Chaput, Lennie Wagner, James Wagner, David O'Brien, Paul Charbonneau, Jerry Suprenant, and Mark Gosslin – will testify as to the suitability of the plaintiff as interim chief.

Dr. Massacotte – a Chelmsford oncologist.

Dr. Pickel – Lowell primary care physician.

Sergeant Martin Conroy of the Billerica Police Department – will testify as to a hearing with Louis Panas regarding sick leave for the plaintiff.

The plaintiff reserves the right to supplement his witness list prior to trial.

5.      Identify each person whom Plaintiff expects to call as an expert witness at the trial in this case, and with respect to each such expert witness, state:

  a.  The expert's name and home and business addresses and telephone numbers;

  b.  The expert's business or occupation;

  c.  The expert's title or position and the name and address of the entity by which he or she is employed, or through which the expert otherwise carries on his or his business or occupation;

  d.  The substance of the opinions to which the expert is expected to testify; and

  e.  A summary of the grounds for each of the expert's expected opinions.

Answer:  The plaintiff has not retained an expert but does intend to retain an actuary to calculate the lost retirement benefits.  The plaintiff will notify the defendant on a timely basis as to the identity of his expert (s) and the substance of their testimony.

6.      Set forth in full detail the sum and substance of any unrecorded oral statements you believe you may have made to the Defendant (or employees, or

former employee, of the Defendant) concerning the Incidents alleged in the

Complaint and, of the injuries (or damages) alleged in the Complaint, or which

you intend to use for any purpose in the litigation.

Answer: The defendant objects as being overly broad. By way of further answer

the plaintiff states the following: Dennis Piendak – a conversation involving the

plaintiff expressed his desire to be interim chief. This conversation occurred in

June of 2004. Further conversations with Piendak in August regarding the

plaintiff's pending surgery, the position of interim chief and the buy back

requirements. Further conversations with Louis Panas and James O'Laughlin

occurred in April of 2004 regarding pending surgery.

The plaintiff reserves the right to supplement any unrecordable statements prior to

trial.

7.    Please state each and every date on which you were examined or treated by

any doctor, physician or medical practitioner with respect to any injury, illness

(including mental or emotional harm) or disability which you claim to have

sustained as a result of the alleged Incidents, setting forth in detail as to each such

date of examination or treatment.

    a. The name and address of each such doctor, physician or medical

        practitioner;

    b. The nature and extent of the examination or treatment received from each such doctor, physician or medical practitioner;

    c. The diagnosis or prognosis made by each doctor, physician or medical practitioner; and

    d. An itemized list of each charge made to you or any other person or organization for your account by each doctor, physician or medical practitioner.

Answer: The plaintiff does not claim any physical or mental injury as a result of not being appointed interim chief.

8. Please identify and describe the "disability" under which you were suffering at any time while you were employed by the Defendant, the dates when and how you first became aware of this disability, and the length of time you continued to suffer from the disability.

Answer: The plaintiff first became aware of his prostate cancer in April 2004. The plaintiff remains in the care of doctors for prostate cancer.

9. Please identify in complete detail any and all medical providers from whom you sought treatment for your disability identified in interrogatory number 8, including who referred you to each medical provider and the date(s) of treatment or conclusion.

6

Answer:  Dr. Pickel, Dr. Masscotte, Massachusetts General Hospital, and Dr. McGovern.

10.    Please state if you ever advised the Defendant or their agents that you suffered from the disability identified in interrogatory number 8, and if so, whom you advised, the date and manner such information was provided, and exactly what you informed the Defendant or their agents.

Answer:  The plaintiff did not advise the defendant as to the exact disability in interrogatory number 8.

11.    Please state if you were ever advised by a medical provider that you could not perform the essential functions of your job with the Defendant without reasonable accommodations based on the disability identified in interrogatory number 8, and if so, whom you advised, the date and manner such information was provided.

Answer:  The plaintiff was not told by any medical provider that he could not work without reasonable accommodation.

12.    Please state if you ever informed the Defendant or its agents that you required accommodations, as a result of the disability identified in interrogatory number 8, in order for you to perform the essential functions of your job with the Defendant, and if so, whom you advised, the date and manner such information was provided, and exactly what you informed the Defendant or their agents.

7

Answer:  The plaintiff did not inform the defendant about any required accommodations.

13.    Please state, in full and complete detail, the reasons for each instance of sick leave or sick days taken or requested by you for the time period in January 1, 2002 and ending in December 31, 2004, including but not limited to why you requested sick leave or sick days.

Answer:  Sick leave was used primarily for an operation involving prostate cancer and skin cancer.

14.    Please state each and every date on which you were examined or treated by any doctor, physician or medical practitioner with respect to your sick leave or sick days taken by you during the time period starting in January 1, 2002 and ending in December 31, 2004, setting forth in detail as to each such date of examination or treatment:

   a.  The name and address of each such doctor, physician or medical practitioner;

Answer:  Dr. Seth Kates          Dr. Thomas Rohever
         3 Village Square        955 Main Street
         Chelmsford, MA          Winchester, MA

         Dr. Francis McGovern
         1 Hawthorne Place
         Boston, MA

b.  The nature and extent of the examination or treatment received from

each such doctor, physician or medical practitioner;

Answer:  1)  Removal of skin cancer from nose; 2)  Operation for prostrate

cancer.

c.  The diagnosis or prognosis made by each such doctor, physician or

medical practitioner; and

Answer:  Skin and prostrate cancer

d.  An itemized list of each charge made to you or to any other person or

organization on your behalf by each such doctor, physician or medical

practitioner.

Answer:  All treating physicians are listed with name and address on

document request 8.

15.    Please identify any improper adverse employment action you allege the

Defendant took against you, specifying the date of such employment action and

the person you allege took such employment action.

Answer:  On November 30, 2004 the plaintiff discovered a letter dated November

30, 2004 regarding sick leave, which was derogatory in nature.  The letter was in

his personnel file.  On or about January 15, 2005 the plaintiff was passed over for

appointment as interim chief.

The plaintiff reserves the right to supplement his answer regarding adverse employment action prior to trial.

16.    For each and every adverse employment action identified in interrogatory number 15, please state the facts upon which you base your contention that the adverse employment action was taken based on your age.

Answer:  The plaintiff no longer contends that the adverse employment action was based on age.

17.    For each and every adverse employment action identified in interrogatory number 15, please state the facts upon which you base your contention that the adverse employment action was taken based on your having a disability or handicap.

Answer:  The Plaintiff was on extended sick leave due to prostate cancer.  The Town Manager used the sick leave to determine the plaintiff as being unsuitable.

18.    Please state in full and complete detail all the facts upon which you base your allegations of Count I "Mass. Gen. L. 151, Sec 4 (16)" of the Complaint "that the Defendant has discriminated against [Plaintiff] in violation of the Massachusetts General Laws" including (a) identifying the agents/servant/employees of the defendant involved in this alleged discrimination, (b) the sum and substance of the occurrence(s) that constituted this alleged discrimination, (c) the date, place and means (e.g., telephone, face-to-face

conversation, e-mail) of any occurrences that constituted this alleged

discrimination; and (d) any complains filed, or redress sought, for your employer

or any administrative agency for the alleged discrimination.

Answer:  Dennis Piendak and Louis Panas were the agents of the defendant who

discriminated against the plaintiff.  The discrimination occurred when Lieutenant

Richardson was appointed interim chief when the statutory scheme in effect

pursuant to Mass.Gen.L. 151, § 4(16) required that the plaintiff be appointed.

19.    Please state in full and complete detail all the facts upon which you base

your allegations of Count II "Article CXIV" of the Complaint in which you allege

"that the Town of Dracut has violated the rights of the Plaintiff guaranteed under

the Constitution of the Commonwealth of Massachusetts" including (a) identifying

the agents/servants/employees of the defendant involved in this alleged violation

of "the rights of the Plaintiff guaranteed under the Constitution of the

Commonwealth of Massachusetts," (b) the sum and substance of the occurrences

that constituted this alleged violation of "the rights of the Plaintiff guaranteed

under the Constitution of the Commonwealth of Massachusetts," (c) the date,

place means (e.g., telephone, face-to-face conversation, e-mail) of the occurrences

that constituted this alleged violation of "the rights of the Plaintiff guaranteed

under the Constitution of the Commonwealth of Massachusetts."

Answer: Dennis Piendak by appointing Lieutenant Kevin Richardson as interim

chief for the Town of Dracut denied the plaintiff a property right, which he

possessed and is protected by both the United States Constitution and

Massachusetts Constitution.

20.    Please state in full and complete detail all the facts upon which you base

your allegations of Count III "Americans with Disability Act" of the Complaint

that Defendants violated the Americans with Disability Act with respect to

Plaintiff including (a) identifying the agents/servants/employees of the defendant

involved in this alleged violation of the "Americans with Disability Act," (b) the

sum and substance of the occurrences that constituted this alleged violation of the

"Americans with Disability Act," (c) the date, place and means (e.g., telephone,

face-to-face conversation, e-mail) of the occurrences that constituted this alleged

violation of the "Americans with Disability Act."

Answer: The plaintiff had a disability, prostate cancer, which required him to use

sick leave. The Town Manager used the sick leave as the sole reason for

determining the plaintiff as being "unsuitable."

21.    Please state in full and complete detail all the fact upon which you base your

allegations of Count IV "Equal Protection Clause" of the Complaint that "The

Plaintiff is being treated by the Town of Dracut in violation of both the United

State Constitution made applicable to the States pursuant to the Fourteenth

Amendment and the Massachusetts Constitution, both of which prohibit

discrimination based upon age," including (a) identifying the

agents/servants/employees of the defendant involved in this alleged violation of

Equal Protection, (b) the sum and substance of the occurrences that constituted

this alleged violation of Equal Protection, (c) the date, place and means (e.g.,

telephone, face-to-face conversation, e-mail) of the occurrences that constituted

this alleged violation of Equal Protection, (d) identify the names, addresses, and

job titles of all person(s) you claim were similarly situation but treated differently

than you, (e) identify the facts, circumstances and evidence of any custom, policy

or practice of the Defendant that you contend caused the violation of Equal

Protection.

Answer:  The plaintiff no longer contends that the defendant committed a

violation of the "Equal Protection Clause."

22.    Please state in full and complete detail all the facts upon which you base

your allegations of Count V "Violation Mass. Gen. L. C.31, sec. 15" of the

Complaint, including (a) identifying the agents/servants/employees of the

defendant involved in this alleged violation of "Mass. Gen. L. C.31, sec. 15," (b)

the sum and substance of the occurrences that constituted this alleged violation of

"Mass. Gen. L. C.31, sec. 15," (c) the date, place and means (e.g., telephone, face-

to-face conversation, e-mail) of the occurrences that constituted this alleged

violation of "Mass. Gen. L. C.31, sec. 15."

Answer: Dennis Piendak and Louis Panas were the agents of the defendant who

discriminated against the plaintiff. The discrimination occurred when Lieutenant

Richardson was appointed interim chief when the statutory scheme in effect

pursuant to Mass.Gen.L. 151, § 4(16) required that the plaintiff be appointed.


23.    Please state in full and complete detail all the facts upon which you base

your allegations as alleged in paragraph 16 ("The Board of Selectmen of the Town

of Dracut notified the Town Manager that they anticipated and would approve

pursuant to Civil Service Regulations the appointment of the Plaintiff as the

interim chief") of the Complaint.

Answer:  During the months of November and December of 2004, the Board of

Selectman spoke with the town manager regarding the plaintiff and the position of

interim chief.  Members of the Board of Selectman advised the Town Manager

that the Board anticipated that the plaintiff would be appointed interim chief.

24.    Please state in full and complete detail all facts upon which Plaintiff bases

his allegations of injuries, ailments, pains or damages, as alleged in Counts I, II,

III, IV & V of the Complaint.

Answer:  The plaintiff incurred a financial loss due to not being appointed interim chief.

25.    Please describe in full and complete detail the facts and circumstances upon which you base your allegation that you were a "qualified individual" to become "interim chief," including but not limited to describing in full and complete detail your employment history, including your employment history with Defendant, specifying the employer's name and address, your dates of employment, and reasons for discontinuing your employment, any and all disciplinary actions brought against you at each employment and any and all commendations awarded to you at each employment.

Answer:  The plaintiff was the most senior ranking officer in the department and therefore was the most "qualified" individual.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 4th DAY OF AUGUST 2005.

08/04/05

The Plaintiff,
THOMAS MCNIFF,

_Thomas M. Mcn____

CERTIFICATE OF SERVICE
I hereby certify that on this day
a true copy of the above document
was served upon each attorney of
record, or pre se litigant, by hand/mail)
08/04/05  Cheryl Laurence
date

15

EXHIBIT "B"

1

```
1                                    VOLUME: I
                                     PAGES: 1-220
2                                    EXHIBITS:  1-20

3
                   UNITED STATES DISTRICT COURT
4                  COMMONWEALTH OF MASSACHUSETTS

5
                           C.A. NO. 05CV10238 RBC
6

7    * * * * * * * * * * * * * * * * * * * * * * * * * * * *
     THOMAS MCNIFF,                          *
8           Plaintiff,                       *
                                             *
9        vs.                                 *
                                             *
10   TOWN OF DRACUT,                         *
            Defendant.                       *
11   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12
            DEPOSITION OF THOMAS MCNIFF, a witness
13   called on behalf of the Defendant, taken
     pursuant to Massachusetts Rules of Civil
14   Procedure, before Darlene Caiazzo Sousa,
     Registered Professional Reporter and Notary
15   Public in and for the Commonwealth of
     Massachusetts, at the law offices of Pierce,
16   Davis & Perritano, 10 Winthrop Square, Boston,
     Massachusetts, on Friday, September 2, 2005,
17   commencing at 10:10 a.m.

18

19

20

21

22
                    CURRAN COURT REPORTING
23                    21 Rowe Hill Road
                  Stoneham, Massachusetts 02180
24                      (781) 279-8400
```

1        A.      Yes.

2        Q.      How many other officers did it affect?

3        A.      Let's see, there was Kevin Richardson,

Tony Archinski.  Tony Archinski and Kevin

Richardson were two that were also reduced in

rank.  There was layoffs also, patrolmen back

to being laid off.

8        Q.      And you indicated that it's your

understanding the Civil Service Commission

overturned this decision?

11       A.      Yes, they did.

12       Q.      Was that a matter you had appealed?

13       A.      Yes, we did.

14       Q.      The group of you had appealed?

15       A.      Yes, we did.

16       Q.      Was that something you did through

your union, sir?

18       A.      Yes, it was.

19       Q.      Okay.  Are you a member of a union

today?

21       A.      Yes, I am.

22       Q.      We didn't really establish, you're

currently employed with the Dracut Police

Department, correct?

22

1        A.    Yes, I am.

2        Q.    You hold what position, sir?

3        A.    Captain.

4        Q.    What union is it that you're also a

5   member of?

6        A.    IBPO, Local 379.

7        Q.    IBPO.    That's the International

8   Brotherhood of Police Officers?

9        A.    Yes, it is.

10       Q.    Is that a separate union affiliation

11  for superior officers such as captain?

12       A.    No, they're both together.    It's all

13  one.

14       Q.    And I'm going to ask you to wait until

15  I finish my question.    I know you can

16  anticipate where I'm going.    Are all members of

17  the Dracut Police Department members of that

18  union?

19       A.    Yes.

20       Q.    What about the chief's position?

21       A.    No, the chief is not.

22       Q.    Are there any other supervisory

23  officials who are not a member of the union?

24       A.    They created a deputy's position,

23

1    that's nonunion also.  That's not filled right

2    now.

3         Q.    Do you hold any offices in the union,

4    sir?

5         A.    No.

6         Q.    At any time have you held any offices?

7         A.    I did years and years ago, but I

8    haven't in the last 20.

9         Q.    Now, you mentioned that there's an

10   unfilled position for deputy chief, sir?

11        A.    Yes.

12        Q.    Okay.  What's your understanding of

13   why that position is unfilled?

14        A.    Well, they gave an exam for it.  They

15   established the list.  I believe it's all on

16   hold according to an injunction placed by one

17   of the officers.

18        Q.    Okay.  That was I think Officer

19   Berard?

20        A.    Berard, yes.

21        Q.    Were you a candidate for that

22   position, sir?

23        A.    No.

24        Q.    Why were you not a candidate for that

24

1    position?

2         A.    I didn't sign up for it.

3         Q.    Do you remember when that position of

4    deputy chief was posted?

5         A.    No.

6         Q.    Can you estimate, was it a year ago

7    that it was posted or --

8         A.    It's been a while.

9         Q.    Okay.  More than a year?

10        A.    Yeah.

11        Q.    Officer Berard was a candidate for

12   that position?

13        A.    He took the exam.

14        Q.    Do you know who else from the

15   department was a candidate for that position?

16        A.    No.

17        Q.    And how come you did not apply for

18   that position?

19        A.    I wasn't interested in it.

20        Q.    Why not?

21        A.    I had filled a position as acting

22   deputy for four years.  Didn't get the

23   permanent position and just wasn't interested

24   in taking it again.

1        A.    No, same shifts.

2        Q.    What shift did you work when you were

3   a deputy chief?

4        A.    Eight to four, days.

5        Q.    Was that four-day on two-day off

6   schedule?

7        A.    Five and two.

8        Q.    Five and two.    Standard workweek.    Did

9   you have weekends off?

10       A.    Yes.

11       Q.    As captain today what kind of shift

12  are you working, sir?

13       A.    I have the same schedule, Monday

14  through Friday, Saturday and Sunday off, seven

15  to three days.

16       Q.    That's 7 a.m. to 3 p.m.?

17       A.    Yes.

18       Q.    What are your job duties as captain

19  today?

20       A.    I'm assigned to Lowell District Court

21  as the prosecutor.

22       Q.    And are you a police prosecutor?    Do

23  you actually prosecute misdemeanors?

24       A.    Yes.    Liaison officer between the Town

32

```
 1        Q.    And at that time you were no longer

 2   being a prosecuting officer for the district

 3   court?

 4        A.    That's right.

 5        Q.    Okay.  And your duties as captain were

 6   what when you first were promoted to captain?

 7        A.    I was in charge of the earlier night

 8   shift, 5 p.m. to 1 a.m.

 9        Q.    How long were you responsible for that

10   shift, sir?

11        A.    Right up until I became deputy.

12        Q.    Okay.  You were deputy chief from '98

13   to --

14        A.    '95 to '98.

15        Q.    '95 to '98, excuse me.

16        A.    Yeah.

17        Q.    And then you returned to the role of

18   captain in '98?

19        A.    In January of '99, yes.

20        Q.    And that's when you returned to your

21   role in the Lowell District Court?

22        A.    Yes.

23        Q.    And you've been in that role ever

24   since?
```

1      A.    In writing to the chief.

2      Q.    Did you communicate separately your

3  intent to retire to the town manager, sir?

4      A.    In writing?

5      Q.    Either in writing or verbally?

6      A.    Verbally.

7      Q.    That was a yes, you did verbally?

8      A.    Yes.

9      Q.    And when did you do that?

10     A.    That would be in June of '04.

11     Q.    Okay.  Were there any benefits that

12  accrued to you by reporting your retirement

13  18 months before your intended retirement date?

14     A.    Yes.  That was the reason for it.  By

15  contract it was required to give notice prior

16  to the town meeting that set the budget for the

17  following year, so by contract I gave them the

18  notice.

19     Q.    You know, is there any financial

20  benefit to giving that notice that early, sir?

21     A.    Yes.  They give you a 7 1/2 percent

22  pay increase in your base salary.

23     Q.    Did you, in fact, receive that pay

24  increase, sir?

1       A.    Yes, I did.

2       Q.    Why was it that you were seeking to

3   retire at that time, sir?

4       A.    At that time there was no indication

5   of any forward advancement, and the chief at

6   the time didn't give any indication he was

7   going to be leaving, so I decided that I would

8   retire.

9       Q.    The chief at the time was whom, sir?

10      A.    Louis Panas.

11      Q.    Do you know how long he had been chief

12  for?

13      A.    I'm trying to think when he got

14  promoted.  I can't remember when he got

15  promoted.

16      Q.    Who was his predecessor as chief?

17      A.    That was Robert Tyrrell was the

18  permanent chief.  There was an acting chief in

19  between.

