# United States District Court
# District of Massachusetts

THOMAS MCNIFF,
        Plaintiff,

V.                                    CIVIL ACTION NO. 2005-10238-RBC[1]

TOWN OF DRACUT,
        Defendant.

## MEMORANDUM
## AND ORDER ON
## DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT (#16)

COLLINGS, U.S.M.J.

### I. INTRODUCTION

Plaintiff Thomas McNiff (hereinafter "McNiff") is a Captain in the Dracut Police Department.  In early December of 2002 he notified his supervisor, Police Chief Louis Panas (hereinafter "Chief Panas"), of his intent to retire in December, 2004.  McNiff has since withdrawn his 2002 retirement notice

---

[1]

  With the parties' consent, this case has been reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. §636(c).

consequent to Chief Panas' June 9, 2004 announcement of his own retirement.

Chief Panas' pending retirement led the defendant, the Town of Dracut (hereinafter "Dracut"), to take steps to appoint a Provisional (or Acting) Police Chief. With a view to becoming the new Provisional Police Chief, McNiff withdrew his retirement papers. The plaintiff's ambitions were dashed, however, when Lt. Kevin Richardson (hereinafter "Lt. Richardson") was ultimately chosen for the position of Acting Police Chief of Dracut.

In January of 2005 McNiff filed a five-count complaint against Dracut in the state court of Massachusetts. The claims alleged included violation of Mass. Gen. L. c. 151, §4(16) resulting from discrimination based on disability, violation of Article CXIV of the Massachusetts Constitution for discrimination based on handicap, violation of the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq.*, violation of the Equal Protection clause of the Fourteenth Amendment, and violation of Mass. Gen. L. c. 31, §15 for refusing to appoint the highest-ranking officer as Acting Chief of Police. The defendant removed the case to the this court in February, 2005.

In accordance with a Scheduling Order (#15) issued on September 20, 2005, the defendant filed a motion for summary judgment (#16) together with

a memorandum of law (#17) and a statement of undisputed facts with exhibits (#18) on November 21, 2005.  In due course the plaintiff filed an opposition to the dispositive motion (#20) accompanied by a memorandum in support (#21).  Thereafter Dracut submitted a request for oral argument on its motion (#22).

Having reviewed the parties' filings and the pertinent case law, the Court finds that the summary judgment motion may properly be decided on the papers without the need for a hearing.

## II. The Facts[2]

McNiff has held a number of positions within the Dracut Police Department, including Sergeant, Captain and Provisional Deputy Chief. (#18, Exh. C ¶6)  The plaintiff held the position of Provisional Deputy Chief from 1995 to 1998 until another police officer, Kevin Rowe, was appointed permanent Deputy Chief, thereby causing McNiff to return to the rank of Captain. (#18, Exh. C ¶7)

On December 3, 2002, McNiff notified Chief Panas, in writing, of his

---

[2]

The plaintiff has submitted no statement controverting the defendant's statement of material facts and so, to the extent that they are facts and not conclusions of law, they are deemed to be admitted. *See* Local Rule 56.1.  At times the defendant's material facts shall be essentially quoted herein verbatim, albeit without quotation marks.

decision to retire effective December 31, 2004. (#18, Exh. B at 34; Exh. F)  In June of 2004 McNiff verbally advised the town manager of his intent to retire in December of that same year. (#18, Exh. B at 34)  Such early notification of an expected retirement date is provided because under the terms of the then-existing union contract, notice had to be given prior to the town meeting which sets the budget for the following year. (#18, Exh. B at 34)  By giving such advance notice, the future retiree also became entitled to a 7.5% pay increase in base salary, which the plaintiff, in fact, received. (#18, Exh. B at 34-5; Exh. F)

By December of 2002 McNiff had accumulated more than 250 sick days. (#18, Exh. B at 41)  At that point in time, Dracut had in place a sick leave buy-back policy pursuant to which the Town "bought back" up to 120 sick days from the employee at the time of retirement. (#18, Exh. B at 140)  In other words, an employee would be paid for up to 120 sick days that the employee had on the books when he/she retired.  Dracut also had a policy which stated that if an individual chose to withdraw his/her notice of retirement, then said individual must repay any benefits received which accompanied the announcement of retirement. (#18, Exh. B at 42)