20      Q.    Panas wasn't the acting chief?

21      A.    No.  Captain Paquin was.

22      Q.    How many chiefs had you served under

23  in your tenure?  Was there a bunch?

24      A.    Yeah.

38

1       A.    I don't believe so.

2       Q.    And other than your attorneys or your

3   spouse, did you talk to anyone else concerning

4   your intent to retire before your announcement

5   on December 3, 2002?

6       A.    I don't believe so.

7       Q.    Did you do any investigation to gage

8   or determine when the chief would be retiring

9   before you announced your retirement in

10  December of 2002?

11      A.    No.

12      Q.    Did anything later occur after

13  announcing your retirement, sir, which caused

14  you to reconsider you having announced your

15  retirement?

16      A.    Yes.  The chief announced he was going

17  to retire.

18      Q.    Do you remember when that was?

19      A.    June of '04.

20      Q.    How did you come to learn of that,

21  sir?

22      A.    I read it in the paper.

23      Q.    Had the chief ever announced his

24  retirement before June of '04?

41

1          A.      Yes.

2          Q.      And is that your signature?

3          A.      Yes, it is.

4          Q.      And are you verifying as to the

5    content of the complaint, sir?

6          A.      Yes.

7          Q.      Before signing this did you review the

8    compliant for accuracy?

9          A.      Yes.

10          Q.      And was it accurate and true to the

11   best of your knowledge?

12          A.      To the best of my knowledge.

13          Q.      Okay.  Going to paragraph 11 of your

14   complaint, sir, I ask you to take a moment and

15   look at that.

16          A.      (Witness complies)  Okay.

17          Q.      That indicates there that you had in

18   excess of 250 days of sick leave accumulated.

19   Do you see that, sir?

20          A.      Yes.

21          Q.      Does that refresh your recollection as

22   to how much sick leave you had when you

23   announced your retirement?

24          A.      You know, I really don't remember.  It

CURRAN COURT REPORTING

1    says over 250.  I probably have over 250.

2        Q.    Now, is there a limit to the amount of

3    -- strike that.

4              Are you aware of a sick leave buy-back

5    provision for the Town of Dracut employees?

6        A.    Yes.

7        Q.    Okay.  What's your understanding of

8    sick leave buy-back?

9        A.    You can buy back 120 days.  I'm

10   covered under 120 days.

11       Q.    When you say you're covered under

12   120 --

13       A.    By contract, yeah.  It was changed and

14   negotiations in the number from 120 has been

15   reduced.

16       Q.    When did they reduce that?

17       A.    It's been a while.

18       Q.    Because you were already an employee

19   they didn't reduce --

20       A.    Right.  They grandfathered up to a

21   certain point, and I was one of them.

22       Q.    Okay.  So what is your understanding

23   of what would happen to the excess days over

24   the 120 days that you would have upon

1          A.    No.

2          Q.    Do you know how old Chief Panas was,

3    sir, or is?

4          A.    No.

5          Q.    Do you know Chief Panas' age relative

6    to you?

7          A.    Older.

8          Q.    Okay.  Do you know how much older he

9    is?

10         A.    No.

11         Q.    The conversation that you had with Mr.

12   Piendak about Chief Panas' retirement, you

13   indicated to him you wanted to be considered

14   for the position at that time?

15         A.    Yes.

16         Q.    And that was on the telephone?

17         A.    Yes.

18         Q.    What was Mr. Piendak's response?

19         A.    He said okay.  He was glad that I

20   called.  His concern was the benefits that I

21   had been receiving after announcing that I was

22   going to retire.  I said there was no problem

23   with that because according to the contract

24   there was -- it's stated that if you do

48

1    withdraw your retirement, you pay back the

2    benefits you received.  And I said that would

3    be no problem.  I could do that.

4         Q.    And before calling Mr. Piendak, had

5    you checked the contract to ensure that you

6    could do that under the contract?

7         A.    No.  I knew it was there because I had

8    read it prior to that, and I believe there was

9    one other officer that also had done that.  I'm

10   not sure but I think Officer Hogg also did the

11   same thing.

12        Q.    You're going to have to give me that

13   officer's name again,

14        A.    H-O-G-G, Robert.

15        Q.    How long ago has Officer Robert Hogg

16   done that?

17        A.    It's been a while.

18        Q.    Now, did you, in fact, make any

19   arrangements to pay back the benefits you had

20   received?

21        A.    Yes, I did.

22        Q.    How did you do that?

23        A.    I paid back the Town.

24        Q.    What steps did you take to pay back

1    the Town, sir?

2        A.    I met with the accountant and

3    determined how much was to be paid back, and I

4    gave him a check.

5        Q.    And you wrote a personal check?

6        A.    Yes.

7        Q.    Did you keep a copy of that check,

8    sir?

9        A.    I believe I have one somewhere.

10       Q.    Okay.

11            MR. CLOHERTY:  Dick, I don't know if

12   that's responsive to any requests we already

13   made.

14            MR. AHERN:  Yeah, I'll get it for you.

15       Q.    Do you recall today the approximate

16   amount of monies you had to pay back?

17       A.    I think it was just over 5,000.

18       Q.    That represented the additional 7 1/2

19   percent raise you had received from December of

20   '02 through June of '04?

21       A.    It would have been December of '03 to

22   December of '04.

23       Q.    Okay.  Then I just need to clarify

24   that.  You announced your retirement in

73

1    Q.    Yes.

2    A.    Or prior exams?

3    Q.    How does it work?  Why don't you

4    describe for me.  Is there an exam given for

5    every chief's vacancy?

6    A.    Well, civil service has open chiefs

7    exams which anybody can walk in and take.  They

8    also have closed exams which Dracut actually

9    selected to do was that they would keep it

10    within a department, and it would be candidates

11    within a department that are eligible to take

12    the exam.  None of that had taken place prior

13    to all this stuff.

14    Q.    But you knew prior to being able to

15    take that position full-time you would have to

16    take a chief's exam?

17    A.    Oh, yeah.  Under civil service, yeah.

18    Q.    It would just be a matter of whether

19    it was going to be an open exam for all

20    candidates or closed exam for internal

21    candidates?

22    A.    Right.

23    Q.    And your understanding of what

24    eventually transpired was that they did an

74

1      internal candidates exam?

2           A.    Right.   It was a closed exam is what

3      they call it.

4           Q.    Did you sit for that exam, sir?

5           A.    That was this past May.

6           Q.    How long an exam was that?

7           A.    They give you four hours.

8           Q.    Is that a written exam?

9           A.    Yes.

10          Q.    Is there any --

11          A.    Multiple choice.

12          Q.    Is there any other components to the

13     exam, hands on or verbal?

14          A.    No.

15          Q.    Did you receive the results of your

16     exam, sir?

17          A.    The results are out individually.

18     There's no established list yet.   It's been

19     held up.

20          Q.    So you received your own individual

21     results?

22          A.    Yes.   Everybody did.

23          Q.    Okay.   What were your results?

24          A.    I didn't pass it.

75

1      Q.    And how was it determined that you did

2    not pass?

3      A.    You needed a 70 minimum and I ended up

4    with a 68.

5      Q.    Do you know how many candidates sat

6    for that exam, sir?

7      A.    I think there was six of us.

8      Q.    Who were the candidates, to your

9    knowledge?

10     A.    Myself, Lieutenant Archinski,

11   Lieutenant Richardson, Sergeant Pappas,

12   Sergeant Gosselyn, and Phil Berard.

13     Q.    And do you have any knowledge of

14   whether any of the other candidates passed the

15   exam?

16     A.    I have no -- I've never seen official

17   results, no.

18     Q.    Do you have any knowledge from any

19   other sources of who passed the exam?

20     A.    Just rumors.

21     Q.    Did you speak to any of the candidates

22   as to whether the other candidates passed the

23   exam?

24     A.    I know Tony did; he said he did,

1      Q.     Okay.  And was there a person

2   appointed to the position of acting chief upon

3   the chief's retirement?

4      A.     Yes.

5      Q.     Who was that?

6      A.     Lieutenant Richardson.

7      Q.     Okay.  Since Lieutenant Richardson was

8   appointed acting chief, has there been a

9   permanent chief appointed, sir?

10     A.     No.

11     Q.     Did you file any type of grievance or

12  appeal from the appointment of Lieutenant

13  Richardson as acting chief?

14     A.     Yes.  That was bypassed, yes.

15     Q.     Okay.  What's your understanding of

16  the outcome of that appeal, sir?

17     A.     That hasn't been held, that hearing.

18     Q.     We just need to backtrack a little

19  bit.  Did you ever receive any knowledge or

20  information from the Town that they were

21  seeking approval from the Civil Service

22  Commission to bypass you for the position of

23  provisional chief?

24     A.     Dennis did supply me with the

87

1    look at that with your attorney and tell me if

2    you recognize that document.

3         A.    Okay.

4         Q.    Have you ever seen that before, sir?

5         A.    I may have.  I don't know if I have.

6    I may have.

7         Q.    Okay.  Well, the caption on this

8    document it's a copy of a document directed to

9    the human resources division of the civil

10    service unit.  Do you see that in the upper

11    right-hand corner?

12         A.    Yes.

13         Q.    It's in the upper left-hand corner, it

14    says provisional promotion?

15         A.    Yes.

16         Q.    In it it seeks, I'll suggest to you,

17    the promotion of Kevin Richardson to

18    provisional police chief.  Do you see that on

19    the fifth line down?

20         A.    Yes.

21         Q.    Down the lower right-hand corner

22    there's a stamp from the Civil Service

23    Commission human resources division.  Do you

24    see that, sir?

88

1      A.    Yes.

2      Q.    And it's stamped approved?

3      A.    Yes.

4      Q.    And there's a date of January 28,

5  2005?

6      A.    Yes.

7      Q.    Were you aware that in or around that

8  time the Civil Service Commission approved the

9  promotion of Richardson to provisional police

10 chief?

11     A.    Yes.

12     Q.    Had you contested that, sir?

13     A.    Yes, I had.

14     Q.    And, in fact, you've subsequently

15 appealed from that decision?

16     A.    Yes.

17     Q.    Okay.  And before this decision was

18 issued in January 2005, you had submitted

19 documents to the Civil Service Commission in

20 opposition of that?

21     A.    Yes.

22     Q.    And you are aware, weren't you, of the

23 reasons why the Town was seeking to bypass you

24 for promotion?

95

1              MR. CLOHERTY:  Let's have this marked,

2       please.

3              (Exhibit No. 7, Letter to Chief Panas,

4       12/22/04 so marked)

5          Q.    All right.  Showing you, sir, what's

6       been marked as Exhibit No. 7, I ask you to take

7       a moment to look at that and tell me if you

8       recognize it?

9          A.    Yes.

10         Q.    Okay.  Is that a letter by you, sir?

11         A.    Yes.

12         Q.    What's the date of that letter?

13         A.    December 22.

14         Q.    December 22, 2004?

15         A.    Yes.

16         Q.    That's your letter to Chief Panas?

17         A.    Yes.

18         Q.    In that letter you're telling him that

19      you're withdrawing your retirement?

20         A.    Yes.

21         Q.    Okay.  Before that had you ever told

22      Chief Panas that you were not intending to

23      retire?

24         A.    I don't believe so.

96

1          Q.    Okay.  Earlier when you were looking

2    at Exhibit No. 5, which is the letter to the

3    commission --

4          A.    Okay.

5          Q.    -- I had asked you a question about

6    point number one in that letter which states

7    that there has been no revocation of the

8    retirement notice received.  Do you see that,

9    sir, last sentence of paragraph one?

10         A.    Yes.

11         Q.    Okay.  It's fair to say that as of

12   December 17 that's true because your letter,

13   Exhibit No. 7, was dated December 22?

14         A.    Yes.  I had told Dennis, not Chief

15   Panas.

16         Q.    In fact, Chief Panas' letter of

17   November 23, which is Exhibit No. 6, indicates

18   the same thing in item No. 1 that he didn't

19   have any written notice from you.

20         A.    No written notice, right.

21         Q.    Okay.  Why don't we go to paragraph

22   No. 2 of Exhibit No. 5 with the list of reasons

23   from Mr. Piendak.  Have you had a chance to

24   read that, sir?

100

1    April of '04?

2            A.    I know of at least ten, I think.

3            Q.    What was the nature of the treatment

4    you received for that cancer problem?

5            A.    I had surgery.  They had removed the

6    left nostril and split the nose down the center

7    and did about a four-hour surgery.

8            Q.    Where was that surgery conducted?

9            A.    It was down outside Boston.  I can't

10    think of the doctor's name right now.

11            Q.    What facility were they affiliated

12    with?  Was that -- you mentioned earlier Mass.

13    General was for prostate.

14            A.    No.  This was done at -- they have a

15    medical facility that I went to down on Route

16    9, I believe it is.  And they have surgery

17    procedures right in there.  It's a regular

18    operating room they have.

19            Q.    Okay.  So it was at a clinic setting,

20    not a hospital setting?

21            A.    Not in a hospital, no.

22            Q.    But it was four hours of surgery, sir?

23            A.    Yes.

24            Q.    You don't remember the name of your

1    doctor, today?

2         A.    I don't have it with me, no.

3         Q.    How about the name of the facility?

4         A.    I don't have that either.

5         Q.    Okay.  And after that surgery was

6    there any followup care that you had to receive

7    in the immediate aftermath?

8         A.    Well, they removed the stitches, and

9    then I had to go back -- I had about

10   18 stitches, and they removed the stitches.  I

11   also had to go back for two other growths that

12   were after the surgery they removed also.

13        Q.    And you said two other growths?

14        A.    Yes, on the nose itself.

15        Q.    And was that turned out to be

16   cancerous as well?

17        A.    No.  Those weren't, no.

18        Q.    Was that a well-publicized athlete

19   Derek Lowe who had --

20        A.    Same thing.

21        Q.    Same thing.  Okay.  So you had the

22   same surgery that Derek Lowe underwent?

23        A.    Pretty much, yeah.

24        Q.    And during your recuperation from that

1   surgery, the four-hour surgery, did you have to

2   wear a bandage on your nose that had been on

3   the surgery?

4       A.   Oh, yeah.  I was all swollen, black

5   and blue, yeah.  It was all bandaged up.

6       Q.   And how long were you in bandages for

7   that surgery, sir?

8       A.   I'd say two weeks.

9       Q.   Was there any additional other

10  recuperation that you had to take other than

11  going for followup and wearing the bandages?

12      A.   I know I had to keep applying -- yeah,

13  after, but during that every day there was some

14  kind of gel that I had to keep applying on

15  there to keep the stitches moist so that they

16  wouldn't -- it would reduce the scarring.  And

17  then once all that was done and off, I had to

18  go back where they did a type of laser

19  treatment on the length of the scar to reduce

20  the scarring also.

21      Q.   And was that during that time that you

22  were out for leave, for sick leave originally?

23      A.   No.  This was beyond that.

24      Q.   How soon thereafter did you go back

1   for laser surgery?

2       A.    I don't remember.

3       Q.    And how many days did you have to miss

4   for the laser surgery?

5       A.    I think it was just the day that I had

6   it done.

7       Q.    Was that outpatient?

8       A.    Yeah.

9       Q.    How many total days did you miss from

10  work due to the nose skin cancer?

11      A.    I don't know.

12      Q.    You mentioned earlier you were out ten

13  days at least?

14      A.    Eight to ten days at least and then a

15  couple of doctor visits after that and the

16  laser treatment after that so a total -- I

17  don't know.

18      Q.    It would have been less than 20 days,

19  though?

20      A.    Less than 20, sure.

21      Q.    And during the time you were

22  recuperating from the initial surgery, sir,

23  were you under doctor's orders not to return to

24  work?

104

1       A.    Yes.

2       Q.    Did you ever inform your employer at

3    the police department what surgery you were

4    undergoing at that time?

5       A.    Yes.

6       Q.    Who did you inform?

7       A.    My wife went down and spoke to Chief

8    Panas.

9       Q.    When did she speak to Chief Panas?

10      A.    I know it was on a Sunday.  She ran

11   down and seen him.

12      Q.    Was it after the surgery or before the

13   surgery?

14      A.    Yes, right after the surgery, yeah.

15      Q.    So before you went in for surgery, had

16   you spoken to anyone from work about being out

17   of work?

18      A.    I don't remember if I did or not.

19      Q.    Did you ever provide any written

20   notice that you would be out of work for a

21   certain period of time?

22      A.    I believe I did because I needed it to

23   get back to work.

24      Q.    When you say you "needed it to get

CURRAN COURT REPORTING

108

1    A.    Yes.

2    Q.    And when did you first become aware of

3    that problem, sir?

4    A.    My annual physical was in April, and

5    the PSA blood test showed an abnormality so

6    they did followups on that.

7    Q.    And how many days were you out from

8    work as a result of your prostate cancer

9    surgery, sir?

10    A.    Out of work somewhere around August 25

11    and went back to work in October.

12    Q.    Okay.  And you provided medical notes

13    to your employer for that surgery, sir?

14    A.    No.

15    Q.    Did you notify your employer that you

16    were going for surgery?

17    A.    Yes.

18    Q.    Okay.  How did you notify your

19    employer?

20    A.    I told them I was going to be out.  I

21    notified the town manager that I'd be out and

22    that I'd be having surgery that would require

23    me to stay out of work for a while and didn't

24    tell them exactly the exact reason.

109

1      Q.    Was there a reason why you didn't tell

2    them the exact reason you were out for surgery?

3      A.    I felt that it was a private matter

4    and didn't want to discuss it with them.

5      Q.    Did you provide any written

6    notification of your pending surgery, sir?

7      A.    I believe I did, yes.

8      Q.    What type of written notification did

9    you provide?

10     A.    It came from Dr. McGovern at Mass.

11   General.

12     Q.    Now, did you instruct your doctor not

13   to advise them of the nature of your surgery?

14     A.    Yes.

15     Q.    And why was it that you instructed him

16   not to advise them?

17     A.    Again, it was a private matter and he

18   agreed.

19     Q.    Did you tell Chief Panas about your

20   being out for surgery, sir?

21     A.    He's the one that got the notice.

22     Q.    He got the written notice?

23     A.    Yeah.

24     Q.    Did you ever speak to him before going

110

1    out for surgery about why you were going out

2    for surgery?

3        A.    No.

4        Q.    Did you ever tell anyone else at the

5    police department the reason why you were going

6    out for surgery?

7        A.    No.

8        Q.    Did you ever tell anyone at the Town

9    of Dracut that you were getting surgery for a

10   hernia?

11       A.    I had a hernia operation years ago but

12   not this time, no.

13       Q.    Okay.  You didn't tell anyone that you

14   were going for hernia surgery?

15       A.    No, I did not.

16       Q.    Did you tell anyone any other reasons

17   other than the prostate surgery that you were

18   going for surgery?  Did you make up any other

19   reasons for --

20       A.    No.

21       Q.    -- your surgery?

22       A.    No.

23       Q.    Okay.

24            MR. CLOHERTY:  Why don't we mark these

1    you see that, sir?

2         A.    Tuesday, October 12.

3         Q.    And did you, in fact, return to work

4    on that date?

5         A.    Yes.

6         Q.    Tuesday, October 12?

7         A.    Yes.

8         Q.    You were out of work from August 18 to

9    October 12 approximately?

10        A.    No.  I'd be out of work from roughly

11   -- he wrote that on August 18, but the surgery

12   was on the 25th, so I was off -- probably off

13   the 24th through October 11 anyway.

14        Q.    Of those days -- you used sick days

15   for all that time that you were out of work,

16   sir?

17        A.    Yes.

18        Q.    Do you remember how many sick days you

19   used for that time period?

20        A.    Yes.

21        Q.    If I suggest to you it was 36 sick

22   days, is that consistent --

23        A.    Fine.

24        Q.    Okay.  During your recuperation from

113

1    that surgery, sir, were you instructed by your

2    doctor not to return to work?

3         A.    Yes.

4         Q.    Okay.  And during your recuperation,

5    were you on bed rest or during that 36 days was

6    there a reason why you were unable to return to

7    work?

8         A.    I had some major surgery I was

9    recuperating from.

10        Q.    Okay.

11        A.    I had a catheter installed for the

12   first two weeks and took a while to recuperate

13   from it.