In June of 2004 Chief Panas announced his own plans to retire. (#18,

4

Exh. B at 38; Exh. D ¶5 and Exh. 1)  With the Chief of Police position becoming vacant, McNiff reconsidered his retirement plans.  (#18, Exh. B at 38)  Following the announcement by Chief Panas[3], the plaintiff had a conversation with Dennis Piendak (hereinafter "Piendak"), Town Manager for Dracut, during which McNiff indicated that he was interested in, and wanted to be considered for, the now-open Chief of Police position.[4]  (#18, Exh. B at 47)  On December 22, 2004, McNiff sent a letter to Chief Panas withdrawing his retirement.  (#18, Exh. B at 95)  As required when an individual revokes his retirement, the plaintiff repaid to Dracut the retirement benefits he had received, to wit, close to six thousand dollars including the 7.5% retirement raise he had been collecting.  (#18, Exh. B at 47-9; Exh. H)

In order to hold the chief's position on a full-time basis, McNiff knew that he would have to take the chief's exam.  (#18, Exh. B at 73)  In May, 2005, the plaintiff sat for the four hour civil service exam for the Dracut Police Chief's position, as did Lt. Richardson.  (#18, Exh. B at 73-4)  The plaintiff did not earn a passing grade, scoring only a 68% when a 70% or above was needed.  (#18,

---

[3] Chief Panas retired on February 19, 2005.  (#18, Exh. C ¶2)

[4] In his position as Town Manager, Piendak is the appointing authority for the position of Police Chief (and Provisional Police Chief) for Dracut, with such appointments being subject to the approval of the Board of Selectman.  (#18 ¶4)

5

Exh. B at 74-5)  Lt. Richardson did pass the exam and, on January 28, 2005, was appointed Provisional Chief, a non-permanent substitute for the Chief of Police position approved by the Civil Service Commission. (#18, Exh. B at 88)

The plaintiff appealed the decision to promote Lt. Richardson to Provisional Chief (#18, Exh. L), and has brought suit against Dracut for its decision to bypass him for the Chief of Police position.

McNiff contends that he was not appointed to the job as Provisional Chief due to the fact that he suffered from a disability, i.e., cancer. (#21)  The plaintiff suffered from skin cancer of the nose as well as prostate cancer, and, as a result of these conditions, underwent surgery twice. (#18, Exh. B at 100, 108) His cancer treatments did not require radiation or chemotherapy. (#18 ¶9)

McNiff did not advise his employer about his skin cancer surgery beforehand, but did have his wife inform Chief Panas immediately thereafter. (#18, Exh. B at 104)  At some point he provided  written notice stating only that he would be out of work for a certain period of time. (#18, Exh. B at 104) McNiff's skin cancer on his nose required four hours of outpatient surgery, followed by two weeks of wearing bandages on his nose, the removal of stitches and follow-up surgery to reduce the scarring. (#18 ¶10)  The plaintiff missed

an estimated 10 to 20 days from work due to the nose surgery for skin cancer. (#18 ¶11)  Upon his return to work McNiff never advised his employer that he needed any accommodations to do his job, or that he was limited in his abilities in any way. (#18 ¶12)

Prior to the surgery for prostate cancer in August, 2004, McNiff told the Town Manager only that he would be undergoing surgery and so would have to take a leave from work. (#18, Exh. B at 108)  Although the surgery required the plaintiff to take 36 days of sick leave, he felt the prostate surgery was a private matter and did not want to discuss it with his employer. (#18, Exh. B at 109)  McNiff did not explain to anyone the exact reason for his leave, and he also informed his doctor not to advise his employer as to the reason for the surgery.[5] (#18, Exh. B at 109)  The doctor's notes regarding the surgery and stating that McNiff could return to work as of October 12th do not indicate that he could not perform the essential functions of his job. (#18 ¶18)  Upon his return to duty, the plaintiff acknowledged that he did not advise his employer that he had any limitations on his return to work, nor did he request any

---

[5]

Indeed, it is undisputed that the defendant was not aware that the plaintiff had prostate cancer until after the filing of the lawsuit in this case. (#18 ¶14)

accommodations from his employer.[6] (#18 ¶¶25, 26)

The defendant contends that there were legitimate, non-discriminatory grounds for bypassing the plaintiff for the position as Provisional Chief. On November 16, 2004, Chief Panas sent a letter to Piendak setting forth reasons why Lt. Richardson and not McNiff - who, based on ranking, was in line to be appointed - should be promoted to the position of Acting Chief. (#13, Exh. C ¶16) According to Chief Panas, he was of the view that Lt. Richardson's extensive experience, qualifications and skills rendered him the best candidate for promotion. (#18, Exh. C ¶16 and Exh. 1)