14        Q.    Did your cancer surgery for prostate

15   cancer or the earlier skin cancer entail any

16   radiation treatments?

17        A.    No.

18        Q.    Did either cancer surgery or treatment

19   entail chemotherapy?

20        A.    No.

21        Q.    Were you on any prescription medicines

22   that affected your ability to go to work during

23   the times you were recuperating from those

24   surgeries?

1     A.    I know I had pain medicine, but I

2   didn't take it too much but I'd say no.

3     Q.    So fair to say during the 36 days or

4   so that you were out for the prostate surgery,

5   you had to recuperate from just the major

6   surgery and rest your body so you could

7   recover?

8     A.    Yes.

9     Q.    Okay.  When you returned to work on

10  October 11 or 12, were you able to function in

11  your job duties the same way you were able to

12  function before you left for your surgery?

13    A.    Close.

14    Q.    Okay.  What, if anything, were you

15  unable to do that you could do before?

16    A.    Well, I wouldn't want to wrestle with

17  anybody at that point, but I was able to get

18  back to work.

19    Q.    When you say you were not able to

20  wrestle with anyone, is that because you were

21  not as strong as you were beforehand or was it

22  because you felt at risk for harm?

23    A.    Exactly.  I didn't want to hurt myself

24  at all so I went back to work and I was able to

1    do my job, but I certainly wasn't going to

2    wrestle anybody at that point.

3        Q.    Your job duties at the time were as

4    the court officer?

5        A.    Yes.

6        Q.    Okay.  Did that require you as a

7    function of your job duties to physically

8    handle prisoners?

9        A.    No.

10        Q.    Okay.  Was there any occasion during

11    your years that you had been prosecutor where

12    you had to wrestle someone or physically handle

13    someone as a suspect?

14        A.    I don't recall.

15        Q.    Were you put on light duty when you

16    returned to work, sir?

17        A.    No.  We don't have light duty.

18        Q.    Okay.  Were there any limitations

19    placed upon your return to work by your

20    treating physicians as to what you could and

21    couldn't do?

22        A.    No.

23        Q.    So you were feeling that you didn't

24    want to be in a position where you had to

117

1    them if he's got them still?

2              MR. AHERN:   Yeah.

3        Q.    Did you advise your employers at the

4    Town of Dracut that you had any limitations on

5    your ability to return to work after your

6    surgery?

7        A.    No.

8        Q.    Did you request from your employers at

9    the Town of Dracut any accommodations or

10   changes in your job conditions to enable you to

11   return to work?

12       A.    No.

13       Q.    I didn't ask you those same questions

14   about the basal cell skin surgery, but did you

15   ever advise your employers that that in any way

16   limited your ability to do your job duties?

17       A.    No.

18       Q.    Did you ever request any

19   accommodations from your employer as a result

20   of your basal cell skin cancer?

21       A.    No.

22       Q.    Okay.  Other than those two surgeries,

23   were there any other incidents that required

24   you to take extended sick leave from the year

1    2002 on?

2         A.    I can't think of any.

3         Q.    Okay.  And you've already testified

4    that you may have missed up to 20 days for the

5    basal cell skin cancer.  And in the range of

6    about 36 days or so for the prostate cancer, is

7    that fair to say, sir?

8         A.    Okay.

9         Q.    Okay.  Rounding up, that would be

10   about 60 days of sick leave that you would have

11   suffered or had to use because of those two

12   surgeries, correct?

13        A.    Okay.

14        Q.    The other sick leave that you took,

15   sir, did you have any opportunity to review the

16   reasons for taking that sick leave?

17        A.    Yes.

18        Q.    Okay.  And what reasons did you take

19   that time off?

20        A.    I believe I supplied -- I don't have

21   anything with me, in front of me, but I believe

22   I supplied it with the requests that were given

23   me.

24        Q.    Okay.  I think I did make a copy of

139

1    or overtime pay?

2        A.    No.

3        Q.    Now, are you aware, do you have any

4    knowledge of how much retirement, how much sick

5    time you had left at the time of Mr. Piendak

6    not recommending you for the position?

7        A.    No.

8        Q.    Okay.  Directing your attention to

9    Exhibit 5, paragraph two, the second paragraph

10   under that number, the second sentence it

11   states that you had 128 days available to you

12   as of that day, December 17, 2004.  Do you see

13   that, sir?

14       A.    It says I have 128 days available.

15       Q.    Right.  Do you see that?

16       A.    Yeah.

17       Q.    Do you have any reason to believe that

18   that's not accurate, sir?

19       A.    No.

20       Q.    In fact, by the time of the

21   appointment of a provisional chief, you had

22   used -- you had gotten your sick time down from

23   about 250 days to 128 days, correct?

24       A.    It says here my balance was 128.

1      Q.    Okay.   And earlier we talked about in

2    your complaint you allege that you had about

3    250 days when you first announced your

4    retirement.   Do you see that, sir?

5      A.    Yes.

6      Q.    During the two-year period from when

7    you announced your retirement until the

8    provisional chief's position was discussed in

9    this December 2004 memorandum, you had gotten

10   250 days down to 128 days, correct?

11     A.    Yes.

12     Q.    All right.   And you were aware of the

13   rule that you could buy out 120 days at the

14   time of your retirement, correct?

15     A.    Yes.

16     Q.    Now, the next numbered paragraph on

17   this memorandum dated December 17, 2004, can

18   you just take a moment to read paragraph No. 3,

19   sir.

20     A.    Uh-huh.   Yes.

21     Q.    In there there's a reference as to one

22   of the reasons why Mr. Piendak felt you are not

23   qualified was because of an investigation

24   conducted in June of 1997 after a State Ethics

CURRAN COURT REPORTING

143

1    reported it?

2         A.    No.

3         Q.    Did you get a finding from the State

4    Ethics Commission?

5         A.    I received a letter from them

6    basically saying use better judgment next time

7    and don't let it happen again.  It was no fine,

8    no official reprimand or anything like that,

9    just a letter from them.

10        Q.    And did the police department at the

11   time take any action as a result of that Ethics

12   Commission investigation?

13        A.    As a result of that investigation?

14        Q.    Yes.

15        A.    I think what they did was they put a

16   letter in my personnel file saying don't be

17   involved in that again and use better judgment.

18   They gave me a copy of the law that refers to

19   that.

20        Q.    And did you take any grievance from

21   that letter of reprimand?

22        A.    No.

23        Q.    And why not?

24        A.    Didn't see any reason to.

155

1    Q.    And how did it come to your attention

2    that these issues were being looked at for rule

3    violations by your supervisor?

4    A.    I must have received notice from the

5    chief that they were doing an investigation.

6    Q.    Did you participate in the

7    investigation?

8    A.    I don't believe so.

9    Q.    And as a result of the investigation

10    were you, in fact, disciplined.

11    A.    Yes.   I received a three-day

12    suspension.

13    Q.    Were you told why you were getting

14    suspended?

15    A.    Yes.   They wrote out the rule and

16    regulations that were violated.

17    Q.    And what was your understanding of the

18    allegations -- what was being violated for that

19    welfare check on the resident issue?

20    A.    I don't remember the exact wording on

21    it.

22    Q.    Okay.   Did you take any grievance or

23    appeal of that suspension, sir?

24    A.    Yes.   I appealed it to civil service.

156

```
 1        Q.    What happened as you appealed it to
 2   civil service?
 3        A.    It was upheld by civil service.
 4        Q.    Was there a hearing conducted in civil
 5   service?
 6        A.    Yes.
 7        Q.    And you testified at that hearing?
 8        A.    Yes.
 9        Q.    Was there testimony from other
10   witnesses taken?
11        A.    Yes.
12        Q.    Do you know who else testified?
13        A.    Let's see, Maureen Lamarr was the
14   dispatcher.  Officer Bailey was the police
15   officer.  I don't remember who else was
16   testifying.
17        Q.    Now, Officer Bailey made the traffic
18   stop, right?
19        A.    Yes.
20        Q.    Who was the one did the welfare check?
21        A.    Officer Bailey.  Same one.  It
22   happened to be the same one.  He worked the
23   five to one shift; that's his regular shift at
24   that time.
```

1     A.    You refer to put in for your

2    retirement.  You notify the retirement board,

3    fill out the forms, fill out the paperwork, and

4    then you establish what you're going to be

5    getting and the date you're going to be

6    leaving.  I had not done any of that.  I had

7    notified the Town that my intentions were to

8    retire in December of '04 but had not filled

9    out or turned in any paperwork to the

10   retirement board.

11    Q.    Now, that date has passed December of

12   '04, and Lieutenant Richardson has since been

13   appointed provisional chief, correct?

14    A.    Yes.

15    Q.    And do you have any present intentions

16   of retiring in the near future, sir?

17    A.    No.

18    Q.    When Chief Panas announced his

19   retirement, you saw that as an opportunity for

20   you to apply for the chief's position, correct?

21    A.    Yes.

22    Q.    Okay.  And you sought to be appointed

23   in the mean time as a provisional chief before

24   the chief's exam could be taken, correct?

1      A.    Yes.

2      Q.    Today having taken and not passed the

3   police chief's exam, would you be eligible for

4   the chief's position?

5      A.    No.  Once they establish the list, no.

6      Q.    Okay.  When you retire, sir, how is

7   your retirement pay calculated, to your

8   knowledge?

9      A.    It's calculated percentages on your

10  base salary.

11     Q.    And is the base salary based on your

12  highest salary that you achieved at any time in

13  your career or how is that --

14     A.    It's your highest three years.

15     Q.    Does the provisional chief get the

16  same pay as the chief?

17     A.    No.

18     Q.    Okay.  How --

19     A.    I'm sorry, I don't know what he got.

20  I don't know.  That's right.  I don't know if

21  he did or not.  I don't know what the rate of

22  pay is.

23     Q.    When you were provisional deputy

24  chief, did you receive a higher rate of pay

1      A.    My years' experience on the job, my

2    overall education, my years' experience as a

3    supervisor compared to his, the overall

4    experience that I have on the department being

5    there longer.

6      Q.    Do you have a good working

7    relationship today with -- he's now chief

8    Richardson -- provisional chief Richardson?

9      A.    Yes, I do.

10     Q.    And you're able to work with him and

11    complete your duties despite the fact that

12    there's this ongoing litigation?

13     A.    Yeah.  It's nothing personal between

14    us.  It's just a position that became

15    available.

16     Q.    And how long have you known

17    provisional chief Richardson for?

18     A.    Since he's been on the department.  I

19    don't know when he's come on.

20     Q.    Early '80s?

21     A.    I really don't remember.

22     Q.    A long number of years?

23     A.    Oh, yeah.  He's been on at least 15,

24    yeah.

CURRAN COURT REPORTING

1      Q.    It's your position that the Town

2    should have records for each day that you were

3    absent of a telephone call from you stating the

4    reasons why you were going to be out?

5      A.    I'm saying that I called every day.

6    Is there a record there?  There should be.

7      Q.    Do you have any knowledge of what the

8    recordkeeping procedures are for the Town

9    relative or the police department relative to

10   those sick leave requests?

11     A.    What the chief used to do -- I don't

12   see any here, but it's just a pink memo; you

13   write it out, and he'd put it in a box on the

14   corner.  He's probably got -- if he was the

15   chief for 18 years, he's got 18 years of pink

16   slips in the corner with everybody's sick time

17   on it.

18     Q.    Have you yourself done any research of

19   those records to determine if they support your

20   contentions as to why you were out?

21     A.    I have no reason to.

22     Q.    And the payroll records are updated as

23   well that were on the computer when there's a

24   person out on sick leave?

1      A.    Payroll now is on computer, yes.  You

2    also have to remember too that not every day

3    called in sick is a reason given.  Sometimes

4    the shift supervisor writes whatever he feels

5    like it.  The reason is most people just say

6    sick time.  So if the person taking the call

7    says, all right, I'll put you in as a flu,

8    he'll write the flu, and it goes in that way.

9    So don't rely too heavily on what it says.

10     Q.    Well, what was your practice when you

11   called in on these sick days?

12     A.    Most the time I just called in and

13   took a sick day.

14     Q.    Did you express a reason?

15     A.    Sometimes I did, sometimes I didn't.

16   If I had doctor's appointments, I told them.

17   Otherwise, I said I was out sick.  And whatever

18   they wrote for reason, I don't know.

19     Q.    Okay.  I'm just trying to get --

20     A.    Yeah.

21     Q.    Just let me ask the question, sir.

22     A.    Okay.

23     Q.    When you took all these days from

24   December 2002 through December 2004, it was

178

```
 1    your practice --
 2              (Cell phone interruption)
 3         Q.   It was your practice to call in and
 4    give a reason why you were out sick?
 5         A.   I didn't give a reason every time, no.
 6         Q.   Okay.
 7              (Recess 2:41-2:42)
 8         Q.   Paragraph No. 15, sir, take a moment
 9    to look at that and tell me if you've had a
10    chance --
11         A.   Yes, I have.
12         Q.   That references the board of selectmen
13    telling the town manager they would approve you
14    for interim chief.  Do you see that, sir?
15         A.   Yes.
16         Q.   What are you referring to to support
17    that?
18         A.   From my conversations with the board
19    of selectmen, they said they would have
20    confirmed my appointment.
21         Q.   Do you know if any board of select
22    member ever communicated that to the town
23    manager?
24         A.   I don't recall if any of them have
```

CURRAN COURT REPORTING

1      Q.    What handicap are you referring to?

2      A.    Cancer.

3      Q.    Is that the prostate cancer, sir, that

4  you suffered?

5      A.    Yes.

6      Q.    Earlier you had also testified about

7  suffering from skin cancer on your nose?

8      A.    Yes.

9      Q.    Are you contending also that you were

10  treated less favorably due to that?

11      A.    Because it was the sick time use that

12  I used because of both.

13      Q.    Is there any other handicaps other

14  than those two bouts of cancer that you had

15  that you're referring to?

16      A.    No.

17      Q.    Now, count No. 2 on the next page,

18  sir, paragraph 24 there's an allegation that

19  your disability was based upon prostate cancer.

20  Do you see that, sir?

21      A.    Yes.

22      Q.    In there your complaint doesn't allege

23  skin cancer.  Is that fair to say?

24      A.    That doesn't mention it there, no.

184

1    responsibilities of your employment based on

2    your suffering cancer?

3        A.    That I can't do it?

4        Q.    Right.

5        A.    No.

6        Q.    And you never requested any

7    accommodations from your employer to change

8    your working conditions based on your having

9    suffered from cancer?

10       A.    No.

11       Q.    Now, I want to direct your attention

12   to count No. 4 of the complaint.   Take a moment

13   to read paragraph 36.

14       A.    (Witness complies)

15       Q.    Have you had a chance to read that,

16   sir?

17       A.    Yes, I have.

18       Q.    I know, again, you're not a lawyer,

19   but I suggest to you the last clause of that

20   sentence indicates that you were discriminated

21   against based upon your age.   Do you see that,

22   sir?

23       A.    Yes.

24       Q.    And I understand from reading your

185

1    recent interrogatory answers that you're no

2    longer pursuing that claim?

3        A.    That's correct.

4        Q.    Okay.  The next count of your

5    complaint, sir, sites to a provision of the

6    General Laws.  Do you see that, count five?

7        A.    Yes.

8        Q.    Okay.  Are you familiar with General

9    Laws chapter, I think it's 31, section 15?

10       A.    32, 15.

11       Q.    32, 15, I'm sorry.  Are you familiar

12   with that provision of the General Laws?

13       A.    I've read it, yes.

14       Q.    And that's the civil service laws?

15       A.    Yes, it is.

16       Q.    Is that violation of civil service

17   laws also subject to an appeal that's going on?

18       A.    Yes, it is.

19       Q.    Okay.  And that appeal is still

20   pending before --

21       A.    That's still pending down there.  We

22   haven't heard when that will be heard so I

23   don't know when that will be heard.

24       Q.    Okay.  And you're represented by

1      separate counsel in that case?

2          A.    Yes.

3          Q.    And the Town is also represented by

4      someone other than me in that case?

5          A.    Yes.

6          Q.    And is that awaiting hearing or

7      argument or do you know what the status is of

8      that case?

9          A.    Waiting for hearing.

10         Q.    There's been no decision as of today,

11     correct?

12         A.    No.

13         Q.    You're not claiming -- I may have

14     asked you this.  You're not claiming you

15     suffered from any other disability, sir, other

16     than the cancer?

17         A.    Right.

18         Q.    Let me go through some documents with

19     you, sir.

20         A.    Can we take a quick break?

21         Q.    Sure.

22               (Recess 2:53-2:55)

23               MR. CLOHERTY:  Can we just have that

24     marked as an exhibit, please.

207

1    the interrogatory answers for accuracy and

2    completeness?

3        A.    Yes.

4        Q.    And were they accurate and complete to

5    the best of your knowledge?

6        A.    The best of my knowledge.

7        Q.    Okay.  I'm going to ask you a couple

8    of questions about some of those answers, sir.

9    Why don't we go first to page 13 of your

10   interrogatory answers.

11       A.    (Witness complies)

12       Q.    And in the middle of that page is your

13   answer to question No. 21.  Do you see that,

14   sir?

15       A.    Yes.

16       Q.    Okay.  Without reading the whole

17   question, your answer is that, "The plaintiff

18   no longer contends that the defendant committed

19   a violation of the equal protection clause."

20   Do you see that, sir?

21       A.    Yes.

22       Q.    Okay.  Today you're foregoing that

23   claim for equal protection, correct?

24       A.    Yes.

1       Q.    All right.  And, similarly, on page

2  ten, earlier question No. 16, your answer to

3  that question; do you see it, sir?

4       A.    Yes.

5       Q.    It states, "Plaintiff no longer

6  contends that the adverse employment action was

7  based on age."  Do you see that, sir?

8       A.    Yes.

9       Q.    And is that a true statement?

10      A.    Yes.

11      Q.    Okay.  Now, are you claiming any

12  damages as a result of the conduct of the Town

13  of Dracut in this case, sir?

14      A.    Yes, I am.

15      Q.    What types of damages are you

16  claiming?

17      A.    The damages would be the difference

18  between the chief's salary and my current

19  salary.

20      Q.    Okay.  Before we get into that, sir,

21  other than the differences in your wages, are

22  there any other categories or types of damages

23  you're seeking?

24      A.    No.

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

THOMAS MCNIFF,              )
       Plaintiff           )
                               )
v.                           )
                               )     C.A. No. 05CV10238 RBC
TOWN OF DRACUT,        )
       Defendant       )
                               )

**AFFIDAVIT OF LOUIS PANAS**

I, Louis Panas, being duly sworn, does hereby swear, affirm and depose as follows:

1.     I presently reside at 54 Holly Lane in Dracut Massachusetts.

2.     I was formerly employed as the Chief of Police of the Dracut Police Department, having

retired on February 19, 2005.

3.     I began my service as a full-time police office with the Dracut Police Department in 1970,

after having served as a part-time reserve officer.

4.     I was appointed to Police Chief in 1986, and served in that position approximately

nineteen years until my retirement.

5.     I know the Plaintiff, Thomas McNiff, as a member of the Dracut Police Department.

6.     The Plaintiff held various positions within the Police Department during my tenure, to

include Sergeant, Captain, and Provisional Deputy Chief.

7.     At the time of my retirement, Plaintiff held the position of Captain, having served as

Provisional Deputy Chief for a period of approximately three years from 1995 through

1998 until permanent Deputy Chief Kevin Rowe was appointed 12/27/98 and Plaintiff

returned to the rank of Captain.

8.    I was not aware the Plaintiff suffered from prostate cancer until that allegation was made in the lawsuit complaint in this case, well after the decision to bypass Plaintiff for promotion to Provisional Chief was made.

9.    I was aware that Plaintiff had previously undergone surgery for a skin lesion on his nose, however, I did not regard this ailment as substantially limiting any of his major life activities.

10.    The only notice which I received of the reasons for Plaintiff's absence from work from late August through early October 2004 was a letter from a Dr. Francis MacDonald, M.D., stating only that Plaintiff would be "undergoing surgery" for an unspecified reason, and that he was expected to be out of work for 3-4 weeks.

11.    My understanding from speaking to the Town Manager, Dennis Piendak, was that Plaintiff's surgery was for a hernia condition.