Lt. Richardson graduated with honors when receiving both his Bachelor of Science degree and his Master of Science degree; he had over thirty years of law enforcement experience during which he solved several major crimes and garnered several awards, including the prestigious Massachusetts Police Association's Community Service Award for outstanding and dedicated service to the community and the George L. Hanna Memorial Award for Bravery Medal of Valor, the highest award a Massachusetts police officer can receive. (#18,

---

[6]

McNiff's position with the Dracut Police Department is as the police prosecutor assigned to the Lowell District Court. (#18 ¶21) He works weekdays from 7:00 A.M. to 3:00 P.M., and has filled that role since 1999. (#18 ¶22) As the Department's prosecuting Court Officer, the plaintiff is not required physically to handle prisoners. (#18 ¶24)

Exh. C ¶16 and Exh. 1)  In making his recommendation Chief Panas also took into consideration that when Lt. Richardson was appointed Provisional Deputy Chief on September 21, 2003, he was the sole individual to sign up for the position. (#18, Exh. C ¶16 and Exh. 1)  While serving in that position, Lt. Richardson demonstrated his administrative, management and leadership capabilities which were "exemplary". (#18, Exh. C ¶16 and Exh. 1)  Lt. Richardson had never been disciplined in all his years of service and had displayed no pattern of sick time abuse.  (#18, Exh. C ¶16 and Exh. 1)

On November 23, 2004, Panas wrote a second letter to Piendak detailing his reasons why McNiff was not qualified to hold the position of Acting Chief of Police in Dracut. (#18, Exh. C and Exh. 2)  At the outset was McNiff's pending retirement, which, at that time, had not been withdrawn. (#18, Exh. C and Exh. 2)  Next was the perceived abuse by the plaintiff of his sick leave, which was a primary source of concern for Chief Panas. (#18, Exh. C and Exh. 2)  McNiff's excessive use of sick days began on January 29, 2002, approximately two months after he announced his intended retirement, and continued on to the date of the letter. (#18, Exh. C and Exh. 2)  Bearing in mind Dracut's policy of buying back up to 120 sick days at the time of retirement, the plaintiff's usage of sick leave reduced the 250 sick days he had

9

accumulated at the time of his retirement announcement to 128 days as of the time of the appointment of the Provisional Chief. (#18 ¶40)  The plaintiff's use of sick time reflects that from January 29, 2002 to November 2004 he took 152 sick days, 37 of which could be justified by a doctor's note for surgery, leaving 115 sick days unexplained. (#18 ¶42)  The two notes by McNiff's doctor were the only written documentation received by the Town for the plaintiff's use of sick days from January 2002 through November 2004. (#18 ¶44)  The letters do not indicate the exact reason for the usage of sick time, nor do they explain the plaintiff's usage of sick time before and after the period of August 25 to October 12, 2004, time taken for his prostate surgery. (#18 ¶45)

In addition to the large number of undocumented days, McNiff usually called in sick on Tuesdays, Wednesdays, or Thursdays. (#18, Exh. C and Exh. 2)  A comparison of the sick days used with the subsequent overtime shifts during the years 2002 through 2004 reveals a clear pattern of usage of multiple sick days in the middle of the week permitting work on overtime shifts on the weekends without violating the Department's rule prohibiting assignment to overtime or pair detail shifts within two days of a sick day. (#18 ¶43)  From Chief Panas' perspective, the pattern of sick days taken by McNiff was both abusive and excessive. (#18, Exh. C and Exh. 2)

Also playing an important part in Chief Panas' recommendation not to appoint the plaintiff as Provisional Chief was McNiff's work history. (#18, Exh. C and Exh. 2)  On June 9, 1997, Chief Panas commenced an investigation regarding the plaintiff's involvement in the personnel records of his [McNiff's] wife who was also an employee of the Dracut Police Department. (#18, Exh. C and Exh. 2)  While McNiff was Provisional Deputy Chief, he violated the conflict of interest law by instructing a Sergeant to alter his wife's sick time accrual records. (#18, Exh. C and Exh. 2)  A written reprimand was issued and placed in McNiff's personnel record. (#18, Exh. C and Exh. 2)