12.    I did not regard Plaintiff Thomas McNiff as being substantially limited in one or more of his major life activities at anytime during his employment with the Dracut Police Department.

13.    Plaintiff provided a Doctor's note stating he would be able to return to work on October 12, 2004, which again did not identify the reason for his surgery or specify any injury, ailment or limitations suffered by Plaintiff.

14.    These two written notes by Plaintiff's doctor saying that he would be out of work and later saying he was allowed to return to work were the only written documentation received by me for Plaintiff's use of sick days from January 2002 through November 2004.

15.   After I announced my retirement, the Town Manager requested that I make a recommendation to him concerning who should be promoted to the position of Provisional (or Acting) Police Chief.

16.   By letter dated November 16, 2004, a true and accurate copy of which is attached hereto as **Exhibit 1**, I recommended the Town appoint Lt. Kevin Richardson as the Acting Chief, setting forth reasons including his lengthy and exemplary service in law enforcement, his awards and decorations, and his demonstrated leadership.

17.   By letter dated November 23, 2004, I recommended to the Town Manager that he not consider promoting Captain McNiff to the position of Acting Police Chief.

18.   A true and accurate copy of my November 23 letter to the Town Manager is attached hereto as **Exhibit 2**.

19.   The reasons set forth in the November 23 letter for bypassing Plaintiff are true and accurate to the best of my knowledge.

20.   My reasons for recommending that Plaintiff not be promoted to Provisional Chief, as set forth in more detail in the November 23 letter, included: 1) Plaintiff had previously announced his intent to retire and received a raise for doing so; 2) Plaintiff used excessive amounts of sick leave and the pattern of leave suggested abuse; 3) I had previously reprimanded Plaintiff for a conflict of interest in changing his spouse's sick leave accruals; 4) I had suspended Plaintiff for 2 separate incidents of violating department rules in 1999; 5) Plaintiff never signed up for the open position of Deputy Chief in 2003, indicating no interest in a leadership role in the Department.

21.   At the time of my letter of November 23, Plaintiff had not informed me of his intent to

withdraw his letter of resignation, and I was not aware of this from any other source.

22.    By my accounting, other than receiving a medical note documenting 39 days of sick leave, Plaintiff had not submitted documentation for his use of 84 full sick days and 29 partial sick days in the 23 months between January 2002 and my November 2004 letter.

23.    Plaintiff did not file a union grievance from my letter of reprimand over the conflict of interest violation.

24.    Plaintiff's grievance over the three day suspension was denied after an appeal and testimony before the Civil Service Commission Hearing.

25.    I perceived Plaintiff's failure to sign up for the Provisional Deputy Chief's position as an expression of lack of interest in a leadership position in the Department.

26.    My recommendation to bypass Plaintiff for Provisional Chief was in no way based upon Plaintiff suffering from cancer, of which I was not even aware at the time of my recommendation in November 2004.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _18th_ DAY OF _November_, 2005.

_Louis Panas_
Louis Panas

Page 4 of 4

# EXHIBIT 1



# Dracut Police Department

1600 LAKEVIEW AVENUE
DRACUT, MASSACHUSETTS 01826

LOUIS PANAS
Chief of Police

TEL. (978) 957-2123
FAX (978) 957-7197

November 16, 2004

Mr. Dennis Piendak
Town Manager
62 Arlington St.
Dracut MA. 01826

Dear Mr. Piendak,

It is my recommendation that you as the appointing authority for the Town of Dracut appoint Mr. Kevin Richardson to the position of acting chief of police for the following reasons.

Mr. Richardson holds a Master of Science degree in Criminal Justice Administration from Western New England College where he graduated Suma Cum Laude. He also holds a Bachelor of Science degree from Springfield College in Criminal Justice and Human Services and graduated Cum Laude.

He has over thirty years of experience in law enforcement. He started his career in 1972 when he enlisted in the United States Army and served with the Military Police Corps until 1975.

In January of 1977 he was appointed a Correction Officer with the Middlesex Sheriff's Office and in 1980 he was promoted to the supervisory rank of sergeant. During his career with the Sheriff's Office he was commended on numerous occasions by Sheriff John Buckley for his actions. On one occasion he was commended for discovering an inmate in the process of making a bomb, and on another he was commended for arresting several subjects who attempted to deliver a large amount of narcotics to inmates at that institution.

In January of 1985 Mr. Richardson was appointed a patrolman with the Dracut Police Department. A review of his personnel file indicates the he was commended for his work on several occasions for outstanding performance of duty.

In February of 1988 he was appointed to the position of Detective in the Criminal Investigation Bureau. Again he displayed outstanding performance of duty by solving several major crimes including housebreaks and narcotics offenses.

In September of 1989 he was promoted to the rank of Detective Sergeant and was the supervisory officer of the Criminal Investigation Bureau. During this time there were several major crimes solved and prosecuted under his leadership including the murder of a young boy.

In September of 1992 Mr. Richardson went to the Patrol Division where he served as a Patrol Sergeant on the day shift.

In November of 1993 then Sergeant Richardson was awarded the Massachusetts Police Associations Community Service Award for outstanding and dedicated service to the community.

In October of 1994 Sergeant Richardson was awarded the prestigious George L. Hanna Memorial Award for Bravery Medal of Valor for his actions during a violent confrontation with two armed robbery suspects. One of those suspects pulled a 45 caliber semi automatic handgun and attempted to murder another police officer that Richardson was providing backup for on that day. This award is one of the highest awards a Massachusetts police officer can receive for bravery in the line of duty.

In October of 1994 Sergeant Richardson was presented with a commendation from the Dracut Board of Selectmen for Bravery Courage and Dedication to the Citizens of Dracut.

In April of 2000 Richardson was promoted to the rank of Lieutenant and took command of the 1:00 am to 9:00 am shift. During this time Lieutenant Richardson demonstrated to me that he is an exceptional leader.

In May of 2000 Lieutenant Richardson was chosen to represent the Commonwealth of Massachusetts at the National Law Enforcement Officers Memorial in Washington D.C. an honor bestowed on him for his dedication to the police service.

On September 21st 2003 Richardson was promoted to the rank of provisional Deputy Chief a position that was posted and only he signed up for. While serving in this capacity Richardson has demonstrated exemplary capabilities as a top level administrator. During this time Richardson has been assigned the task of conducting numerous internal investigations. These difficult assignments have been accomplished with the utmost thoroughness. During his tenure the District Attorney's Office has modified numerous accepted police practices. Deputy Richardson has worked hand in hand with myself to draft and implement new policies and procedures for the Dracut Police Department. Deputy Richardson also spearheaded a revamping of the uniform policy of the department. His extensive work involved multiple negotiation sessions with members of the local bargaining unit. During these sessions he has demonstrated his ability to address the concerns of union members while attaining the goals of the administration.

There is no doubt that during his tenure as Deputy Chief, Richardson has demonstrated the diverse skills and management ability required to serve as Chief of the police department. His current presence and past accomplishments combine to create an air of confidence and leadership among the rank and file of the police department. Also in conclusion I have personally checked Deputy Richardson's personnel folder and in twenty-one years of service there isn't one instance of any discipline taken against him and no pattern of sick time abuse.

Respectfully,

Louis Panas
Chief of Police

# EXHIBIT 2



# Dracut Police Department
### 1600 LAKEVIEW AVENUE
### DRACUT, MASSACHUSETTS 01826

LOUIS PANAS
Chief of Police

TEL. (978) 957-2123
FAX (978) 957-7197

Dennis E. Piendak
Dracut Town Manager
62 Arlington Street
Dracut, MA.

11/23/2004

Dear Mr. Piendak:

    Chapter 31, Section 15 of the Massachusetts Central Laws specifically indicates that an Appointing Authority may, with the approval of the Personnel Administrator, make a Provisional Promotion of a civil service employee in one title to the next higher title in the same departmental unit. Such provisional promotion may be made only if there is no suitable eligible list, or if the list contains the names of less than three persons eligible for and willing to accept employment. It goes on to say that if there is no such employee in the next lower title who is qualified for and willing to accept such provisional promotion the administrator may authorize a provisional promotion of a permanent employee in the departmental unit without regard to title, upon submission to the administrator by the appointing authority of sound and sufficient reasons therefore, satisfactory to the administrator.

    Based on the above statute, I am recommending that you do not consider promoting Captain Thomas McNiff to the position of Acting Police Chief even though he is in the next lower title for the following reasons as listed below.

1. On December 3, 2002, Captain McNiff submitted a letter of retirement, addressed to me, indicating his intent to retire from the Dracut Police Department on December 31, 2004. He also indicated in his letter that he would be entitled to a 7.5% increment in his pay as a contractual benefit, from December 31, 2003 to his retirement date of December 31, 2004. He has been receiving that benefit for almost a full year now. I have not received anything in writing or otherwise to indicate that his position has changed regarding this matter.

2. Since January 29, 2002 to the present day,  Captain McNiff has used One Hundred twenty three (123) full days of sick leave and twenty nine (29) partial days of sick leave. Thirty nine (39) sick days are documented. (Days for which I have a doctor's letter with a reason). That leaves eighty four (84) full days and twenty nine (29) partial days that he just took randomly. After reviewing this list of sick days, it became obvious that he has engaged in a  pattern of sick leave abuse that is considered excessive. Most of the days that he called in sick

The Town of Dracut is an Equal Opportunity/Affirmative Action Employer

were during the middle of the work week, Tuesday, Wednesday or Thursday requiring a replacement officer for him as the department prosecutor to be payed at time and one half. It also became obvious with this abuse pattern, that he was calling in sick on those days so that he would be eligible for overtime shifts on the weekends without coming under the two day sick rule which would not allow him to work overtime or details for a 48 hour period after calling in sick. A number of times during that period of time, he has called in sick on a Monday the day after he would work an overtime shift on a Sunday. You have the information on this sick leave abuse pattern as provided by me.

3.  On June 9, 1997, I conducted an investigation regarding his involvement with the personnel records of his wife who was also a permanent employee of the Dracut Police Department. This investigation was initiated by me as a result of a referral from an investigator of the State Ethics Commission. At that time he was a Provisional Deputy Chief and instructed a Sergeant on the Department to make changes in her sick time accrual records. It was clear that he violated the Conflict of Interest Law and as a result, I issued him a written reprimand that has remained in his personnel file. Attached is a copy of the written reprimand.

4.  On September 10, 1999, I issued Captain McNiff a three day suspension for violation of the Rules and Regulations of the Dracut Police Department, Neglect of Duty. He failed to take suitable and appropriate police action on Wednesday June 2, 1999 and also on June 17, 1999. This suspension was appealed by him to the Appointing Authority of the Town of Dracut and also the Civil Service Commission, and in both cases the suspension was upheld. Attached is a copy of the three day suspension notice with more details.

5.  On August 29, 2003, I posted a notice on the Union Bulletin Board at the Dracut Police Station which specifically said, Any Captain or Lieutenant interested in a position as a Provisional Deputy Police Chief please indicate by signing below. This notice remained posted for approximately one week and the only person that signed the notice was Lieutenant Kevin Richardson. This indicated to me that the only person interested in this higher management position was and still is Kevin Richardson. At no time since his departure as Provisional Deputy Chief has Captain McNiff approached me as the Chief of Police and made any suggestions, or provided any type of information or input that would lead one to believe that he was interested in becoming part of the management of this department or that he has a legitimate interest in the betterment of the Dracut Police Department as a whole. Attached is a copy of the notice as posted on the bulletin board.

If you have any further questions regarding this matter, contact me at my office.

Sincerely,

*Louis Panas*

Louis Panas

December 3, 2002

Chief Louis Panas
Dracut Police Department

Chief Panas:

This letter is to inform you that on December 31, 2004, I intend to retire from the Dracut Police Department.

Article 29 of the Collective Bargaining Agreement between the Town of Dracut and the International Brotherhood of Police Officers, Local 379, Termination of Employment, states under Section 3; " The employee shall receive a 5% salary increase if retiring after 60, but before 62, a 7.5% salary increase if, retiring after age 50, but before age 60. This increment shall be paid for his/her **last twelve (12) months of service**. He/she shall notify the Department in writing of his/her expected separation date. Notification must be at least sixty (60) days prior to the Annual Spring Town Meeting to provide proper budget presentation."

With this notice I will be entitled to the **7.5%** pay increment from **December 31, 2003** to my retirement date of **December 31, 2004**.

Article 25, Section 3, refers to Sick Leave Buy Back, "Upon the retirement, separation, or death of an employee, such employee or his/her estate will be able to convert into cash up to one hundred and twenty (120) days of his/her accumulated sick leave…"

I will be carrying a balance of at least **one hundred and twenty** sick days on my retirement date and as a result I will be entitled to the **full buy back** of the one hundred and twenty days.

On my retirement date I will also be entitled to payment of any accumulated comp time or any other time owed to me. Please make your budget preparation to reflect all monies owed to me so that I can be properly compensated for all monies owed at that time.

My employment with the Town of Dracut Police Department has been a very rewarding thirty-two years experience. I have accomplished many personal goals during that time and I have been able to assist many members of this community throughout my career as a police officer. I have made many lifetime friendships and I am grateful for the opportunity I had to serve the Town of Dracut for such a long employment

Respectfully;

Thomas M. McNiff

Thomas M. McNiff
Captain

# DEPARTMENT NOTICE

## August 29, 2003

### Any Captain or Lieutenant Interested in a Provisional Deputy Police Chief's Position Please Indicate By Signing Below

_Kevin McRichardson_

Louis Panas, Chief



# Dracut Police Department

1600 LAKEVIEW AVENUE
DRACUT, MASSACHUSETTS 01826

TEL. (508) 957-2123

LOUIS PANAS
Chief of Police

Deputy Thomas McNiff
Dracut Police Department                         June 09, 1997
Dracut, MA.

Dear Deputy McNiff:

This letter will confirm our conversations regarding your involvement with the personnel records of your wife who is also an employee of this department. It will also serve as a strict admonition and written reprimand that you are to avoid any involvement with her records or assignment so that there will not be even the appearance of impropriety or favoritism. This written reprimand will be placed in your personnel file.

After a thorough investigation, I have concluded that you instructed Sergeant Joseph Shurtleff to correct the sick time accrual records of your wife. You acknowledged this in your discussion with me.

While it appears clear that your wife was entitled to the credit, and had made attempts to have a bookkeeping error corrected through other department employees, she was wrong for seeking your intervention and you were wrong for getting involved. Even though you were not seeking or providing any unwarranted benefit, you have violated the Conflict of Interest Law. I expect your actions to be above reproach.

I am confident that the seriousness of this matter is now evident to you and you have assured me that no similar incident will reoccur. Be advised that further actions of this nature will be dealt with much more severely.

Respectfully,

Louis Panas

Louis Panas
Chief of Police



# 𝔇racut 𝔓olice 𝔇epartment

**1600 LAKEVIEW AVENUE**
**DRACUT, MASSACHUSETTS 01826**

LOUIS PANAS
Chief of Police

TEL. (978) 957-2123
FAX (978) 957-7197

Captain Thomas M. McNiff                           September 10, 1999
6 Independence Drive
Tyngsboro, MA.

Dear Captain McNiff:

You are hereby notified that pursuant to the powers conferred on me by Massachusetts
General Laws, Chapter 31, Section 41, I am suspending you from the Dracut Police
Department for a period of three (3) days without pay.

The three days of suspension are to be served on Monday September 13, 1999, Tuesday
September 14, 1999 and Wednesday September 15, 1999.

The specific reason for this suspension is that you were in violation of the Rules and Regulations
of the Dracut Police Department section 1, paragraph G Prohibited Conduct.

Paragraph G- Item 3- Neglect of Duty- Being absent from assigned duty without leave or failing
to take suitable and appropriate police action when any crime, public disorder or other incident
requires police attention.
On Wednesday June 2, 1999, you failed to take suitable and appropriate police action when you
did not provide a report yourself, and you did not allow Officer William Bailey to make out a
police report on an incident that could of had some relevance to an important police
investigation being conducted by the New Hampshire State Police.
Also, you would not allow the on duty Dispatcher to log the information on the Daily Log so that
it would be available for review.
On Thursday June 17, 1999, you failed to take suitable and appropriate police action when you
told Officer William Bailey who had made a motor vehicle stop, not to arrest an individual on an
outstanding default warrant for (1) Assault and (2) Threatening to commit a crime. The
Dispatcher on duty immediately checked the local records to confirm the charges and found that
the default warrant was for Domestic Assault & Battery. She immediately informed you as the
Commanding Officer of such, and then notified Officer Bailey over the police radio. You told
Officer Bailey to have this individual turn himself in at a later date. This individual also had a
young child in the motor vehicle (2 to 3 years of age) that was being transported without a Child
Safety Seat. You were made aware of this fact and the operator was allowed to leave the scene



# Dracut Police Department

1600 LAKEVIEW AVENUE
DRACUT, MASSACHUSETTS 01826

LOUIS PANAS
Chief of Police

TEL. (978) 957-2123
FAX (978) 957-7197

with the unrestrained child in the motor vehicle.

You may file a counter statement, and you have the right, within forty-eight hours of receipt of this notice, to request in writing a hearing by the Appointing Authority, the Town Manager Dracut, Massachusetts. The hearing will be on the question of whether there was just cause for the suspension. If you request such a hearing, it will be held within five (5) days of the receipt of such request by the Appointing Authority. Always disregard Saturdays, Sundays and holidays when computing time.

I have enclosed a copy of Massachusetts General Laws, Chapter 31, Sections 41, 41A, 42, 43, 44 and 45.

Sincerely,,

Louis Panas
Chief of Police

Enclosures
CC:  Personnel Administrator
        Town Manager
        Dracut Board of Selectmen

Served:  Date 9-10-9? Time 1400

Deputy Chief Kevin Rowe *Deputy Chief Kevin M. Rowe*

The Town of Dracut is an Equal Opportunity/Affirmative Action Employer

# EXHIBIT "D"

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THOMAS MCNIFF,<br>          Plaintiff | ) ) ) ) | |
| v. | ) ) | C.A. No. 05CV10238 RBC |
| TOWN OF DRACUT,<br>          Defendant | ) ) ) ) | |

**AFFIDAVIT OF DENNIS E. PIENDAK**

I, Dennis E. Piendak, duly under oath, do hereby swear, affirm and depose as follows:

1.     I am the Town Manager for the Town of Dracut, Massachusetts.

2.     I was appointed to the position of Town Manager by vote of the Board of Selectmen in

        September 1986.

3.     The authority for my position of Town Manager is pursuant to the Town of Dracut Town

        Charter Article 4.

4.     In my capacity as Town Manager I am the appointing authority for the Position of Police

        Chief (and Provisional Police Chief) for the Town of Dracut, such appointments subject

        to the approval of the Board of Selectmen.

5.     By letter dated June 9, 2004, Police Chief Panas advised me of his intent to retire from

        that position.  See L. Panas Ltr. dtd. 06/09/04 (attached hereto as **Exhibit 1**)

6.     Although his letter specified a date certain for his retirement (September 18, 2004), in my

        subsequent discussions with Chief Panas, he agreed to an open-ended retirement date

        dependent upon the Town appointing his successor.

7.     After consulting with Chief Panas, on November 23, 2004 I notified the Board of

Selectmen of my selection of Lt. Kevin Richardson as Acting Police Chief. <u>See</u> Memo. to Bd. of Selectmen dtd. 11/23/04 (attached hereto as **Exhibit 2**).

8.   I later met with the Board of Selectmen regarding my recommendation of the appointment of Kevin Richardson as a Provisional Chief.

9.   The Board of Selectmen requested we await a decision from the Civil Service Commission authorizing the bypass of Plaintiff before it would vote upon the appointment of Kevin Richardson as Provisional Chief.

10.   By letter dated December 21, 2004 I submitted detailed reasons for my selection of Lt. Kevin Richardson as Provisional Chief to the Massachusetts Civil Service Unit. <u>See</u> D. Piendak Ltr. dtd. 12/21/04 and accompanying doc.s (attached hereto as **Exhibit 3**).