On September 10, 1999, the plaintiff was issued a three-day suspension by Chief Panas for his violation of the Rules and Regulations of the Dracut Police Department, Neglect of Duty. (#18, Exh. C and Exh. 2)  It was determined that the plaintiff failed to take suitable and appropriate police action on June 2, 1999 in that he did not report and did not allow another officer and the duty dispatcher to report "an incident that could of (sic) had some relevance to an important police investigation." (#18 ¶¶51, 52)  Further, it was determined that the plaintiff failed to take suitable and appropriate police action on June 17, 1999 because it was found that the plaintiff told an officer to not arrest an individual with an outstanding warrant for (1) assault and (2)

11

threatening to commit a crime, but rather to allow the individual to turn himself in at a later time. (#18 ¶53)  The three-day suspension was appealed by McNiff but upheld after a hearing before the Civil Service Commission. (#18 ¶¶54, 55)

Lastly, that McNiff did not sign up for the Provisional Deputy Chief position in August, 2003, indicated to Chief Panas that the plaintiff was not interested in a higher management position. (#18, Exh. C and Exh. 2)  Also adding to Chief Panas' perception of the plaintiff's disinterest was the fact that since McNiff had departed the position of Provisional Deputy Chief which he had held from 1995 to 1998, he had never submitted any suggestions or input from which one could infer that the plaintiff was interested in becoming part of the management of the Department or was even interested in the welfare of the Police Department. (#18, Exh. C and Exh. 2)

### III. The Claims

In Count I of his complaint, the plaintiff alleges that he was discriminated against due to his handicap in violation of Mass. Gen. L. c. 151B, §4 which states that it is unlawful to refuse to "advance in employment [an individual] . . . because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved

. . .".  McNiff asserts that he was "a qualified person in that he met the requirement of being the highest ranking officer" and that because Lt. Richardson was, instead, promoted, the plaintiff was "subject to an adverse action against him . . . [and he] was treated less favorably due to his handicap." (#5 ¶¶19-21)

It is alleged in Count II that Dracut violated Article CXIV of the Massachusetts Constitution[7], which protects against the discrimination of handicapped individuals, when the Police Department refused to promote him to the position of Acting Chief, a decision which was purportedly due to his cancer.

In Count III, the plaintiff charges a violation of the Americans with Disabilities Act[8] in that allegedly he was subjected to an adverse action because of his disability and was "treated less favorably than persons who were not handicapped." (#5 ¶30)

---

[7]

Article CXIV protects against discrimination of handicapped individuals: "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth." Mass. Constitution Amend. Art. CXIV.

[8]

Under the ADA, "No covered entity shall discriminate against a qualified individual with a disability because of the disability of sch individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges." Title 42 U.S.C. §12111(a).

A claim of violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution is alleged in Count IV.[9]

In the final count of the complaint, Count V, the plaintiff alleges that Dracut, or, more specifically, Piendak as the Town Manager, was required by Mass. Gen. L. c. 31, §15[10] to "appoint the highest-ranking officer based upon civil service ranking as interim Chief of Police." (#5 ¶38)  By having failed to appoint McNiff, Dracut is said to have knowingly violated state law.

### IV. The Summary Judgment Standard

The purpose of summary judgment "'is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico,* 394 F.3d 40, 42 (1 Cir., 2005) (quoting *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1 Cir., 1992)); *see also Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1 Cir., 1990).  The party moving for summary

---

[9]

At this point, McNiff has specifically waived his Equal Protection claims. (*See* Defendant's Local Rule 56.1 Concise Statement of Material Facts #18 ¶1).

[10]

"An appointing authority may, with the approval of the administrator . . . make a Provisional promotion of a civil service employee in one title to the next higher title in the same departmental unit . . . . If there is no such employee in the next lower unit who is qualified for and willing to accept such a provisional promotion the administrator may authorize a provisional promotion of a permanent employee in the departmental unit without regard to title."  Mass. Gen. L. c. 31, §15.

judgment bears the initial burden of asserting the absence of a genuine issue of

material fact and "support[ing] that assertion by affidavits, admissions, or other

materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19

(1 Cir., 2003); *De La Vega v. San Juan Star, Inc.,* 377 F.3d 111, 115-116 (1 Cir.,

2004). "'Once the moving party avers the absence of genuine issues of material

fact, the nonmovant must show, through materials of evidentiary quality, that

such a dispute exits.'" *Cordero-Soto v. Island Finance Inc.,* 418 F.3d 114, 119 (1

Cir., 2005) (quoting *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 66 (1 Cir., 2004));

*see also, Mulvihill,* 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49,

53 (1 Cir., 2000)).