11.   The attachments to my letter to the Civil Service Unit included my memorandum to the Board of Selectmen dated November 30, 2004 detailing my reasons for selecting Lt. Richardson, as well as a Confidential Letter to the Civil Service Unit outlining my reasons for determining that Plaintiff was not qualified for the position of Acting Chief under the civil service laws. <u>See Id.</u>

12.   Among the reasons for my determination that Plaintiff was not qualified for the position were 1) Plaintiff's earlier noticed retirement and receipt of additional pay therefor; 2) Plaintiff's sick leave usage patterns suggestive of his work ethic and lack of leadership; 3) Plaintiff was found to have violated the conflict of interest laws in 1997; 4) Plaintiff was suspended for three days in 1999 for violating Department Rules; 5) Plaintiff did not sign up for the position of Provisional Deputy Chief in 2003 demonstrating disinterest in a leadership role; 6) Plaintiff did not provide regular input to Chief Panas in the

management of the Department; and 7) Plaintiff did not sit for the Deputy Chief exam

demonstrating disinterest in leadership of the Department.  See Id.

13.    In response to my request, on January 28, 2005, the Civil Service Commission approved

the appointment of Lt. Richardson, and bypass of Plaintiff, as Provisional Chief.  See

Provisional Promotion Form 15A dtd. 01/28/05 (attached hereto as **Exhibit 4**).

14.    At no time prior to my decision to appoint Kevin Richardson as Provisional Chief was I

aware that Plaintiff suffered from Prostate cancer or any other ailment which caused him

to miss extended time from work.

15.    Plaintiff informed me that the reason he was to miss work in late August and September

2004 was for hernia surgery.

16.    My decision to bypass Plaintiff for Provisional Chief was in no way based upon Plaintiff

suffering from cancer, of which I was not even aware at the time of my decision  in

November 2004.

17.    I first learned that Plaintiff suffered from prostate cancer by the filing of the Plaintiff's

Complaint in this lawsuit.

18.    Plaintiff's use of sick time reflects that from January 29, 2002 to November 2004 he took

152 sick days, 37 of which could be justified by a doctor's note for surgery, leaving 113

sick days unexplained.  See Printout of T. McNiff Sick Day Usage (attached hereto as

**Exhibit 5**).

19.    A comparison of the sick days used with subsequent overtime shifts during the years 2002

through 2004 shows a clear pattern of usage of multiple sick days in the middle of the

week permitting work on overtime shifts on the weekends without violating the

Department's rule prohibiting assignment to Overtime or Paid Detail Shifts within two days of a sick day.  See List of T. McNiff Sick Days and Overtime Shifts (attached hereto as **Exhibit 6**):

20.  Under the union contract applicable to Plaintiff, employees were entitled to a buyback of up to 120 days of sick leave at the time of retirement, and by November 2004 Plaintiff had decreased his sick leave balance to 128 days.

21.  This pattern of sick day usage suggests Plaintiff was abusing the sick leave and not setting the proper example for other officers in the Department.

22.  I appointed Lt. Richardson as Provisional Chief because of his record of lengthy and exemplary service in law enforcement, his awards and decorations, and his demonstrated leadership, as more fully described in my letter of November 30, 2004 attached hereto.

23.  Plaintiff, himself, had previously notified the Town of his intent to retire and received a 7.5% raise pursuant to the union contract for so doing.

24.  It was not until Plaintiff submitted a written notice of his intent to withdraw his resignation in December 2004 that the Town calculated the amount Plaintiff would be required to reimburse the Town for his 7.5 % retirement raise.  See A. Vandall Ltr. dtd. 01/11/05 (attached hereto as **Exhibit 7**).


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _16th_ DAY OF _November_, 2005

Dennis E. Piendak
Town Manager, Town of Dracut


Page 4 of 4

# EXHIBIT 1



# Dracut Police Department

1600 LAKEVIEW AVENUE
DRACUT, MASSACHUSETTS 01826

LOUIS PANAS
Chief of Police



TEL. (978) 957-2123
FAX (978) 957-7197

Dennis E. Piendak
Dracut Town Manager                    June 9, 2004
62 Arlington Street
Dracut, MA.

Dear Mr. Piendak:

    I am writing this letter to inform you of my intent to retire from the
Dracut Police Department on September 18, 2004.
Effective with this notification, I would like to have all benefits that I am
entitled to including but not limited to: (Sick Leave Buy Back), Vacation
days and other benefits not used. I would like to convert into cash my
accumulated One Hundred and Twenty days (120) of sick leave buy back
and vacation days not used at the rate of pay in effect at the time of my
retirement.
My many years of service with the police department have been rewarding,
and I would like to thank you and my other superiors, my fellow officers at
the police department, and the people in our community for all the help and
support that I have received through the years.

                                Sincerely,

                                Louis Panas
                                Chief of police



EXHIBIT
No 3
10-18-05

The Town of Dracut is an Equal Opportunity/Affirmative Action Employer

# EXHIBIT 2



# Town of Dracut

**TOWN HALL**
62 ARLINGTON STREET
DRACUT, MASSACHUSETTS 01826

Office of the Town Manager
(978) 452-1227
Fax: (978) 452-7924
Email: DEPSH@aol.com

Dennis E. Piendak
Town Manager

November 23, 2004

To: Board of Selectmen

Re: Acting Police Chief

Please be advised I have selected Lieutenant (Acting Deputy Chief) Kevin Richardson to be acting Police Chief upon retirement of Chief Panas. Chief Panas plans to retire between now and the end of December after meeting with the retirement board.

Because the position of police chief is under civil service the departmental exam will be called for which is conducted in May 2005 with an eligibility list to be forwarded during next summer.

Respectfully submitted,

Dennis E. Piendak
Town Manager

/sac

# EXHIBIT 3

**FILE COPY**



# Town of Dracut

TOWN HALL
62 ARLINGTON STREET
DRACUT, MASSACHUSETTS 01826

Office of the Town Manager
(978) 452-1227
Fax: (978) 452-7924
Email: DEPSH@aol.com

Dennis E. Piendak
Town Manager

December 21, 2004

Commonwealth of Massachusetts
Executive Office for Administration & Finance
Attn: Ms. Sally McNeely
Human Resources Division, Room 301
Boston, MA 02108

Dear Ms. McNeely,

Please be advised of the following:

- Dracut Police Chief Louis Panas has notified me of his intent to retire in 2005 although the specific date is yet to be determined.
- Accordingly, I hereby request a scheduling of a police chief's examination for the Town of Dracut with the eligibility pool to be all ranks from Sergeant and above.
- In anticipation of the chief's retirement, I have selected Lieutenant Kevin Richardson for the appointment of acting police chief.
- Within Dracut's current rank structure the position of deputy chief is unfilled; it does include one captain and two permanent lieutenants.
- The Dracut Police Department table of organization does not offer multiple incumbents in the rank of captain from which a selection may be made, as is usual customary civil service practice.
- Attached are more detailed reasons for my selection for appointment of Lieutenant Richardson.
- In making this selection it is my determination and judgment that Captain Thomas Mcniff is not qualified as set forth in M.G.L. Chapter 31 Section 15. This determination recognizes that qualified, definitionally includes, suitability for an office or position. Therefore, selection from the rank of lieutenant.
- Set forth in the second attachment, which I have marked personal and confidential because of the personnel file matters contained therein there are other reasons as to why I reached the above determination.
- You should be aware that the Dracut charter requires that the Board of Selectmen approve the Town Manager's appointment to police chief (Town Counsel opined that this extends to acting chief as well) and the board has not yet approved my appointment of Lieutenant Richardson as acting chief.

Page Two
RE: Dracut Police Chief
December 21, 2004

You may recall that we discussed this matter with you when we met earlier this fall and with this same correspondence I am requesting the authorization of the personnel administrator so that Lieutenant Richardson might be appointed as acting police chief.

Sincerely,

Dennis E. Piendak
Town Manager

/sac

c: Board of Selectmen
   Captain Thomas McNiff
   Chief Louis Panas



# Town of Dracut

*Attachment 2*

**TOWN HALL**
**62 ARLINGTON STREET**
**DRACUT, MASSACHUSETTS 01826**

Dennis E. Piendak
Town Manager

Office of the Town Manager
(978) 452-1227
Fax: (978) 452-7924
Email: DEPSH@aol.com

November 30, 2004

To: Board of Selectmen

RE:  Acting Police Chief

The following is a written report constituting the reasons Chief Panas in recommending to me and in which I concur and forward the basis for selection of Mr. Kevin Richardson as Acting Police Chief.

Mr. Richardson holds a Master of Science degree in Criminal Justice Administration from Western New England College where he graduated Sum Cum Laude. He also holds a Bachelor of Science degree from Springfield College in Criminal Justice and Human Services and graduated Cum Laude.

He has over thirty years of experience in law enforcement. He started his career in 1972 when he enlisted in the United States Army and served with the Military Police Corps until 1975.

In January of 1977, he was appointed Correction Officer with the Middlesex Sheriff's Office and in 1980 he was promoted to the supervisory rank of sergeant. During his career with the Sheriff's Office, Sheriff John Buckley commended him on numerous occasions for his actions. On one occasion he was commended for discovering an inmate in the process of making a bomb, and on another he was commended for arresting several subjects who attempted to deliver a large amount of narcotics to inmates at that institution.

In January of 1985, Mr. Richardson was appointed patrolman with the Dracut Police Department. A review of his personnel file indicates that he was commended for his work on several occasions for outstanding performance of duty.

In February of 1988 he was appointed to the position of Detective in the Criminal Investigation Bureau. Again, he displayed outstanding performance of duty by solving several major crimes including housebreaks and narcotic offenses.

In September 1989 he was promoted to the rank of Detective Sergeant and was the supervisory officer of the Criminal Investigation Bureau. During this time there were several major crimes solved and prosecuted under his leadership including the murder of a young boy.

In September 1992 Mr. Richardson went to the Patrol Division where he served as a Patrol Sergeant on the day shift.

In November 1993 then Sergeant Richardson was awarded the Massachusetts Police Association Community Service Award for outstanding and dedicated service to the community.

In October 1994 Sergeant Richardson was awarded the prestigious George L. Hanna Memorial Award for Bravery Medal of Valor for his actions during a violent confrontation with two armed robbery suspects. One of those suspects pulled a 45 caliber semi-automatic handgun and attempted to murder another police officer that Richardson was providing backup for on that day. This award is one of the highest awards a Massachusetts Police Officer can receive for bravery in the line of duty.

In October 1994, Sergeant Richardson was presented with a commendation from the Dracut Board of Selectmen for Bravery, Courage and Dedication to the Citizens of Dracut.

In April 2000 Richardson was promoted to the rank of Lieutenant and took command of the 1:00 a.m. to 9:00 a.m. shift. During this time Lieutenant Richardson demonstrated to me that he is an exceptional leader.

In May 2000 Lieutenant Richardson was chosen to represent the Commonwealth of Massachusetts at the National Law Enforcement Officers Memorial in Washington D.C. an honor bestowed on him for his dedication to the police service.

On September 21, 2003 Richardson was promoted to the rank of provisional Deputy Chief a position that was posted and only he signed up for. While serving in this capacity Richardson has demonstrated exemplary capabilities as a top-level administrator. During this time Richardson has been assigned the task of conducting numerous internal investigations. These difficult assignments have been accomplished with the utmost thoroughness. During his tenure the District Attorney's office has modified numerous accepted police practices. Deputy Richardson has worked hand in hand with myself to draft and implement new policies and procedures for the Dracut Police Department. Deputy Richardson also spearheaded a revamping of the uniform policy of the department. His extensive work involved multiple negotiation sessions with members of the local bargaining unit. During these sessions he has demonstrated his ability to address the concerns of union members while attaining the goals of the administration.

There is no doubt that during his tenure as Deputy Chief, Richardson has demonstrated the diverse skills and management ability required to serve as Chief of the Police Department. His current presence and past accomplishments combine to create an air of confidence and leadership among the rank and file of the police department. Also, in conclusion, I have personally checked Deputy Richardson's personnel folder and in twenty-one years of service there isn't one instance of any discipline taken against him and no pattern of sick time abuse.

Chief Louis Panas
Dracut Police Department

Dennis E. Piendak
Town Manager

*Attachment 3*

December 17, 2004

**PERSONAL AND CONFIDENTIAL NOT TO BE DISSEMINATED**

Attachment to McNeeley Letter
RE: Acting Police Chief
Captain McNiff - Evaluation and Determination

The following is an analysis of the information drawn upon to reach my judgment and determination that Captain McNiff is not qualified for the position of acting chief.

1. On December 3, 2002, Captain McNiff submitted a letter of retirement, indicating his intent to retire from the Dracut Police Department on December 31, 2004. He also indicated in his letter that he would be entitled to a 7.5% increment in his pay as provided for in the contract agreement between the Town and Local 379. From December 31, 2003 to date he has and continues to receive this benefit. No cessation of the receipt of this benefit has taken place nor has any revocation of his retirement notice been received.

2. Attached is a three-year calendar showing Captain McNiff's leave usage. Since January 29, 2002 to date, Captain McNiff has utilized 123 full and 29 partial days of sick leave. Only the period between August 25, 2004 to October 11 2004 was subject to a note from a medical practitioner attesting to his inability to work. The analysis on the attached sheet shows that sick leave was utilized on or around holiday periods. (See December 2002, November 2003, December 2003, and November 2004.) Sick leave was often used on Fridays, when not, it was used mid-week so as not to conflict with the Town's two-day sick leave policy which prohibits overtime or detail shift work within two-days of sick leave usage.

   Additionally, the analysis shows that on at least seven occasions the sick leave usage either a full or partial day was paired with a vacation day. By contractual agreement Captain McNiff is eligible to be paid for up to 120 days of unused sick days at retirement. Currently Captain McNiff has 128 days available to him. I weigh this information carefully and importantly, as it is an indicator of work ethic, and ability to lead by example.

3. On June 9, 1997, Chief Panas conducted an investigation regarding Captain McNiff's involvement with the personnel records of his wife who at the time was also a permanent employee of the Dracut Police Department. The Chief as a result of a referral from an

Page 2
RE: Acting Police Chief
December 17, 2004

investigator of the State Ethics Commission initiated this investigation. At that time
Captain McNiff was a Provisional Deputy Chief and instructed a Sergeant on the
department to make changes in her sick time accrual records.  It was clear to the Chief
that he violated the Conflict of Interest Law and as a result of that investigation a written
reprimand was issued. Attached is a copy of that reprimand.

4.  On September 10, 1999, Captain McNiff was issued a three-day suspension for violation
    of the Rules and Regulations of the Dracut Police Department, Neglect of Duty. The
    suspension was for failure to take suitable and appropriate police action on Wednesday
    June 2, 1999 and also on June 17, 1999. He appealed this suspension to the Appointing
    Authority of the Town of Dracut and also the Civil Service Commission and in both
    cases the suspension was upheld. Attached is a copy of the three-day suspension notice
    with more details.

5.  On August 29, 2003 a notice was posted on the Union Bulletin Board at the Dracut Police
    Station which specifically said, any Captain or Lieutenant interested in a position as a
    Provisional Deputy Police Chief please indicate by signing below.  This notice remained
    posted for approximately one week and the only person that signed the notice was
    Lieutenant Kevin Richardson.  This indicated that the only person interested in this
    higher management position and succession in the Dracut Police Department was and
    still is Lieutenant Kevin Richardson.

6.  I am advised by Chief Panas that at no time since his departure as Provisional Deputy
    Chief has Captain McNiff approached the Chief of Police and offered or provided any
    type of information or input that would lead one to believe that he was interested in
    becoming part of the management of the department.

7.  In May of 2004 a deputy police chief exam was given to the Dracut Police Department
    and Captain McNiff did not sign for or take that examination, which I further weighed in
    determining his lack of interest in succession with the department, until Chief Panas
    announced his retirement plans thus providing the potential opportunity under M.G.L.
    Chapter 31 Section 15 of being the only captain in the department.

December 3, 2002

Chief Louis Panas
Dracut Police Department

Chief Panas:

This letter is to inform you that on December 31, 2004, I intend to retire from the Dracut
Police Department.

Article 29 of the Collective Bargaining Agreement between the Town of Dracut and the
International Brotherhood of Police Officers, Local 379, Termination of Employment,
states under Section 3; " The employee shall receive a 5% salary increase if retiring after
60, but before 62, a 7.5% salary increase if, retiring after age 50, but before age 60. This
increment shall be paid for his/her **last twelve (12) months of service**. He/she shall
notify the Department in writing of his/her expected separation date. Notification must be
at least sixty (60) days prior to the Annual Spring Town Meeting to provide proper
budget presentation."

With this notice I will be entitled to the **7.5%** pay increment from **December 31, 2003** to
my retirement date of **December 31, 2004**.

Article 25, Section 3, refers to Sick Leave Buy Back, "Upon the retirement, separation, or
death of an employee, such employee or his/her estate will be able to convert into cash up
to one hundred and twenty (120) days of his/her accumulated sick leave…"

I will be carrying a balance of at least **one hundred and twenty** sick days on my
retirement date and as a result I will be entitled to the **full buy back** of the one hundred
and twenty days.

On my retirement date I will also be entitled to payment of any accumulated comp time
or any other time owed to me. Please make your budget preparation to reflect all monies
owed to me so that I can be properly compensated for all monies owed at that time.

My employment with the Town of Dracut Police Department has been a very rewarding
thirty-two years experience. I have accomplished many personal goals during that time
and I have been able to assist many members of this community throughout my career as
a police officer. I have made many lifetime friendships and I am grateful for the
opportunity I had to serve the Town of Dracut for such a long employment

Respectfully;

*Thomas M. McNiff*

Thomas M. McNiff
Captain

# DEPARTMENT NOTICE

## August 29, 2003

## Any Captain or Lieutenant Interested in a Provisional Deputy Police Chief's Position Please Indicate By Signing Below

_Kevin McRichardson_

_Louis Panas_

Louis Panas, Chief



# Dracut Police Department

1600 LAKEVIEW AVENUE
DRACUT, MASSACHUSETTS 01826

LOUIS PANAS
Chief of Police

TEL. (508) 957-2123

Deputy Thomas McNiff
Dracut Police Department
Dracut, MA.

June 09, 1997

Dear Deputy McNiff:

This letter will confirm our conversations regarding your involvement with the personnel records of your wife who is also an employee of this department. It will also serve as a strict admonition and written reprimand that you are to avoid any involvement with her records or assignment so that there will not be even the appearance of impropriety or favoritism. This written reprimand will be placed in your personnel file.

After a thorough investigation, I have concluded that you instructed Sergeant Joseph Shurtleff to correct the sick time accrual records of your wife. You acknowledged this in your discussion with me.

While it appears clear that your wife was entitled to the credit, and had made attempts to have a bookkeeping error corrected through other department employees, she was wrong for seeking your intervention and you were wrong for getting involved. Even though you were not seeking or providing any unwarranted benefit, you have violated the Conflict of Interest Law. I expect your actions to be above reproach.

I am confident that the seriousness of this matter is now evident to you and you have assured me that no similar incident will reoccur. Be advised that further actions of this nature will be dealt with much more severely.

Respectfully,

Louis Panas
Louis Panas
Chief of Police

The Town of Dracut is an Equal Opportunity/Affirmative Action Employer



# Dracut Police Department

**1600 LAKEVIEW AVENUE**
**DRACUT, MASSACHUSETTS 01826**

LOUIS PANAS
Chief of Police

TEL. (978) 957-2123
FAX (978) 957-7197

Captain Thomas M. McNiff                    September 10, 1999
6 Independence Drive
Tyngsboro, MA.

Dear Captain McNiff:

You are hereby notified that pursuant to the powers conferred on me by Massachusetts General Laws, Chapter 31, Section 41, I am suspending you from the Dracut Police Department for a period of three (3) days without pay.

The three days of suspension are to be served on Monday September 13, 1999, Tuesday September 14, 1999 and Wednesday September 15, 1999.

The specific reason for this suspension is that you were in violation of the Rules and Regulations of the Dracut Police Department section 1, paragraph G Prohibited Conduct.