When considering whether to grant summary judgment, the Court must

determine whether:

> ...the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with
> the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party
> is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

The Court looks to "the record on summary judgment in the light most

favorable to the nonmovant." *Hoffman v. Applicators Sales and Service, Inc.*, 439

F.3d 9, 11 (1 Cir., 2006) (citing *Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 50 (1 Cir. 2000)). All reasonable inferences will be drawn in the favor of the nonmoving party. *Poulis-Minott v. Smith,* 388 F.3d 354, 361 (1 Cir., 2004); *see also Alliance of Auto Mfrs. v. Gwadosky*, 430 F.3d 30, 34 (1 Cir., 2005), *cert. denied,* -S.Ct.-, 2006 WL 684045 (2006); *Santoni v. Potter*, 369 F.3d 594, 598 (1 Cir., 2004); *Mulvihill,* 335 F.3d at 19; *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 13 (1 Cir., 2003).

Despite this "notoriously liberal" standard, *Mulvihill,* 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat." *Kearney v. Town of Wareham*, 316 F.3d 18, 22 (1 Cir., 2002). A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Poulis-Minott,* 388 F.3d at 362-63 (quoting *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1 Cir., 1993)); *Rojas-Ithier,* 394 F.3d at 42; *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1 Cir., 2004). Mere speculations raised by the nonmoving party that are unsubstantiated will not be sufficient to defeat summary judgment. *Nieves-*

*Luciano v. Hernandez-Torres,* 397 F.3d 1, 5 (1 Cir., 2005).

In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *De La Vega v. San Juan Star, Inc.,* 377 F.3d 111, 115 (1 Cir., 2004); *Rojas-Ithier*, 394 F.3d at 42.

The focus at the summary judgment phase "'should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact.'." *Rivas Rosado v. Radio Shack, Inc.,* 312 F.3d 532, 535 (1 Cir., 2002) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430-31 (1 Cir., 2000)); *see also Nieves-Luciano*, 397 F.3d at 4; *Rojas-Ithier*, 394 F.3d at 42. The party objecting to summary judgment must set forth specific facts proving a genuine issue of material fact in order to "deflect the swing of the summary judgment scythe." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1 Cir., 2005) (quoting *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1 Cir., 2003)). Where "the non-moving party rests 'merely upon conclusory allegations,

improbable inference, and unsupported speculation,'" summary judgment will be appropriate. *Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21 (1 Cir., 2006) (quoting *Benoit v. Technical Mtg. Corp.,* 331 F.3d 166, 173 (1 Cir., 2003) (further internal citations omitted)).  Moreover, the party objecting to summary judgment may not merely rest upon "the mere allegations or denials of [their] pleading."  Fed. R. Civ. P. 56(e); *Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 425 F.3d 67, 83 (1 Cir., 2005).  Instead, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## V. Discussion

The place to start is with the sole federal claim alleged.  McNiff charges Dracut with discriminating against him due to his "disability," which he contends is the cancer from which he has suffered.  In order to recover on a disability discrimination claim under the ADA, certain criteria must be met by the complainant, and these elements must be proven by a preponderance of the

18

evidence: "First, that he [or she] was disabled within the meaning of the Act[11].

Second, that with or without reasonable accommodation he [or she] was able

to perform the essential functions of [the] job[12]. And, third, that the employer

discharged him [or her] in whole or in part because of his [or her] disability."

*Jacques v. Clean-Up Group, Inc.,* 96 F.3d 506, 511 (1 Cir., 1996) (quoting *Katz*

*v. City Metal Co, Inc.,* 87 F.3d 26, 30 (1 Cir., 1996)). Alternatively, a claim may

be established by utilizing the burden shifting method explained in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under that analysis, the plaintiff

must prove, in addition to the aforementioned three criteria, two other prongs

by a preponderance of the evidence: "(iv) [that he or she] was replaced by a

non-disabled person or was treated less favorably than non-disabled employees;

and (v) [that the disabled employee] suffered damages as a result." *Jacques,* 96

F.3d at 511. Only when all of these criteria are met can an employee win on

the grounds of disability discrimination.