Paragraph G- Item 3- Neglect of Duty- Being absent from assigned duty without leave or failing to take suitable and appropriate police action when any crime, public disorder or other incident requires police attention.
On Wednesday June 2, 1999, you failed to take suitable and appropriate police action when you did not provide a report yourself, and you did not allow Officer William Bailey to make out a police report on an incident that could of had some relevance to an important police investigation being conducted by the New Hampshire State Police.
Also, you would not allow the on duty Dispatcher to log the information on the Daily Log so that it would be available for review.
On Thursday June 17, 1999, you failed to take suitable and appropriate police action when you told Officer William Bailey who had made a motor vehicle stop, not to arrest an individual on an outstanding default warrant for (1) Assault and (2) Threatening to commit a crime. The Dispatcher on duty immediately checked the local records to confirm the charges and found that the default warrant was for Domestic Assault & Battery. She immediately informed you as the Commanding Officer of such, and then notified Officer Bailey over the police radio. You told Officer Bailey to have this individual turn himself in at a later date. This individual also had a young child in the motor vehicle (2 to 3 years of age) that was being transported without a Child Safety Seat. You were made aware of this fact and the operator was allowed to leave the scene



# Dracut Police Department

1600 LAKEVIEW AVENUE
DRACUT, MASSACHUSETTS 01826

LOUIS PANAS
Chief of Police

TEL. (978) 957-2123
FAX (978) 957-7197

with the unrestrained child in the motor vehicle.

You may file a counter statement, and you have the right, within forty-eight hours of receipt of this notice, to request in writing a hearing by the Appointing Authority, the Town Manager Dracut, Massachusetts. The hearing will be on the question of whether there was just cause for the suspension. If you request such a hearing, it will be held within five (5) days of the receipt of such request by the Appointing Authority. Always disregard Saturdays, Sundays and holidays when computing time.

I have enclosed a copy of Massachusetts General Laws, Chapter 31, Sections 41, 41A, 42, 43, 44 and 45.

Sincerely,,

Louis Panas
Chief of Police

Enclosures
CC: Personnel Administrator
       Town Manager
       Dracut Board of Selectmen

Served:    Date 9-10-9? Time 1400

Deputy Chief Kevin Rowe

**Board of Selectmen**
**Minutes of August 19, 2004**

Present for the Board of Selectmen were: Jack DiTillio, Chairman, Ken Cunha, Douglas Willett, Dennis Williams and James O'Loughlin.

Also present: Attorney Stanley Weinberg, Attorney James A. Hall, Chief of Police Louis Panas Town Manager Dennis E. Piendak and Assistant Town Manager Glen Edwards. Samantha Carver was the recording secretary.

The Chairman called the meeting to order at 4:40 p.m. Mr. O'Loughlin and Mr. Williams arrived a little later.

Mr. Piendak advised the Board that they have received the civil service list for the Deputy Chief's position with three names on it. The names in order of test scores are Philip Berard, Anthony Archinski and the provisional deputy currently Kevin Richardson. Mr. Piendak stated there are concerns of the suitability of the list. A patrolman was able to take the test for deputy chief due to his appeal regarding his demotion from sergeant. The other issue here to discuss is the Chief's retiring on September 17, 2004. The Chief is willing to stay on as long as necessary, two to three months, in order to resolve the issues of his replacement.

Mr. Piendak also discussed taking the Chief's position out of civil service, which would have to be done at Town Meeting by a vote of the Town's people. If the position is taken out of civil service they have the ability to recruit outside and open up the field of potential applicants.

Mr. Cunha stated that he made the motion to have a Chief in place by September 1, 2004 because they had nothing concrete on getting someone in place. The Board did not know for certain what was going to happen after September 17, 2004 once the Chief retired. It was only rumor that the Chief would be willing to stay on beyond that date but they had nothing concrete.

Mr. Willett inquired about requiring residency and whether we could recruit from within. Mr. Panas responded that an officer has to live within a ten-mile radius. Mr. Piendak stated they could recruit from within.

Mr. Willett asked what the procedure is for taking the Chief's position out of civil service. Mr. Piendak responded that it requires an article enacted at Town Meeting and then a home rule petition filed with the Legislature.

There was a discussion on the ranks that could be considered for acting chief. The next lowest title of captain could be considered however currently that person is retiring at the end of the year. Mr. O'Loughlin stated should we ask if he is interested and wants to stay?

Mr. Piendak discussed that Attorney Weinberg has been trying to get an appointment at the civil service board to get some of these questions answered. If civil service determines that the list is

Page Two
BOS Minutes 08-19-04

ineligible then they can maintain status quo. They do not have to act on the list for a period of two years so they could choose not to fill that position.

Mr. Williams noted that if the Chief's position is voted at Town Meeting to take it out of civil service then the other question of the deputy chief's position goes away.

Mr. DiTillio would entertain a motion for an action on the deputy chief's position.

Mr. O'Loughlin made a motion that the Board is notifying the Manager and the Police Chief that until further decision by the Board and contingent upon Civil Service instructing them that they can no longer keep the acting or provisional deputy and now have to hire a permanent deputy, they will not permanently fill the Deputy Chief's position at the current time. Mr. Williams seconded the motion. The motion carried 4-1 with Mr. Willett being opposed.

Until the Board hears from civil service as to the eligibility of the list the current status stays as is. Mr. Williams and the Board concurred that they would like something in writing from Chief Panas as to his intentions to stay on for whatever period of time he decides. Mr. O'Loughlin thought there should be a date certain put in the letter rather than leave it open ended. Chief Panas stated he cannot give a date certain but will give reasonable notice after a replacement is hired. The Board would like Mr. Piendak to get a warrant article put together to take the Chief's position out of civil service.

The Chairman would entertain a motion on rescinding the action taken at the August 10, 2004 meeting to have a new Chief is place by September 1, 2004.

Mr. Williams made a motion to rescind the original action from August 10, 2004 requiring that a new Police Chief be in place by September 1, 2004. Mr. Cunha seconded the motion. The motion carried unanimously.

Mr. O'Loughlin wants to be kept up to date on the outcome from civil service and if there are any meetings that take place the Board should be notified.

Mr. Cunha made a motion to adjourn the meeting at 5:40 p.m. seconded by Mr. Williams. The motion carried unanimously.

# 2002 CALENDAR

Green = Full Reg 17
Blue = Restical Oct 6

**April 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

**August 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**December 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |   |   |   |   |

**March 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

**July 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

**November 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

**February 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 |   |   |

**June 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |   |   |   |   |   |   |

**October 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

**January 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

**May 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

**September 2002**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |   |   |   |   |   |

# 2003 CALENDAR

Green = Full Day = 37
Blue = Part'l Day = 11

**January 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**February 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | |

**March 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

**April 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

**May 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**June 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**July 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**August 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**September 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

**October 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**November 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

**December 2003**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

# 2004 CALENDAR

**January 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**February 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 |   |   |   |   |   |   |

**March 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

**April 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |   |

**May 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

**June 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

**July 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**August 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |   |   |   |   |

**September 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |   |   |

**October 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

**November 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

**December 2004**
| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

# EXHIBIT 4

# PROVISIONAL PROMOTION
(G.L. Ch. 31, Sec. 15)
Form 15A 9/2003

## HUMAN RESOURCES DIVISION
## CIVIL SERVICE UNIT

_____ State Service       **X** Municipal Service

City or Town: **Dracut, MA**        Department: **Police**

Division: **Administrative**        Bureau: _____

To: The Personnel Administrator        Date: **January 28, 2005**

Name of Employee: **Kevin M. Richardson**        SSN: **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**

Position into which provisional promotion is requested:

Title: **Provisional Police Chief**        Effective Date: **02-28-2005***

Title of permanent position
from which promoted: **Police Lieutenant** _____

**One of the following paragraphs must be completed, including signature. If the appointing authority is not certain that the position is or is not in the next higher grade, he/she should complete paragraph 2 to prevent any delay in processing.**

1. Provisional promotion of the above employee is requested. The position to which promotion is requested is in the next higher grade.
   Signature of Appointing Authority: _____

(2.) Provisional promotion of the above named employee is requested. The position to which promotion is requested is not in the next higher grade.

   (a)   Statement of sound and sufficient reason why provisional promotion will be for the public good.
         **See Attached Letter dated December 21, 2004**

   _____

   _____

   (b)   I hereby certify that there is no employee in the next lower grade and willing to accept.
         Signature of Appointing Authority: _Dennis E. Piendak_
         **Dennis E. Piendak, Town Manager**

The following statement applies on MUNICIPAL PROMOTIONS ONLY:
This is to notify you that I have made a provisional promotion of the person named above.
I have forwarded copies of this letter to the Treasurer and to **Ann Vandal, Town Accountant**
                                        (Insert title of Auditor, Accountant, etc.)

Requisition No. _____

\* **Subject to approval.**

APPROVED
HUMAN RESOURCES DIVISION

BY: _Sally A. McNeely_ 01/28/2005

JAN 28 2005 13:56        617 727 0399        PAGE.02

EXHIBIT 4
T. Mullett
9/2/03

617 727 0399        PAGE.02
** TOTAL PAGE.04 **

# EXHIBIT 5

Request: REP004          Payroll - Dracut Police Dept

Individual time off

Page 1          Filters:    Detail Date Is On or After 07/01/01
                           Members Last_name Is Like McNiff

| | Vacation (Days) | Holiday (Days) | Personal (Days) | Sick (Hours) | Sick (Days) | Compe (Hou |
|---|---|---|---|---|---|---|
| **McNiff, Thomas M.** | 28.00 | | | 1027.00 | 128.37 | |

**Personal**

| | | |
|---|---|---|
| 1.00 Days | 8/8/01 |
| 1.00 Days | 8/20/01 |
| 1.00 Days | 5/13/02 |
| 1.00 Days | 7/5/02 |
| 1.00 Days | 8/7/02 |
| 1.00 Days | 8/19/02 |
| 1.00 Days | 8/13/03 |
| 1.00 Days | 8/18/03 |
| 1.00 Days | 10/8/03 |
| 2.00 Days | 7/1/04,7/2/04 |
| 1.00 Days | 10/18/04 |

**Sick**

| | | |
|---|---|---|
| 8.00 Hours | 10/2/01 |
| 4.00 Hours | 10/3/01 |
| 16.00 Hours | 10/9/01,10/12/01 |
| 8.00 Hours | 11/27/01 |
| 8.00 Hours | 12/5/01 |
| 8.00 Hours | 1/29/02 |
| 24.00 Hours | 3/11/02,3/12/02,3/15/02 |
| 3.00 Hours | 3/14/02 |
| 8.00 Hours | 4/4/02 |
| 16.00 Hours | 4/25/02,4/26/02 |
| 8.00 Hours | 5/7/02 |
| 8.00 Hours | 6/6/02 |
| 4.00 Hours | 9/5/02 |
| 8.00 Hours | 9/6/02 |
| 8.00 Hours | 9/10/02 |
| 2.00 Hours | 9/30/02 |
| 8.00 Hours | 10/1/02 |
| 2.50 Hours | 10/16/02 |
| 2.00 Hours | 10/21/02 |
| 8.00 Hours | 11/14/02 |
| 8.00 Hours | 11/20/02 |
| 8.00 Hours | 12/5/02 |
| 2.00 Hours | 12/23/02 |
| 16.00 Hours | 12/24/02,12/26/02 |
| 8.00 Hours | 1/15/03 |
| 8.00 Hours | 1/21/03 |
| 16.00 Hours | 1/29/03,1/30/03 |
| 8.00 Hours | 2/4/03 |
| 16.00 Hours | 2/26/03,2/27/03 |
| 2.50 Hours | 3/17/03 |
| 16.00 Hours | 3/25/03,3/26/03 |
| 1.00 Hours | 3/31/03 |
| 8.00 Hours | 4/1/03 |
| 8.00 Hours | 4/8/03 |
| 2.00 Hours | 4/29/03 |

| | | |
|---|---|---|
| 2.50 Hours | 5/2/03 |
| 8.00 Hours | 5/5/03 |
| 8.00 Hours | 5/19/03 |
| 4.50 Hours | 6/2/03 |
| 8.00 Hours | 6/3/03 |
| 8.00 Hours | 7/7/03 |
| 4.00 Hours | 7/21/03 |
| 8.00 Hours | 7/23/03 |
| 8.00 Hours | 7/28/03 |
| 4.50 Hours | 8/6/03 |
| 8.00 Hours | 8/7/03 |
| 16.00 Hours | 8/14/03,8/15/03 |
| 8.00 Hours | 8/21/03 |
| 24.00 Hours | 8/25/03,8/26/03,8/27/03 |
| 8.00 Hours | 9/17/03 |
| 4.00 Hours | 9/22/03 |
| 8.00 Hours | 9/23/03 |
| 8.00 Hours | 9/30/03 |
| 8.00 Hours | 10/6/03 |
| 3.00 Hours | 10/20/03 |
| 4.50 Hours | 10/30/03 |
| 8.00 Hours | 10/31/03 |
| 3.00 Hours | 11/10/03 |
| 8.00 Hours | 12/4/03 |
| 16.00 Hours | 12/23/03,12/24/03 |
| 24.00 Hours | 1/13/04,1/14/04,1/15/04 |
| 8.00 Hours | 1/22/04 |
| 8.00 Hours | 1/28/04 |
| 8.00 Hours | 2/4/04 |
| 8.00 Hours | 2/11/04 |
| 8.00 Hours | 2/24/04 |
| 8.00 Hours | 3/3/04 |
| 2.00 Hours | 3/10/04 |
| 8.00 Hours | 3/11/04 |
| 4.00 Hours | 3/15/04 |
| 8.00 Hours | 3/17/04 |
| 8.00 Hours | 3/26/04 |
| 2.00 Hours | 4/5/04 |
| 8.00 Hours | 4/6/04 |
| 16.00 Hours | 4/13/04,4/14/04 |
| 2.00 Hours | 4/20/04 |
| 2.00 Hours | 4/21/04 |
| 8.00 Hours | 4/22/04 |
| 1.00 Hours | 4/27/04 |
| 2.00 Hours | 4/28/04 |
| 16.00 Hours | 4/29/04,4/30/04 |
| 24.00 Hours | 5/3/04,5/4/04,5/5/04 |
| 16.00 Hours | 5/6/04,5/7/04 |

**McNiff, Thomas M.**

| | Vacation (Days) | Holiday (Days) | Personal (Days) | Sick (Hours) | Sick (Days) | Compe (Hou |
|---|---|---|---|---|---|---|
| | 28.00 | | | 1027.00 | 128.37 | |

| | | | | |
|---|---|---|---|---|
| 4.00 Hours | 5/11/04 | | 1.00 Days | 8/12/02 |
| 8.00 Hours | 5/19/04 | | 1.00 Days | 8/21/02 |
| 1.00 Hours | 5/25/04 | | 1.00 Days | 8/26/02 |
| 8.00 Hours | 5/26/04 | | 1.00 Days | 9/9/02 |
| 8.00 Hours | 6/3/04 | | 1.00 Days | 10/31/02 |
| 8.00 Hours | 7/7/04 | | 2.00 Days | 1/7/03,1/8/03 |
| 3.00 Hours | 7/12/04 | | 1.00 Days | 1/14/03 |
| 16.00 Hours | 7/21/04,7/22/04 | | 2.00 Days | 4/15/03,4/16/03 |
| 16.00 Hours | 7/26/04,7/27/04 | | 1.00 Days | 4/28/03 |
| 3.00 Hours | 8/2/04 | | 1.00 Days | 5/12/03 |
| 2.00 Hours | 8/3/04 | | 3.00 Days | 6/16/03,6/17/03,6/18/03 |
| 8.00 Hours | 8/4/04 | | 2.00 Days | 6/19/03,6/20/03 |
| 24.00 Hours | 8/9/04,8/10/04,8/12/04 | | 3.00 Days | 6/23/03,6/24/03,6/25/03 |
| 16.00 Hours | 8/17/04,8/18/04 | | 2.00 Days | 6/26/03,6/27/03 |
| 24.00 Hours | 8/23/04,8/24/04,8/25/04 | | 1.00 Days | 6/30/03 |
| 16.00 Hours | 8/26/04,8/27/04 | | 2.00 Days | 7/14/03,7/17/03 |
| 24.00 Hours | 8/30/04,8/31/04,9/1/04 | | 1.00 Days | 7/25/03 |
| 16.00 Hours | 9/2/04,9/3/04 | | 1.00 Days | 8/20/03 |
| 24.00 Hours | 9/6/04,9/7/04,9/8/04 | | 1.00 Days | 9/11/03 |
| 16.00 Hours | 9/9/04,9/10/04 | | 1.00 Days | 9/25/03 |
| 24.00 Hours | 9/13/04,9/14/04,9/15/04 | | 1.00 Days | 10/9/03 |
| 16.00 Hours | 9/16/04,9/17/04 | | 1.00 Days | 2/2/04 |
| 24.00 Hours | 9/20/04,9/21/04,9/22/04 | | 2.00 Days | 3/29/04,3/30/04 |
| 16.00 Hours | 9/23/04,9/24/04 | | 1.00 Days | 5/21/04 |
| 24.00 Hours | 9/27/04,9/28/04,9/29/04 | | 1.00 Days | 5/27/04 |
| 16.00 Hours | 9/30/04,10/1/04 | | 1.00 Days | 6/4/04 |
| 24.00 Hours | 10/4/04,10/5/04,10/6/04 | | 2.00 Days | 6/8/04,6/9/04 |
| 16.00 Hours | 10/7/04,10/8/04 | | 3.00 Days | 6/14/04,6/15/04,6/16/04 |
| 8.00 Hours | 10/11/04 | | 2.00 Days | 6/17/04,6/18/04 |
| 8.00 Hours | 11/10/04 | | 3.00 Days | 6/21/04,6/22/04,6/23/04 |
| | | | 2.00 Days | 6/24/04,6/25/04 |
| | | | 3.00 Days | 6/28/04,6/29/04,6/30/04 |

**Vacation**

| | |
|---|---|
| 2.00 Days | 7/5/01,7/6/01 |
| 1.00 Days | 8/3/01 |
| 1.00 Days | 8/6/01 |
| 1.00 Days | 8/16/01 |
| 2.00 Days | 8/30/01,8/31/01 |
| 1.00 Days | 10/4/01 |
| 1.00 Days | 11/23/01 |
| 1.00 Days | 12/26/01 |
| 1.00 Days | 4/12/02 |
| 1.00 Days | 5/16/02 |
| 1.00 Days | 5/24/02 |
| 2.00 Days | 6/3/02,6/4/02 |
| 3.00 Days | 6/10/02,6/11/02,6/14/02 |
| 3.00 Days | 6/17/02,6/18/02,6/19/02 |
| 2.00 Days | 6/20/02,6/21/02 |
| 3.00 Days | 6/24/02,6/25/02,6/26/02 |
| 2.00 Days | 6/27/02,6/28/02 |
| 2.00 Days | 7/22/02,7/23/02 |
| 1.00 Days | 7/31/02 |
| 2.00 Days | 8/5/02,8/6/02 |

Request: REP004

Payroll - Dracut Police Dept.