To meet the first criterion, McNiff contends that his cancer is a disability

---

[11]

The ADA states that a 'disability' means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2).

[12]

The "essential functions" of a job are "the fundamental job duties of the employment position the individual with a disability holds [and] does not include the marginal functions of that position." 29 C.F.R. §1630.2(n)(1)

within the meaning of the ADA and that by promoting Lt. Richardson instead of him, Dracut discriminated against him because of his disability. Although the ADA does not define the term "disability" with specificity, it states that "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual constitutes a disability. Title 42 U.S.C. §12102(2). Courts have observed that "substantially limits" is a broad, sweeping phrase, and, as a consequence, the Supreme Court has striven to add more contour to the definition.

The Court has stated that "[m]erely having an impairment does not make one disabled for the purposes of the ADA," and that a plaintiff must demonstrate that "the impairment limits a major life activity." *Toyota Motor Mfg., Kentucky Inc. v. Williams,* 534 U.S. 184, 195 (2002). When deciding whether a claimant has met this burden, the Court instructed that "the following factors should be considered: '[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact resulting from the impairment.'" *Toyota*, 534 U.S. at 196 (*quoting* 29 CFR §1630.2(j)(2)(i)-(iii)). Major life activities have been defined in 45 C.F.R. 84.3

j(2)(ii) to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."

McNiff provided the defendant with medical documentation to support only 37 of the 152 sick days that he took following his announced plan to retire. According to the plaintiff, he took approximately 37 days off from work due to surgery for prostate cancer, and he missed at least 10 but not more than 20 days when he underwent skin cancer surgery on his nose. Although he undeniably suffered from cancer, McNiff has not satisfied the requirement of "demonstrat[ing] the impairment of a major life activity." *Toyota*, 534 U.S. at 195.

It is clear that in order to qualify as impairing the major life activity of working, a disability must cause one to take a substantial amount of sick leave. The First Circuit determined that an employee's five week absence and his inability to run meetings for four months after the leave, both of which stemmed from his depression, was not enough and that the "impairment must be a significant one to trigger the Act's obligation." *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1 Cir., 1997). In a comparable case the Second Circuit found that a plaintiff who could establish that he was hospitalized for 30 days,

spent six months recuperating at home, and was placed on light duty when he did return to work did not trigger the ADA because such time "is too short a duration and too vague an extent to be 'substantially limiting.'" *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2 Cir., 1998), *cert. denied,* 526 U.S. 1018 (1999) (citations omitted).  Although McNiff can prove that he was out of work for at least 37 days due to his prostate cancer and 10 but not more than 20 days due to his skin cancer, such relatively short periods of leave do not trigger the protections afforded by the ADA under the case law.

Moreover, the plaintiff's claim of cancer itself is not enough to fulfill the ADA requirement of there being a substantial limitation on major life activity. While the number of cases in this Circuit are limited, other Circuits, all with cases similar in outcome, have clarified the relationship between cancer as a disability and the ADA.  It has been held that although "cancer qualifies as an impairment . . . it does not necessarily follow that [one] is also 'disabled' within the meaning of the ADA." *Pimental v. Dartmouth-Hitchcock Clinic,* 236 F. Supp.2d 177, 182 (D.N.H., 2002). In *Pimental,* summary judgment was entered against a nurse suffering from breast cancer on the basis that if an individual undergoes corrective procedures, either through medication or other measures,

then the individual's impairment cannot substantially limit a major life activity. Following this line of reasoning, McNiff's surgeries removing his cancers could well be characterized as corrective procedures. Having undergone the successful surgeries and having returned to his job with no limitations or requested accommodations, the plaintiff is hard-pressed to argue that his illness substantially limits his major life activity of working.

The Eleventh Circuit has come to a similar conclusion. In assessing whether an employee's suffering due to the chemotherapy treatments he was undergoing was enough to trigger the protection of the ADA, the Court concluded that "[w]hile the side effects . . . may qualify as 'physical impairments' under the ADA . . . such impairments did not substantially limit [the plaintiff's] ability to care for himself or to work." *Gordon v. E.L. Hamm & Associates, Inc.,* 100 F.3d 907, 912 (11 Cir., 1996), *cert. denied*, 522 U.S. 1030 (1997). As previously noted, McNiff did not have to undergo chemotherapy or radiation treatment for his cancer; the surgeries alone were the sole treatment. The plaintiff recuperated for discrete periods of time, approximately 10-20 days after his skin cancer surgery and a little over a month after the surgery for his prostate cancer, and then returned to full duty. If ongoing treatment is not

enough to bring the ADA protections into play, then surely successful, relatively short-term treatment fails to cross the hurdle.  It also must be noted that neither Piendak nor anyone else at the Dracut Police Department was informed of the reason for the plaintiff's second surgery.  McNiff admittedly never disclosed his prostate cancer to his employer; indeed, the defendant became aware of this illness only at the time of this suit.  The plaintiff viewed his cancer as a "private matter," and instructed his doctor, if asked, not to inform his employer.