Individual time off

Page 1    Filters:    Detail Date Is On or After 07/01/04
Members Last_name Is Like McNiff

| | Vacation (Days) | Holiday (Days) | Personal (Days) | Sick (Hours) | Sick (Days) | Compe (Hou |
|---|---|---|---|---|---|---|
| **McNiff, Thomas M.** | 28.00 | | | 1027.00 | 128.37 | |

**Personal**

|  |  |  |
|---|---|---|
| 2.00 | Days | 7/1/04,7/2/04 |
| 1.00 | Days | 10/18/04 |

**Sick**

|  |  |  |
|---|---|---|
| 8.00 | Hours | 7/7/04 |
| 3.00 | Hours | 7/12/04 |
| 16.00 | Hours | 7/21/04,7/22/04 |
| 16.00 | Hours | 7/26/04,7/27/04 |
| 3.00 | Hours | 8/2/04 |
| 2.00 | Hours | 8/3/04 |
| 8.00 | Hours | 8/4/04 |
| 24.00 | Hours | 8/9/04,8/10/04,8/12/04 |
| 16.00 | Hours | 8/17/04,8/18/04 |
| 24.00 | Hours | 8/23/04,8/24/04,8/25/04 |
| 16.00 | Hours | 8/26/04,8/27/04 |
| 24.00 | Hours | 8/30/04,8/31/04,9/1/04 |
| 16.00 | Hours | 9/2/04,9/3/04 |
| 24.00 | Hours | 9/6/04,9/7/04,9/8/04 |
| 16.00 | Hours | 9/9/04,9/10/04 |
| 24.00 | Hours | 9/13/04,9/14/04,9/15/04 |
| 16.00 | Hours | 9/16/04,9/17/04 |
| 24.00 | Hours | 9/20/04,9/21/04,9/22/04 |
| 16.00 | Hours | 9/23/04,9/24/04 |
| 24.00 | Hours | 9/27/04,9/28/04,9/29/04 |
| 16.00 | Hours | 9/30/04,10/1/04 |
| 24.00 | Hours | 10/4/04,10/5/04,10/6/04 |
| 16.00 | Hours | 10/7/04,10/8/04 |
| 8.00 | Hours | 10/11/04 |
| 8.00 | Hours | 11/10/04 |

11/15/04    4:04 pm

# EXHIBIT 6

*Tom McNiff*
*Sick Time*

**2002**

Sick                                                           Worked

Sick - Thursday, June 6th, 2002                    Overtime – Sunday June 9th, 2002

**2003**

Sick – Tuesday, Jan. 21st, 2003                    Overtime – Sunday Jan. 26th, 2003
Sick – Wed. & Thurs. Feb. 26th & 27th, 2003       Overtime – Sunday March 2nd, 2003
Sick – Tuesday, April 8th, 2003                    Overtime – Sunday April 13th, 2003
Sick – Monday, May 19th, 2003                      Overtime – Sunday May 25th, 2003
Sick – Wednesday, July 23rd, 2003                  Overtime – Saturday July 19th, 2003
Sick – Mon, Tues, & Wed.
    August 25th, 26th, & 27th, 2003         Overtime – Sunday Aug. 31st, 2003
Sick – Wednesday, Sept. 24th, 2003                 Overtime – Sat & Sun Sept. 27th & 28th,
Sick – Tuesday, Sept. 30, 2003                     Overtime – Sat & Sun Oct. 4th & 5th,
Sick – Monday, Oct. 6th, 2003                      Overtime – Sat & Sun Oct. 11th & 12th,
Sick – Tues & Wed.
    Dec. 23rd & 24th,                         Overtime – Sat. Dec. 27th, 2003

**2004**

Sick – Wed. Jan 28th, 2004                         Overtime – Sun. Feb. 1st, 2004
Sick – Tues. Feb. 24th, 2004                       Overtime – Sun. Feb. 21st, 2004
Sick – Tues. March 11th, 2004                      Overtime – Sat & Sun Mar. 13th & 14th,
Sick - 4 hours on Monday, March 15th, 2004
                                                   Overtime – Sunday, April 4th, 2004
Sick – Tues. April 6th, 2004
Sick – Tues & Wed, April 13th & 14th, 2004         Overtime – Sat., April 17th, 2004
                                                   Overtime – Sun., April 18th, 2004
Sick – Thursday, April 22, 2004
Sick – Thursday, June 3rd, 2004                    Overtime – Sun., June 6th 2004
Sick – Wed., July 7th, 2004                        Overtime – Sun., July 4th, 2004
                                                   Overtime – Sat & Sun
                                                       July 17th & 18th, 2004
Sick – Wed & Thurs, July 21st & 22nd, 2004
Sick – Mon & Tues, July 26th & 27th, 2004          Overtime – Sun Aug. 1st, 2004
Sick – Wed., Aug. 4th, 2004                        Overtime – Sat. Aug. 7th, 2004
Sick – Mon., Tues, Wed, Aug. 9th, 10th, 11th, 2004  Overtime – Sun. Aug. 15th, 2004
Sick – Tues & Wed, Aug. 17th & 18th.

# EXHIBIT 7



# Municipal Government
# Town of Dracut

TOWN HALL
62 ARLINGTON STREET
DRACUT, MASSACHUSETTS 01826

OFFICE OF THE
TOWN ACCOUNTANT
(978) 459-4651
FAX (978) 452-7924

ANN M. VANDAL
TOWN ACCOUNTANT

DATE:       January 11, 2005

TO:          Thomas McNiff,, Captain

FROM:     Ann Vandal, Town Accountant

CC:          Louis Panas, Police Chief
              Dennis E. Piendak, Town Manager

RE:          7.5% Retirement Settlement


After speaking with you regarding the 7.5% retirement incentive you received from January – December 2004, I have reviewed all pertinent documents and have concluded the following:

**January – June 2004**

Weekly Rate as determined by Police Contract plus Quinn Bill:      $ 1,517.23
Weekly Rate with 7.5% additional per payroll records:               $ 1,608.28

*Difference*                                                        $    91.05

*Regular Time*
**26 Weeks x $91.05/Week + 5 Holidays at $18.21/Day =**              $ 2,458.35

*Overtime*
Difference in overtime rate:    $ 3.42
**120 Hours (14 Days) x $3.42 =**                                    $  410.40

**July – December 25, 2004**

| | |
|---|---|
| Weekly Rate as determined by Police Contract plus Quinn Bill: | $ 1,562.74 |
| Weekly Rate with 7.5% additional per payroll records: | $ 1,656.52 |

*Difference*                                                         $     93.78

*Regular Time*
**25 Weeks x $93.78/Week + 7 Holidays at $18.76/Day =**              $2,475.82

*Overtime*
Difference in overtime rate:    $ 3.51
**129.5 Hours (16.2 Days) x $3.51  =**                               $   454.55

**Summary**

| | |
|---|---|
| **Total Regular Time:** | $ 4,934.17 |
| **Total Overtime:** | $   864.95 |
| **Sub-Total:** | $ 5,799.12 |
| **Interest Due:** | $    144.98 |
| **Grand Total Due:** | $ 5,944.10 |

The interest rate used is 2.5%.   The above data does not include any Patrolman hours. I do realize there is a disagreement with the amount of overtime hours and therefore those concerns should be directed to Louis Panas for clarification.  If you have any further questions please contact me at 978-459-4651.



1/4/2005

**THOMAS MCNIFF**
**7.5% BREAKDOWN**

| PAY DATE | TOTAL GROSS | GROSS PRIOR TO 7.5% | TOTAL 7.5% PAID | PRIME INTEREST RATE | INTEREST DUE | GRAND TOTAL DUE 1/31/05 |
|---|---|---|---|---|---|---|
| January 8, 2004 | $ 2,151.83 | $ 2,001.70 | $ 150.13 | 4.00% | 6.40 | 156.53 |
| January 15, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 4.70 | 116.90 |
| January 22, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 4.61 | 116.82 |
| January 29, 2004 | $ 1,929.94 | $ 1,795.29 | $ 134.65 | 4.00% | 5.43 | 140.08 |
| February 5, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 4.44 | 116.64 |
| February 12, 2004 | $ 2,637.57 | $ 2,453.55 | $ 184.02 | 4.00% | 7.14 | 191.16 |
| February 19, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 4.27 | 116.47 |
| February 26, 2004 | $ 2,444.58 | $ 2,274.03 | $ 170.55 | 4.00% | 6.35 | 176.91 |
| March 4, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 4.09 | 116.30 |
| March 11, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 4.01 | 116.21 |
| March 17, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 3.92 | 116.13 |
| March 25, 2004 | $ 1,608.29 | $ 1,496.08 | $ 112.21 | 4.00% | 3.84 | 116.04 |
| April 1, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 3.75 | 115.96 |
| April 8, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 3.66 | 115.87 |
| April 15, 2004 | $ 3,171.07 | $ 2,949.83 | $ 221.24 | 4.00% | 7.06 | 228.29 |
| April 22, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 3.49 | 115.70 |
| April 29, 2004 | $ 1,929.94 | $ 1,795.29 | $ 134.65 | 4.00% | 4.09 | 138.73 |
| May 6, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 3.32 | 115.53 |
| May 13, 2004 | $ 1,608.28 | $ 1,496.07 | $ 112.21 | 4.00% | 3.23 | 115.44 |
| May 20, 2004 | $ 2,122.92 | $ 1,974.81 | $ 148.11 | 4.00% | 4.16 | 152.27 |
| May 27, 2004 | $ 1,608.29 | $ 1,496.08 | $ 112.21 | 4.00% | 3.06 | 115.27 |
| June 3, 2004 | $ 1,608.29 | $ 1,496.08 | $ 112.21 | 4.00% | 2.98 | 115.18 |
| June 10, 2004 | $ 1,935.55 | $ 1,800.51 | $ 135.04 | 4.00% | 3.48 | 138.52 |
| June 17, 2004 | $ 2,122.92 | $ 1,974.81 | $ 148.11 | 4.00% | 3.70 | 151.81 |
| June 24, 2004 | $ 2,637.56 | $ 2,453.54 | $ 184.02 | 4.00% | 4.46 | 188.47 |
| July 1, 2004 | $ 2,122.92 | $ 1,974.81 | $ 148.11 | 4.25% | 3.47 | 151.58 |
| July 8, 2004 | $ 2,157.67 | $ 2,007.13 | $ 150.54 | 4.25% | 3.41 | 153.95 |
| July 15, 2004 | $ 2,716.70 | $ 2,527.16 | $ 189.54 | 4.25% | 4.41 | 193.95 |
| July 22, 2004 | $ 2,726.52 | $ 2,536.30 | $ 190.22 | 4.25% | 4.27 | 194.50 |
| July 29, 2004 | $ 2,186.61 | $ 2,034.06 | $ 152.55 | 4.25% | 3.30 | 155.86 |
| August 5, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.25% | 2.41 | 117.98 |
| August 12, 2004 | $ 2,716.70 | $ 2,527.16 | $ 189.54 | 4.50% | 3.80 | 193.33 |
| August 19, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.50% | 2.22 | 117.79 |
| August 26, 2004 | $ 2,716.70 | $ 2,527.16 | $ 189.54 | 4.50% | 3.69 | 193.23 |
| September 2, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.50% | 2.15 | 117.72 |
| September 9, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.50% | 2.05 | 117.62 |
| September 16, 2004 | $ 1,987.82 | $ 1,849.13 | $ 138.69 | 4.50% | 2.34 | 141.03 |
| September 23, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.75% | 1.85 | 117.42 |
| September 30, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.75% | 1.75 | 117.32 |
| October 7, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.75% | 1.74 | 117.32 |
| October 14, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 4.75% | 1.64 | 117.21 |
| October 21, 2004 | $ 2,186.61 | $ 2,034.06 | $ 152.55 | 4.75% | 2.03 | 154.58 |
| October 28, 2004 | $ 2,286.00 | $ 2,126.51 | $ 159.49 | 4.75% | 1.97 | 161.46 |
| November 4, 2004 | $ 2,726.52 | $ 2,536.30 | $ 190.22 | 4.75% | 2.18 | 192.40 |
| November 11, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 5.00% | 1.22 | 116.79 |
| November 18, 2004 | $ 1,987.82 | $ 1,849.13 | $ 138.69 | 5.00% | 1.34 | 140.02 |
| November 25, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 5.00% | 1.06 | 116.63 |
| December 2, 2004 | $ 2,319.13 | $ 2,157.33 | $ 161.80 | 5.00% | 1.33 | 163.13 |
| December 9, 2004 | $ 1,656.52 | $ 1,540.95 | $ 115.57 | 5.00% | 0.84 | 116.41 |
| December 16, 2004 | $ 2,194.80 | $ 2,041.67 | $ 153.13 | 5.25% | 0.96 | 154.09 |
| December 23, 2004 | $ 2,193.16 | $ 2,040.15 | $ 153.01 | 5.25% | 0.82 | 153.83 |
| December 30, 2004 | $ 2,012.82 | $ 1,872.39 | $ 140.43 | 5.25% | 0.65 | 141.08 |
| | | | | | | |
| TOTALS | $ 102,668.33 | $ 95,505.42 | $ 7,162.91 | | 168.55 | 7,331.46 |

# EXHIBIT "E"



MASSACHUSETTS GENERAL HOSPITAL          HARVARD MEDICAL SCHOOL

FRANCIS J. McGOVERN, M.D.

*One Hawthorne Place*
*Boston, Massachusetts 02114*
*617-726-3560*
*617-523-5250*
*Fax 617-523-8974*



*Assistant Clinical*
*Professor of Surgery*

Practice Limited to Urology

August 18, 2004

To Whom It May Concern:

This is to state that Mr. Thomas McNiff will be undergoing surgery at Mass
General Hospital on August 25th and is expected to be out of work approximately
3-4 weeks.

If you have any questions, please do not hesitate to call.

Sincerely,

Francis J. McGovern, M.D.

MASSACHUSETTS GENERAL HOSPITAL       .       HARVARD MEDICAL SCHOOL



FRANCIS J. McGOVERN, M.D.

*One Hawthorne Place*
*Boston, Massachusetts 02114*
**617-726-3560**
**617-523-5250**
*Fax 617-523-8974*



*Assistant Clinical*
*Professor of Surgery*

Practice Limited to Urology

September 8, 2004

To Whom It May Concern:

This is to state that Mr. Thomas McNiff may return to work as of Tuesday, October 12, 2004.

If you have any questions, please do not hesitate to call.

Sincerely,

Francis J. McGovern, M.D.

# EXHIBIT "F"

December 3, 2002

Chief Louis Panas
Dracut Police Department

Chief Panas:

This letter is to inform you that on December 31, 2004, I intend to retire from the Dracut Police Department.

Article 29 of the Collective Bargaining Agreement between the Town of Dracut and the International Brotherhood of Police Officers, Local 379, Termination of Employment, states under Section 3; " The employee shall receive a 5% salary increase if retiring after 60, but before 62, a 7.5% salary increase if, retiring after age 50, but before age 60. This increment shall be paid for his/her **last twelve (12) months of service**. He/she shall notify the Department in writing of his/her expected separation date. Notification must be at least sixty (60) days prior to the Annual Spring Town Meeting to provide proper budget presentation."

With this notice I will be entitled to the **7.5%** pay increment from **December 31, 2003** to my retirement date of **December 31, 2004.**

Article 25, Section 3, refers to Sick Leave Buy Back, "Upon the retirement, separation, or death of an employee, such employee or his/her estate will be able to convert into cash up to one hundred and twenty (120) days of his/her accumulated sick leave..."

I will be carrying a balance of at least **one hundred and twenty** sick days on my retirement date and as a result I will be entitled to the **full buy back** of the one hundred and twenty days.

On my retirement date I will also be entitled to payment of any accumulated comp time or any other time owed to me. Please make your budget preparation to reflect all monies owed to me so that I can be properly compensated for all monies owed at that time.

My employment with the Town of Dracut Police Department has been a very rewarding thirty-two years experience. I have accomplished many personal goals during that time and I have been able to assist many members of this community throughout my career as a police officer. I have made many lifetime friendships and I am grateful for the opportunity I had to serve the Town of Dracut for such a long employment

Respectfully;

Thomas M. McNiff
Captain



# EXHIBIT "G"

# COPY

1

1             UNITED STATES DISTRICT COURT
                   FOR THE
2             DISTRICT OF MASSACHUSETTS

3

4   - - - - - - - - - - - - - - - - -
   THOMAS MC NIFF,           -
5            Plaintiff    -
                         -  CIVIL ACTION
6   vs.                 -
                         -  No. 05CV10238RBC
7                       -
   TOWN of DRACUT,           -
8           Defendant    -
   - - - - - - - - - - - - - - - - -

9

10         DEPOSITION of LOUIS PANAS, taken

11  pursuant to Federal Rules of Civil Procedure before

12  Deborah C. Ashton, Professional Shorthand Reporter

13  and Notary Public within and for the Commonwealth

14  of Massachusetts, at the Law Office of Richard J.

15  Ahern, 200 Central Street, Lowell, Massachusetts,

16  on Tuesday, October 18, 2005, commencing at

17  10:05 a.m.

18

19

20       Q & A COURT REPORTING ASSOCIATES
             Deborah C. Ashton
21     430 Kingsbury Ave., Bradford, MA 01835
            (978) 521-6226

22

23

24

27

1    A    Not during that year.

2    Q    In the past.  Now, when was the first time

3         that there ever was a disciplinary action

4         against Thomas McNiff?

5    A    The first time?

6    Q    Yes.

7    A    I want to say June of 1997.

8    Q    And what was that action for?

9    A    Okay, that action involved a violation with

10        the State Ethics Commission.

11   Q    What was that violation?

12   A    Well, Captain McNiff's wife was also an

13        employee of the town who happened to be my

14        secretary.  She worked within the Dracut

15        Police Department also -- and I'm not exactly

16        sure of the date, but it was right before June

17        of 1997 at some point in time Captain McNiff

18        ordered a Sergeant on the department or

19        instructed a Sergeant on the department to

20        make some changes in her sick time accrual

21        records.  This was done.  I didn't know about

22        it.  I was never told about it and I received

23        a call from an investigator for the State

24        Ethics Commission.  His name was Juan DeLeon

28

1      and he informed me about the situation.

2            At that time I informed Captain

3      McNiff that I was going to have to do an

4      investigation on it.

5  Q    This fellow who called you from the State

6      Investigating Commission --

7  A    State Ethics Commission.

8  Q    Is it out of the blue that he just calls up or

9      had someone called him from the Town of Dracut

10     and filed a complaint?

11          MR. CLOHERTY:  Objection.

12  A   I'm not exactly sure, but when the

13     investigator called me, I knew nothing about

14     it at all. He informed me about what the

15     complaint was and he informed me that he

16     received the information from a member of the

17     department, although he didn't say who it was.

18  Q   Did you subsequently find out who that member

19     of the department was that reported it to the

20     Ethics Commission?

21  A   Yes.  Eventually, that person approached me

22     also.

23  Q   Who was that person?

24  A   That was Anthony Archinski.

29

| | | |
|---|---|---|
| 1 | Q | Anthony Archinski.  Is he still employed with |
| 2 | | the Town of Dracut Police Department? |
| 3 | A | Yes, he is. |
| 4 | Q | And what rank does he hold now? |
| 5 | A | Lieutenant. |
| 6 | Q | Now, when did Anthony Archinski approach you |
| 7 | | regarding that incident? |
| 8 | A | I can't give you an exact date on that except |
| 9 | | to tell you that it was after I received a |
| 10 | | call from the investigator from the State |
| 11 | | Ethics Commission and it was during the time |
| 12 | | that I was doing the investigation on it. |
| 13 | | MR. AHERN: Can we mark this |
| 14 | | Exhibit 1. |
| 15 | | (Letter was marked Exhibit 1 for |
| 16 | | Identification.) |
| 17 | Q | I show you what I've had marked Exhibit 1. |
| 18 | | If you will look at that and read it to |
| 19 | | yourself. |
| 20 | | (Document exhibited to witness.) |
| 21 | A | Okay. |
| 22 | Q | Now, that letter is written by whom? |
| 23 | A | Myself. |
| 24 | Q | And the date of that letter? |

30

1   A    June 9, 1997.

2   Q    And who is it addressed to?

3   A    Thomas McNiff.

4   Q    And in substance, what does that letter state?

5            MR. CLOHERTY:   Objection. You can

6        answer.

7   A    Okay.  Basically, it says that I was issuing

8        him a written reprimand that would remain in

9        his personnel file and it also says it will

10       serve as a strict admonition and written

11       reprimand that he is to avoid any involvement

12       with his wife's records or assignment so that

13       there will not even be the appearance of

14       impropriety or favoritism.

15            Then I indicated that the written

16       reprimand will be placed in his personnel

17       folder.  I indicated that I had a discussion

18       with him during the investigation and that he

19       instructed a Sergeant on the department to

20       correct his wife's sick time accrual records.

21       I also indicated that it appeared that she had

22       that credit coming to her in the sick time

23       accrual record, but that it was a violation

24       for him to get involved in it directly in any

31

1        way because it would have meant a financial

2        advantage for her in the long run using

3        her sick time.

4    Q   But you used the word "impropriety."  There

5        was no impropriety in this, was there, in

6        terms of him giving something to his wife that

7        wasn't earned?

8                    MR. CLOHERTY: Objection.

9    A   Well, even though you're saying that it was

10       earned, it presented a financial advantage for

11       her and 268a says that you cannot do that.

12       I believe it's Section 19.

13   Q   Well, subsequently, did you take away anything

14       from Mrs. McNiff?

15   A   We ended up making the corrections on the

16       record and it was satisfactory to both sides.

17   Q   Okay.  But the corrections on the record that

18       were made, Mrs. McNiff was entitled to; was

19       she not?