In order to state an ADA claim, McNiff also must demonstrate that, because of his disability, he was "subject to an adverse employment action." *Benoit v. Technical Mfg. Corp.,* 331 F.3d 166, 175 (1 Cir., 2003).  In *Benoit,* the Court held that because it was undisputed that the plaintiff's employer made the decision to terminate him without knowledge of his back injury, "no reasonable fact finder could conclude that [the defendant] retaliated against [the plaintiff]." *Benoit,* 331 F.3d at 177.  Similarly, since Piendak made the decision to promote Lt. Richardson instead of McNiff without any knowledge of the plaintiff's prostate cancer, no discrimination can be said to have occurred.  If Dracut did not know about the plaintiff's "disability", there can be no causal

connection established between that disability and any alleged discrimination.

In order to be protected under the ADA, McNiff must show that he was bypassed for promotion on account of his cancer. Assuming for present purposes that the plaintiff can make out a prima facie case of discrimination under the *McDonnell Douglas* framework:

> [T]he employer must then articulate a legitimate, non-discriminatory reason for the adverse employment action . . . Upon the emergence of such an explanation, it falls to the plaintiff to show both that the employer's "proffered reason is a sham, and that discriminatory animus sparked [its] actions."

*Cruz-Ramos v. Puerto Rico Sun Oil Co.,* 202 F.3d 381, 384 (1 Cir., 2000) (quoting *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 19 (1 Cir., 1999)(further citation omitted)).

Here, the defendant has clearly articulated a "legitimate, non-discriminatory reason for the adverse employment action." Lt. Richardson was promoted over McNiff for a multitude of reasons: Lt. Richardson was more qualified, having graduated with honors when receiving both his Bachelors and Masters degrees; Lt. Richardson's hard work and dedication earned him several awards, including the George L. Hanna Memorial Award for Bravery Medal of Valor, the highest award a Massachusetts police officer can receive; while McNiff did not pass the compulsory chief's exam, Lt. Richardson did, earning high marks. Furthermore,

25

Chief Panas enumerated several other reasons why McNiff was unfit for the job of chief: the plaintiff's patterned practice of abusing sick leave; that the plaintiff was reprimanded on two separate occasions and was suspended for one three-day period; that the plaintiff did not express interest in the management of the police department.

The record is utterly bereft of any evidence or argument proffered by McNiff to counter the defendant's legitimate, non-discriminatory reasons for promoting Lt. Richardson, much less to prove that those reasons were a sham. "A plaintiff's subjective belief that he suffered an adverse employment action as a result of discrimination is not enough to withstand a motion for summary judgment." *Hernandez Marrero v. Crowley American Transport, Inc.,* 206 F. Supp.2d 279, 290 (D. P.R., 2002) (holding that an employee failed to establish discrimination when his employer chose to promote other more-qualified employees) (citing *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1 (1 Cir., 1998)(summary judgment granted in favor of the defendant after stating that plaintiff employee's *mere belief* that statements made by the employer was insufficient in demonstrating a discrimination claim)).  Because no genuine issue of material fact exists, Dracut is entitled to the entry of summary judgment

in its favor on the plaintiff's ADA claim.

There is no need to go further.  With the sole remaining federal claim having been resolved in favor of the defendant, the remaining claims arising under state law shall be remanded to the Middlesex Superior Court, Commonwealth of Massachusetts for adjudication.

### VI. Conclusion and Order

For the reasons stated, it is ORDERED that Defendant's Motion For Summary Judgment be, and the same hereby is, ALLOWED.  Judgment shall enter for the defendant on Count III.  The judgment shall also provide that Count IV (which has been withdrawn) be dismissed and the remaining state law claims be remanded to the Middlesex Superior Court.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

May 30, 2006.

27