20   A   Yes.

21   Q   And there never was a question that she was

22       not entitled to the credit that's mentioned in

23       that letter; is it?

24                   MR. CLOHERTY:  Objection.

32

```
 1    A     Well again, as I told you, until I received a

 2          call from that investigator from the State

 3          Ethics Commission, I had no idea that this was

 4          going on.  As I see it, there was a couple of

 5          problems here.  First of all, at that time

 6          Captain McNiff as a Provisional Deputy should

 7          have come to me about it and not involve

 8          himself directly with his wife's sick time

 9          accrual record.

10                He should have come to me about it

11          to correct the problem.  He didn't do that.

12          I had no idea what was going on until I found

13          out about it from the investigator from the

14          State Ethics Commission.

15                Secondly, as a Deputy, as a Captain

16          before that, a permanent Captain, and as a

17          Deputy, he should have known that it would be

18          a violation.  That he's subject to the

19          conflict of interest law and that it would be

20          a violation for him to get involved directly

21          with his wife's sick time records, okay.  He

22          should have known that.

23                As it turned out, he admitted that

24          he knew that and he felt that he was just
```

33

1    making a correction with numbers, but then he

2    realized that he shouldn't have gotten

3    involved in it at all.

4  Q  So his only problem was that he was involved,

5    not any of the time that she was credited with

6    was in any way dishonest or not entitled to?

7         MR. CLOHERTY: Objection.

8  A  Well again, I believe she had that time

9    coming, but Captain McNiff, because he was her

10   husband, should not have gotten involved in

11   that.  He should have come directly to me.

12 Q  Well, actually he didn't get directly

13   involved.  He asked a fellow named Joe

14   Shurtleff to do it; did he not?

15 A  He didn't ask, he ordered.  The Sergeant

16   felt uneasy about it, didn't want to do it.

17 Q  Did the Sergeant come to you and tell you he

18   was uneasy about it?

19 A  No, but him and the Lieutenant approached me

20   after that.  Lieutenant Archinski informed me

21   at a later date during the investigation that

22   he directly ordered Sergeant Shurtleff to do

23   it and Sergeant Shurtleff informed him, "You

24   know what, you shouldn't be doing this.  You

34

1    should probably go to the Chief about this."

2  Q    So Sergeant Shurtleff told him to go to the

3    Chief about this?

4  A    Lieutenant Archinski and Sergeant Shurtleff.

5  Q    Prior to the changes being made?

6  A    Prior to what?

7  Q    Prior to the changes being made in the sick

8    leave for Mrs. McNiff, they told him that he

9    should go to the Chief?

10  A    Right, because this was all going on before I

11    even knew about it.  I had no idea about this

12    until I got a call from the investigator from

13    the State Ethics Commission.

14  Q    How does this problem first arise -- is it

15    that you're changing over from a manual system

16    to a computerized system for sick leave?

17  A    We had changed over to -- What happened was,

18    we had changed over to a computer system at a

19    later date.  At that particular time,

20    Lieutenant Archinski -- Well, before

21    Lieutenant Archinski, Captain Paquin was

22    handling those records.  He would keep track

23    of the sick time, vacation time, personal

24    days, holidays, that type of thing before that

59

| | | |
|---|---|---|
| 1 | Q | Okay.  And in substance in that letter you |
| 2 | | tell the Town Manager of your intention to |
| 3 | | retire? |
| 4 | A | Yup. |
| 5 | Q | And what date do you give him as a date that |
| 6 | | you want to retire? |
| 7 | A | I gave him a date of September 18, 2004, okay, |
| 8 | | but again, as I told you before, when I talked |
| 9 | | to the Town Manager -- after I gave it to the |
| 10 | | Town Manager and I talked to him he said, |
| 11 | | "We'll try to work something out for that |
| 12 | | date, but it's probably going to take longer," |
| 13 | | and we had discussions about it.  I said, |
| 14 | | "That's fine.  I don't have a problem with it |
| 15 | | taking longer as long as it's understood that |
| 16 | | I would like to get out as soon as I can." |
| 17 | Q | You had had the discussion with Mr. Piendak? |
| 18 | A | Right. |
| 19 | Q | And when was this discussion held, |
| 20 | | approximately? |
| 21 | A | I would have to say some time after |
| 22 | | June 9, after I had sent the letter of |
| 23 | | notification up to him. |
| 24 | Q | In this discussion do you have a distinct |

65

1    Q    Okay.   What is the official date that you

2         retired as Chief of the Dracut Police

3         Department?

4    A    When did I actually retire, you mean?

5    Q    When did you actually retire?

6    A    February 19, 2005.

7    Q    And when you retired, is this a permanent

8         Chief who's immediately assigned, promoted or

9         named?

10   A    No.

11   Q    Who becomes Acting Chief?

12   A    Who became Acting Chief?

13   Q    Yes.

14   A    You want a name?

15   Q    Yes.

16   A    Lieutenant Kevin Richardson.

17   Q    And the appointing authority for the Acting

18        Chief is whom?

19   A    The appointing authority for the Acting Chief?

20        According to the Dracut Town Charter form of

21        government, the Town Manager makes the

22        appointment subject to approval by three

23        members of the Board of Selectmen -- at least

24        three members of the Board of Selectmen.

85

1   A       That after reviewing it and examining it, a

2           determination was made that he abused sick

3           leave by first of all using an excessive

4           amount.  Most of the days that he used were

5           during the middle of the week and he would

6           have to be replaced with his position down at

7           Lowell District Court as a Prosecutor with

8           overtime.

9                   It also became obvious that he

10          was calling in sick during the middle of the

11          week so that he would be eligible for overtime

12          shifts on the weekends without coming under

13          the two-day sick rules that's part of the

14          department rules and regulations that do not

15          allow an officer to work overtime or details

16          within a 48-hour period or two-day period

17          after calling in sick.

18  Q       Okay. You had said earlier that you maintained

19          the sick leave on your computer in your office

20          yourself?

21  A       That's right.

22  Q       And you had done that since 1997?

23  A       In that area, yeah.

24  Q       Well, that's the time that you have the issue

# EXHIBIT "H"

THOMAS M. McNIFF
CAROL A. McNIFF
6 INDEPENDENCE DR.
TYNGSBORO, MA 01879

53-7054/2113
555150184

2161

DATE *1-19-05*

PAY TO THE
ORDER OF *Town of Dracut*     $ *5,916.05*

*five thousand nine hundred sixteen*    05/100    DOLLARS

Security Features
Included
Details on Back.

**◼ Banknorth**
Massachusetts

370 Main Street
Worcester, MA 01608

*Thomas M. McNiff*   MP

MEMO *"04" payback*

⑈211370545⑈ 555150184⑈ 2161

**July – December 25, 2004**

| | |
|---|---|
| Weekly Rate as determined by Police Contract plus Quinn Bill: | $ 1,562.74 |
| Weekly Rate with 7.5% additional per payroll records: | $ 1,656.52 |

*Difference*                                                          $     93.78

**Regular Time**
**25 Weeks x $93.78/Week + 7 Holidays at $18.76/Day =**          $2,475.82 ✓

*Overtime*
Difference in overtime rate:     $ 3.51
**129.5 Hours (16.2 Days) x $3.51  =**                            $   454.55 ✓

**Summary**

| | | |
|---|---|---|
| **Total Regular Time:** | $ 4,934.17 ✓ | |
| $27.36 ⟹ **Total Overtime:** | $  864.95 | (837.5 ) |
| **Sub-Total:** | $ 5,799.12 | (5771.7 ) |
| **Interest Due:** | $   144.98 | (144.29) |
| **Grand Total Due:** | $ 5,944.10 | (5916.0 ) |

The interest rate used is 2.5%.  The above data does not include any Patrolman hours.  I do realize there is a disagreement with the amount of overtime hours and therefore those concerns should be directed to Louis Panas for clarification.  If you have any further questions please contact me at 978-459-4651.

pd.
#2161
1/19/05

# EXHIBIT "I"

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS MCNIFF,<br>       Plaintiff | )<br>)<br>)<br>) |
| v. | )<br>)    C.A. No. 05CV10238 RBC |
| TOWN OF DRACUT,<br>       Defendant | )<br>)<br>)<br>) |

## CONFIDENTIALITY NOTIFICATION

Exhibit "I" to the Defendant's Motion for Summary Judgment is not being provided here electronically due to the *CONFIDENTIAL* nature of the document. The Exhibit is being hand delivered to the United States District Court of Massachusetts today for its file in a sealed envelope.

Respectfully submitted,

The Defendant,
TOWN OF DRACUT
By its Attorneys,

PIERCE, DAVIS & PERRITANO, LLP

John J. Cloherty III BBO # 566522
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

CERTIFICATE OF SERVICE
I hereby certify that on this day a true copy of the above document was served upon each attorney of record, or pro se litigant, by electronic mail.

11/21/05
Date

# EXHIBIT "J"



COMMONWEALTH OF MASSACHUSETTS
CIVIL SERVICE COMMISSION

SUFFOLK, ss

Thomas McNiff,
    Appellant
    v.                                                                 DEC − 6 2000

Dracut Police Department,                                    D-99-808
    Respondent


Appellant's Attorney                          Michael E. Williams, Esq.
                                              159 Burgin Parkway
                                              Quincy, MA 02169


Respondent's Attorney                         Stanley L. Weinberg, Esq.
                                              47 Memorial Drive
                                              Shrewsbury, MA 01545


Commissioner                                  Daniel J. O'Neil


## DECISION

Pursuant to the provisions of G.L. c. 31, s. 43, the Appellant, Thomas McNiff, is

appealing the September 10, 1999 decision of the respondent suspending him from his

position as police captain for three (3) days. The appeal was timely filed. A hearing was

held on September 9, 2000, at the offices of the Civil Service Commission. As no written

notice was received from either party, the hearing was declared private.

Four tapes were made of the hearing and post hearing briefs submitted.

**FINDINGS OF FACT:**

Based on the documents entered into evidence, (exhibits 1 - 12), and the testimony of the appellant, Chief of Police Louis Panas, Dispatcher Maureen Lamarre, Police Officer Bailey and Deputy Chief Rowe, I make the following findings of fact:

1. The appellant has been employed with the Dracut Police Department for twenty-nine years as a uniformed police officer.

2. The appellant was promoted to Captain in 1986.

3. The appellant was promoted to provisional Deputy Chief in 1995 to 1998, and returned to the rank of Captain in December of 1998 due to a Civil Service Certification.

4. On June 2,1999, Captain McNiff was the shift commander for the 5:00 pm. to the 3:00 am. shift on overtime duty.

5. Maureen Lamerre was the dispatcher for the Dracut Police Department and on duty for the evening of June 2, 1999.

6. Peggy Counter, a social worker from the Lowell General Hospital called the Dracut Police Department between 7:00 and 7:30 p.m. on June 2,1999. (Ex. #6)

7. Ms. Counter informed Ms. Lamerre that she had information that George Mahaleris a resident of Dracut had been dating Francis Doda, who had been murdered approximately one week earlier, and feared that he may have done harm to himself. (Ex. #6)

8. Ms. Doda was also dating Dracut Police Officer Doherty who committed suicide the same day Ms. Doda was murdered in N.H.

9. Ms. Lamerre informed Captain McNiff of what Ms. Counter told her and they checked the residence listing and found an address for Mr. Mahaleris at 65 Homefield Ave. (Ex. #6)

10. Captain McNiff contacted Police Officer Bailey and dispatched him to 65 Homefield Ave. to check the welfare of Mr. Mahaleris. (Ex. #6)

11. Officer Bailey returned to the police station to write a report but was told by Captain McNiff "no report was necessary it was just a welfare check" (Ex.#8)

12. Ms. Lamerre wrote an F.Y.I. report to Deputy Chief Rowe about the incident that occurred on June 2, 1999. (Ex. #12)

13. On June 17, 1999, Captain McNiff, was shift commander for the 5:00 p.m. to 3:00 a.m. shift. Also on duty was dispatcher Ms. Lamerre and Police Officer Bailey.

14. On June 17, 1999, at about 6:17 p.m., Officer Bailey stopped a motor vehicle on Loon Hill Rd. that had a 2 or 3 year old child not secured in the front seat. (Ex #7)

15. Officer Bailey radioed dispatch and informed Ms. Lamerre that he had stopped a vehicle that was being driven by Jared Whittemore. He gave her a phone number to call in an attempt to reach someone to bring a child safety seat for the child. (Ex #9)

16. Officer Bailey also requested Ms. Lamerre run a query on the operator Jared Whittemore (03-17-75) for license status and warrants. (Ex. #7 and #9)

17. Ms. Lamerre informed Officer Bailey that the operator of the vehicle Jared Whittemore had a default warrant issued against him (9811CR000807) and that it was still outstanding. (Ex. #7 and #9)

18. Officer Bailey informed dispatcher Lamerre that he was going to place Jared Whittemore under arrest and that he would be bringing him to the station. (Ex #7 and

#9).

19. Captain McNiff radioed Officer Bailey and told him not to arrest Whittemore because the warrant was only for a misdemeanor.

20. Captain McNiff instructed Officer Bailey to tell Whittemore to turn himself in to the Dracut Police Department the next morning. (Ex. #7 and #9)

## CONCLUSION:

The respondent argues that he should not have been suspended for three days because of his exemplary work record of twenty-nine years. With regard to the first incident, which involved the call to Ms. Lammere from Peggy Counter, the respondent denies that he told Dispatcher Lammere only to mark the call as a welfare check in her log. He denies he told Officer Bailey it was not necessary to write an incident report on this matter. However, the respondent did admit that he told him to note the incident on his cruiser log as a welfare check.

The appellant was aware that this incident has to do with a murder/suicide, and that an on going investigation was being conducted out of state. A fellow Dracut Police Officer who had a relationship with Ms. Doda took his life on the same day that she had been murdered. Ms. Lammere was informed that there was another individual, named George Mahaleris who also had a relationship with the murdered victim. Captain McNiff readily admits he never wrote a report about the above events to the Deputy Chief or the Chief.

In the second incident Captain McNiff was shift commander from 5:00 p.m. to 3:00 a.m. on July 17, 1999 at 6:17 p.m. Officer Bailey radioed to Dispatcher Lamerre to

inform her he had just stopped a motor vehicle on Loon Hill Road. Officer Bailey requested a query on the operator's name for license status and outstanding warrants. Officer Bailey also gave Ms. Lamerre a phone number to call so they could get a safety seat for a two or three year old child that was unrestrained in the vehicle. Ms. Lamerre notified Officer Bailey she could not reach anyone at that number, but that there was an outstanding default warrant against the operator for domestic assault and battery. Officer Bailey then notified the dispatcher he was going to place the operator under arrest. That's when Captain McNiff came on and told Officer Bailey not to do anything yet. Moments later Captain McNiff came back on the radio and told Officer Bailey the warrant was only for a misdemeanor and inform the operator to turn himself into the police station the next morning. This is a violation of departmental rules and regulations and must not be taken lightly.

The Respondent has met its burden of proving by a preponderance of the evidence that there is just cause to discipline the appellant by suspending him for three (3) days for violating the rules and regulations of the department, specifically section 1, paragraph G. Prohibited Conduct. Paragraph G-Item 3, Neglect of Duty. Being absent from assigned duty without leave or failing to take suitable and appropriate police action when any crime, public disorder or other incident requires police attention.

Based on the above the appellant's appeal is denied.

By vote of the Civil Service Commission ( Tivnan, O'Neil and Tierney, Commissioners) on November 30, 2000

A true record.   Attest:

France A. Lopez, Chairman

     A motion for reconsideration may be filed by either Party within ten days of the receipt of a Commission order or decision. A motion for reconsideration shall be deemed a motion for rehearing in accordance with M.G.L. c. 30A § 14(1) for the purpose of tolling the time for appeal. Based on the above

     Pursuant to M.G.L. c. 31 s. 44, any party aggrieved by a final decision or order of the Commission may initiate proceedings for judicial review under section 14 of chapter 30A in the superior court within thirty (30) days after receipt of such order or decision. Commencement of such proceeding shall not, unless specifically ordered by the court, operate as a stay of the commission's order or decision.
Notice to:

    Michael E. Williams, Esq.
    Stanley L. Weinburg, Esq.

# EXHIBIT "K"

# DEPARTMENT NOTICE

## August 29, 2003

### Any Captain or Lieutenant Interested in a Provisional Deputy Police Chief's Position Please Indicate By Signing Below

_Kevin McRichardson_

_Louis Panas_
Louis Panas, Chief



EXHIBIT 3
T. McUff
9/2/05

# EXHIBIT "L"

# COMMONWEALTH OF MASSACHUSETTS
## CIVIL SERVICE COMMISSION
### Bypass Appeal Form

**APPEAL PURSUANT TO**
M.G.L. c.31, sec. 2 (b)

1 Ashburton Place, Room 503
Boston, MA. 02108
(617) 727-2293

Petitioner Information

Thomas M. McNiff
_____
Name

6 Independence Drive
_____
Street Address

Tyngsborough, MA  01879
_____
City, State, Zip Code

(978) 649-1022
_____
Telephone Number

Police Captain
_____
Title/ Position

Dennis E. Piendak, Town Manager
Town of Dracut
_____
Appointing Authority (Employer)

62 Arlington Street
_____
Street Address

Dracut, MA  01826
_____
City, State, Zip Code

(978) 452-1227
_____
Telephone Number

July 6, 1975
_____
Civil Service Seniority Date

Pursuant to the provisions of M.G. L. c. 31, sec. 2b, I hereby appeal the decision, action or inaction of the Personnel Administrator that has caused actual harm to my employment status. *Note: You may attach any documents relevant to this appeal.*

## I. APPEAL OF BYPASS

I was bypassed for one or more of the following appointments:

- o Original
- o Promotional
- ⨯ Provisional
- o Temporary

I was advised by the Appointing Authority and /or Personnel Administrator that the reasons for this

bypass are:  I am allegedly unqualified for the position of acting Chief of Police. Town Manager Dennis E. Piendak has selected Lieutenant Kevin Richardson for the provisional appointment to Chief of Police.
(Attach decision, if known, include the names of the individuals selected over you.)

## II. OTHER

- o Examination questions
- o Training and experience
- o Medical

- o Residency requirement
- o Removal from Civil Service list
- o Testing facilities

I hereby certify that I have sent a copy of this appeal to the Personnel Administrator and the Appointing Authority within three days from the filing of this appeal. Make Money Orders or Bank Checks (NO PERSONAL CHECKS) payable to the Civil Service Commission-Commonwealth of Massachusetts for the amount of $25.00 (for Original Appointment) or $75.00 (for Promotional Appointment).

February 7 , 2005
_____
Date:

*Thomas M. McNiff*
_____
Signature

# RICHARD K. SULLIVAN

### ATTORNEY AT LAW

**300 EAST MAIN STREET
MILFORD, MASSACHUSETTS 01757**

TELEPHONE (508) 482-9777
FAX (508) 482-9888

February 7, 2005

COPY

**RECEIVED
FEB 08 2005
TOWN OF DRACUT
TOWN MANAGER**

The Commonwealth of Massachusetts
Civil Service Commission
One Ashburton Place - Room 503
Boston, MA 02108

RE: <u>Thomas M. McNiff v. Town of Dracut and Personnel
    Administrator</u>; appeal of provisional promotion bypass

Dear Sir/Madam:

Please be advised that I represent Thomas M. McNiff (hereafter
"McNiff"), a full-time, permanent captain employed by the Town of
Dracut in its Police Department. Although McNiff is the only
police captain employed by the Town, and the position of police
captain is the next lower title to that of Chief of Police,
Dennis E. Piendak, Town Manager of the Town, has appointed
lieutenant Kevin Richardson to the position of provisional Chief
of Police, claiming that McNiff is unqualified for that position.

Pursuant to the provisions of General Laws Chapter 31, Section
2(b), McNiff appeals his bypass for provisional promotion.
Enclosed herewith please find: (1) a Bypass Appeal Form and (2)
a check, in the amount of seventy-five ($75.00) dollars,
representing the filing fee for that appeal. Would you kindly
file and process this appeal.

                              Very truly yours,

                              Richard K. Sullivan

RKS/rjs
Encls.
cc:  Thomas M. McNiff
     Dennis E. Piendak,
        Town Manager
     Ruth N. Bramson,
        Personnel Administrator